Timothy J. Preso, MT Bar No. 5255
Joshua R. Purtle, MT Bar No. 46334239
Earthjustice
313 East Main Street
Bozeman, MT  59715
Phone: (406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
jpurtle@earthjustice.org

Michael S. Freeman (*admitted pro hac vice*)
Alex J. Hardee (*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO  80202
Phone: (303) 623-9466
Fax: (303) 623-8083
mfreeman@earthjustice.org
ahardee@earthjustice.org

*Counsel for Plaintiffs Montana Wildlife Federation, The Wilderness Society, National Audubon Society, National Wildlife Federation, and Montana Audubon*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| MONTANA WILDLIFE FEDERATION; THE WILDERNESS SOCIETY; NATIONAL AUDUBON SOCIETY; NATIONAL WILDLIFE FEDERATION; and MONTANA AUDUBON, | ) ) ) ) ) ) ) Case No. 4:18-cv-00069-BMM |
| Plaintiffs, | ) **FIRST AMENDED** ) **COMPLAINT** |
| v. | ) ) |
| RYAN ZINKE, in his official capacity as Secretary of the Interior; DONATO JUDICE, in his official capacity as Montana Bureau of Land Management Deputy State Director; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**INTRODUCTION**

1.      This case challenges the Trump Administration's systematic disregard of legally binding land management plans adopted to protect the greater sage-grouse.  Greater sage-grouse once numbered in the millions across much of the western United States.  The Lewis and Clark expedition and numerous other nineteenth-century observers commented on the birds' abundance, and the grouse is an integral part of the western landscape.  In recent decades, however, grouse populations have plummeted throughout their range due to habitat loss and fragmentation caused by oil and natural gas development and other activities.

2.      To preserve the greater sage-grouse, and prevent it from being listed as a protected species under the Endangered Species Act (ESA), the Bureau of Land Management (BLM) and other federal agencies undertook an unprecedented four-year effort to develop comprehensive conservation plans for the grouse. Those plans were adopted in 2015 and establish protections for the species covering public lands across 10 western states.  Among other measures, the plans direct that in issuing leases for oil and gas development, BLM prioritize leasing lands outside of the bird's habitat in order to "limit future surface disturbance" in

1

that habitat and "guide development to lower conflict areas and as such protect important habitat" for the grouse.[1]

3.     Since the new presidential administration took office in 2017, the Interior Department has systematically violated the 2015 plans as part of the administration's policy of encouraging fossil fuel production on public lands. First, Defendants have issued several decisions, including a guidance document, Instruction Memorandum 2018-026 (the 2018 IM), which purport to reinterpret the plans' requirement to prioritize oil and gas leasing outside of greater sage-grouse habitat. The 2018 IM and related decisions disregard the plain language and purpose of the 2015 plans, and would render their prioritization requirements meaningless. Second, BLM in late 2017 and 2018 has offered hundreds of new oil and gas leases covering hundreds of thousands of acres of greater sage-grouse habitat across Montana, Nevada, Wyoming, and other states. This leasing, done pursuant to national Interior Department directives, flatly disregarded the plans' requirement to prioritize leasing outside of greater sage-grouse habitat.

4.     The 2018 IM and related directives, as well as the BLM lease sales, violate the Federal Land Policy and Management Act (FLPMA) because they do

---

[1] BLM, Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region (Rocky Mountain ROD) at 1-25 (Sept. 2015), https://goo.gl/UD5bGu.

2

not conform with the 2015 plans.  *See* 43 U.S.C. §§ 1712(e), 1732(a); 43 C.F.R.

§ 1610.5-3.  In addition, BLM has violated the National Environmental Policy Act

(NEPA) by not analyzing and disclosing the impacts of those decisions, and by

failing to consider alternatives that would have limited new oil and gas leasing in

sage-grouse habitat.  *See* 42 U.S.C. §§ 4332(2)(C), (E); 40 C.F.R. § 1508.9.

### JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal

question jurisdiction) and 5 U.S.C. § 702 (Administrative Procedure Act (APA)).

6.    An actual controversy exists between the parties within the meaning

of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive

relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because

Plaintiffs Montana Wildlife Federation and Montana Audubon are based in this

district, Plaintiffs The Wilderness Society and National Wildlife Federation have

offices in this district, Defendant Donato Judice resides in this district, and

Defendants BLM and the U.S. Department of the Interior maintain offices in this

district.  In addition, a substantial part of the events giving rise to this case

occurred in this district, including BLM's December 2017 and March 2018 oil and

gas lease sales.

8.     Venue is proper in the Great Falls Division of this Court because this case challenges oil and gas leases offered in Glacier, Liberty, Hill, Chouteau, Blaine, Phillips, and Valley Counties, which are covered by the Great Falls Division.  L.R. 1.2(c)(3).

## PARTIES

9.     Plaintiff MONTANA WILDLIFE FEDERATION (the Federation) works to empower hunters, anglers, and other conservationists in order to safeguard fish and wildlife, land and water, and public access for hunting, fishing, wildlife watching, and other recreation.  The Federation, which is incorporated in Montana, has offices in Helena, Billings, and Missoula, and thousands of members across the state.  On behalf of its affiliate organizations, members and supporters statewide, the Federation was involved in the creation of BLM's 2015 sage-grouse conservation plans.  Federation members and supporters submitted hundreds of comments in support of the plans, participated in public meetings, and spoke up in the press.  The Federation has a long history of engagement in sage-grouse conservation, including decades of active participation in the adoption of hunting regulations to ensure that the species is sustainably harvested.  Since 2004, the Federation has advocated for state-level sage-grouse management plans, worked for better oversight and funding for habitat protection, and supported on-the-ground sage-grouse conservation activities.  For example, the Federation advocated

4

extensively during the 2015 Montana state legislative session to get the state sage-grouse plan in place and fully funded.  Since 2015, the Federation also has worked with local rod and gun clubs and other organizations to educate sportsmen and women on the 2015 federal sage-grouse plans and mobilize volunteers to do on the ground sage-grouse conservation work.

10.   Plaintiff THE WILDERNESS SOCIETY (TWS) is a national conservation organization devoted to protecting wilderness and inspiring Americans to care for wild places.  It contributes to better protection, stewardship, and restoration of public lands, preserving the nation's rich natural legacy for current and future generations.  The Wilderness Society has an office in Bozeman, Montana, and another office in Missoula, Montana, with more than one million members and supporters nationwide, including more than 3,900 in Montana.  TWS has been actively engaged in the federal planning efforts for conservation of the greater sage-grouse since their inception, including submission of scoping comments in April 2012, when the federal planning efforts formally commenced; commenting on the draft plans in 2013 and 2014; submitting additional comments and administrative protests on the proposed plans in 2015; and submitting additional recommendations throughout the process. TWS also met with federal and state representatives, and worked with members of the conservation community and other stakeholders to advocate for completion of the plans and for

5

implementing a strong, science-based, landscape-level approach to conserving the greater sage-grouse and the sage-grouse ecosystem.  TWS members, responding to notifications from its WildAlert network, have submitted thousands of comments on the federal plans and also urged Congress to support the completion and implementation of these plans.

11.    Plaintiff NATIONAL WILDLIFE FEDERATION (NWF) works to protect, restore, and connect wildlife habitat, advance wildlife management, and connect Americans with wildlife.  NWF's mission is to inspire all Americans to ensure that wildlife thrive in a rapidly-changing world.  NWF has a regional office in Missoula and more than 2,000 members in Montana.  On behalf of its more than 6 million members and supporters nationwide, NWF played a leading role in the creation of BLM's 2015 sage-grouse conservation plans.  Tens of thousands of NWF members and supporters have submitted comments supporting the plans.  In Montana, NWF early on recognized the downward spiral of sage-grouse populations and helped catalyze the state's first sage-grouse management plan, adopted by Montana Fish, Wildlife and Parks (FWP) in 2004.  NWF also supported the development of a new Montana plan in 2013.  Also in 2013, NWF joined with other conservation groups to support the creation and funding of the Montana Sage Grouse Oversight Committee, which coordinates the work of Montana state agencies to implement sage-grouse conservation strategies.  Over

many years, NWF has organized citizen science programs in Montana, Nevada, and Wyoming to count sage-grouse on their spring breeding areas, known as leks. Such counts remain the primary mechanism for assessing trends in sage-grouse populations. Since 2015, NWF also has partnered with Montana FWP, BLM, and private landowners to organize youth crews to flag fences in sage-grouse habitat, which minimizes fence strikes by sage-grouse and helps reduce sage-grouse mortality. NWF and Montana Wildlife Federation are independent organizations with separate boards and memberships.

12.     Plaintiff NATIONAL AUDUBON SOCIETY is a national nonprofit conservation organization exempt from tax under Section 501(c)(3) of the Internal Revenue Code dedicated to protecting birds and the places they need, today and tomorrow, throughout the Americas using science, advocacy, education, and on-the-ground conservation. Audubon has advocated for birds on public lands for over 110 years and has been deeply engaged in protecting the greater sage-grouse for decades. Audubon has over 1.2 million members nationwide, with 4,789 of those members in Montana. Audubon and its members participated in every stage of BLM's national sage-grouse planning effort, which ultimately led to the 2015 plans, including performing the foundation of the original population modeling. Audubon played an important role in the collaborative conservation efforts, working with conservationists, ranchers, sportsmen, business owners, mineral

7

developers, miners, state governments, federal agencies and Congress.  In

Montana, much of Audubon's advocacy has focused on the greater sage-grouse

and the sagebrush ecosystem.  Audubon views the science-based management of

greater sage-grouse as critical to Montana's sagebrush ecosystem and the more

than 350 plants and animal species that depend on it.

13.     Plaintiff MONTANA AUDUBON is a Montana-based nonprofit

organization working to promote appreciation, knowledge and conservation of

Montana's native birds, other wildlife, and natural ecosystems to safeguard

biological diversity for current and future generations.  Montana Audubon has long

advocated for protection of the greater sage-grouse and its habitat in this state.

Montana Audubon served on Governor Steve Bullock's 12-member Greater Sage-

Grouse Habitat Conservation Advisory Council, the organization advocated

extensively during the 2015 Montana state legislative session to get the state's

sage-grouse program established and fully funded, and the organization was active

in supporting BLM's development of all of the 2015 resource management plans in

Montana.  Montana Audubon has offices in Billings and Helena, and thousands of

members statewide.  Montana Audubon is an independent entity from the National

Audubon Society.

14.     Plaintiffs have campaigned for years to protect remaining sage-grouse

populations and preserve their habitat, including submitting comments and

8

participating in development of the 2015 plans, supporting scientific research, and advocating for other protections.  Plaintiffs also filed comments and administrative appeals of the leasing decisions challenged in this case.

15.     Plaintiffs' members and staff live, work, hunt, and recreate on lands throughout the western United States that are protected under the 2015 plans, and which provide important habitat for the greater sage-grouse, including lands in Montana affected by the oil and gas leasing decisions challenged in this case. Plaintiffs' members and staff regularly observe and study the grouse and the ecosystem on which it depends, and are keenly interested in protecting it. Defendants' violations of FLPMA and NEPA have caused and will continue to cause recreational, aesthetic, scientific, and educational injuries to Plaintiffs and their members, which this Court can redress.

16.     Defendant RYAN ZINKE is the Secretary of the Interior.  Plaintiffs sue Secretary Zinke in his official capacity.  Secretary Zinke oversees oil and gas development on federal and tribal lands, and is responsible for the oil and gas leasing decisions challenged here.  Secretary Zinke also issued some of the policy directives challenged in this case.

17.     Defendant DONATO JUDICE is the Montana BLM Deputy State Director for Energy, Minerals and Realty.  Deputy Director Judice approved the

Montana oil and gas lease sales implementing the national decisions challenged here.  Plaintiffs sue Deputy Director Judice in his official capacity.

18.     Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States government in the Department of the Interior.  BLM is responsible for managing publicly owned lands and minerals in accordance with federal law.  BLM issued many of the decisions that are challenged here.

19.     Defendant U.S. DEPARTMENT OF THE INTERIOR is an executive branch department and is the parent agency of BLM.

### BACKGROUND ON THE GREATER SAGE-GROUSE



20.     The greater sage-grouse once existed in great numbers across vast expanses of the North American sagebrush steppe.  It is estimated that before European settlement, grouse populations totaled millions of birds, with habitat extending for as much as 460,000 square miles over an area now covered by thirteen western states and three Canadian provinces.[2]  Plains Indian tribes mimicked the birds in ceremonial dances, and numerous historical accounts by

---

[2] Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List Greater Sage-Grouse (*Centrocercus urophasianus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858, 59,864 (Oct. 2, 2015).

settlers and explorers describe the grouse.  In their journals, Lewis and Clark recorded the grouse (which they called the "Heath Cock") in 1805 and 1806 as they traveled across what is now Montana and points west: "The Heath Cock or cock of the Plains is found in the Plains of Columbia and are in great abundance from the enterance [sic] of Lewis's river to the mountains which pass the Columbia between the Great falls and Rapids of that river."[3]  Other nineteenth-century travelers reported flocks of sage-grouse so large they "darkened the skies" when taking flight.[4]  Residents in some areas report that as late as the 1950s, "they would actually darken the sky.  It was like clouds coming over."[5]

21.    Since then, greater sage-grouse populations "have declined dramatically," dropping an average of two percent annually over the 42 years

---

[3] Mark Behan, *Sage Grouse, Centrocercus urophasianus*, Discovering Lewis & Clark (June 2004), http://www.lewis-clark.org/article/1904 (last visited Apr. 27, 2018).

[4] Theo Stein, *Science on parade as grouse researchers flock to Elko*, U.S. Fish & Wildlife Serv. (June 19, 2014), https://www.fws.gov/greatersagegrouse/06192014_Elko_Workshop.php#.WodQ2 YWcGcw.

[5] Jennifer Sandmann, *So many birds, they darkened the sky*, Magic Valley Times-News (Jan. 22, 2010), http://magicvalley.com/so-many-birds-they-darkened-the-sky-april/article_5fd28456-07b0-11df-b969-001cc4c03286.html.

between 1965-2007.[6]  The current population is estimated at less than ten percent

of historic levels.  And today, grouse occupy only about half of their historic range.

80 Fed. Reg. at 59,864.



22.     Those declines have resulted from loss and fragmentation of the

sagebrush steppe habitat on which the grouse rely.  *Id.* at 59,867.  "Sage-grouse

depend on large areas of contiguous sagebrush to meet all seasonal habitat

requirements."  *Id.* at 59,866.  Studies have "emphasize[d] the landscape nature of

---

[6] D.J. Manier et al., U.S. Geological Survey, *Summary of Science, Activities, Programs, and Policies that Influence the Rangewide Conservation of Greater Sage-Grouse, Open-File Report* at 11, 16 tbl.2 (2013), https://pubs.usgs.gov/of/2013/1098/OF13-1098.pdf.

the species," finding that migratory populations of the grouse may use areas exceeding 1,000 square miles (667,185 acres). *Id.*

23. The greater sage-grouse also is an "umbrella species," meaning that protecting it also benefits an estimated 350 other species that depend on the same "sagebrush sea" habitat.[7] These include imperiled birds like the Brewer's sparrow and loggerhead shrike, mammals such as the kit fox and pygmy rabbit, and a variety of reptiles.[8]

24. The Interior Department's own research consistently identifies oil and gas development as one of the "primary threats" to greater sage-grouse. 80 Fed. Reg. at 59,858.[9] BLM's National Technical Team, a team of the agency's scientific experts, reported in 2011 that impacts to grouse from oil and gas development "are universally negative and typically severe."[10] The roads, power

---

[7] BLM, *Greater Sage-Grouse: Conserving an Icon of the American West*, https://www.blm.gov/programs/fish-and-wildlife/sage-grouse (last visited Apr. 26, 2018).

[8] U.S. Fish & Wildlife Serv., *Greater Sage-Grouse as an Umbrella Species in the Great Basin* at 8-14, https://goo.gl/AEbM1p (last visited Apr. 26, 2018).

[9] *See also* Manier et al., *supra* note 6, at 51–59 (discussing oil and gas as an "important threat"); U.S. Forest Serv., *Greater Sage-Grouse 101* at 1, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3839884.pdf (last visited Apr. 26, 2018) (finding "[m]ajor threats" to include habitat "fragmentation due primarily to energy development").

[10] Sage-Grouse National Technical Team, *A Report on National Greater Sage-Grouse Conservation Measures* at 18–24 (Dec. 21, 2011) (Sage-Grouse National Technical Team Report), https://goo.gl/wHjyDG.

14

lines, waste pits, and other disturbance associated with oil and gas development all affect grouse populations and their breeding success.[11] Studies have found that greater sage-grouse "[b]reeding populations are severely reduced at [oil and gas] well pad densities commonly permitted."[12] Moreover, sage-grouse breeding areas (known as leks) are negatively affected by oil and gas wells at distances of four miles or even more.[13] BLM's National Technical Team concluded that "[t]here is strong evidence from the literature to support that surface-disturbing energy or mineral development within priority sage-grouse habitats is not consistent with a goal to maintain or increase populations or distribution."[14]

## LEGAL FRAMEWORK

## I.     Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

25.     The APA authorizes judicial review of agency actions and provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or

---

[11] *Id.*

[12] *Id.* at 19.

[13] *Id.* at 20; *see also* Steven E. Hanser et al., U.S. Geological Survey, *Greater Sage-Grouse Science (2015–17)—Synthesis and Potential Management Implications, Open-File Report* at 13–14 (2018), https://pubs.usgs.gov/of/2018/1017/ofr20181017.pdf (discussing current research).

[14] Sage-Grouse National Technical Team Report at 19.

limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D).

26.     An agency acts arbitrarily and capriciously when it has:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A reviewing court applying these factors must "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

27.     When an agency changes positions, the APA requires it to (a) "display awareness that it *is* changing position;" (b) show that the new policy is permissible under governing statutes; (c) explain why the agency believes the new policy is better than the old one; and (d) "show that there are good reasons for the new policy," which requires a more detailed explanation where the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (emphasis in original).

## II.    Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*

28.    FLPMA directs BLM to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

29.    The Interior Department implements these requirements through land management plans, known as resource management plans (RMPs or plans). FLPMA requires that the Interior Department manage public lands "in accordance with the [RMPs] developed" under that statute. 43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) (requiring that BLM resource management decisions "shall conform" to the governing plan). "The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004).

30.    Under FLPMA, BLM uses a three-step process when managing oil and gas development on public lands. First, BLM develops RMPs for particular

17

areas, specifying which lands will be open and closed to oil and gas leasing and development, and the conditions placed on any such development.  43 U.S.C. § 1712(a).  Second, BLM "may grant leases for the development of specific sites within an area, subject to the requirements of the plan."  *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 689 n.1 (10th Cir. 2009); *see also* 43 C.F.R. § 1610.5-3.  Designation of an area as open to leasing in an RMP means that BLM *may* lease those lands, but does not *require* the agency to offer any specific lands for leasing.  Third, after a company has purchased oil and gas leases, it obtains permits to drill on those lands from BLM.  *New Mexico*, 565 F.3d at 689 n.1; 43 C.F.R. § 3162.3-1(c).

31.  When amending or revising an RMP, BLM must follow certain steps designed to "provide for public involvement" and ensure that changes are "consistent with the principles" established by FLPMA, such as multiple-use management.  43 C.F.R. § 1601.0-8.  For example, BLM must provide opportunities for public participation and comment, develop a NEPA analysis addressing the impacts of the changes, publish notice of the proposal in the Federal Register, and coordinate its effort with other federal agencies, state and local governments, and Indian tribes.  *Id.* §§ 1610.2, 1610.3-1, 1610.5-5, 1610.5-6.

## III.   National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*

32.    NEPA is the country's "basic national charter" for environmental
protection. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1177 (9th Cir. 2011)
(quoting 40 C.F.R. § 1500.1(a)).  It serves two goals: (a) fostering informed
decision making by federal agencies, and (b) promoting informed public
participation in government decisions. *Baltimore Gas & Elec. Co. v. Nat. Res.
Def. Council*, 462 U.S. 87, 97 (1983).  To meet those goals, NEPA requires that
agencies "consider every significant aspect of the environmental impact of a
proposed action" and inform the public of the environmental impacts of agency
proposals. *Id.*

33.    Prior to undertaking any "major Federal action[] significantly
affecting the quality of the human environment," NEPA requires federal agencies
to develop an environmental impact statement (EIS), which is a "detailed
statement" explaining "the environmental impact of the proposed action."  42
U.S.C. § 4332(2)(C)(i).  An EIS is required if a proposed action "may"
significantly affect the environment. *See, e.g.*, *Anderson v. Evans*, 371 F.3d 475,
488 (9th Cir. 2004).  "A determination that significant effects on the human
environment will in fact occur is not essential. . . .  If substantial questions are
raised whether a project may have a significant effect upon the human

environment, an EIS must be prepared." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982).

34.     To determine whether an action may significantly affect the environment, the agency must consider several factors, such as the degree to which: (a) the effects on the quality of the human environment are likely to be highly controversial or highly uncertain, (b) the action may establish a precedent for future actions, (c) the action may cause loss of significant scientific, cultural, or historical resources, and (d) the action may adversely affect an endangered or threatened species.  40 C.F.R. § 1508.27(b).  When a proposed action will not have a significant effect, NEPA allows agencies to prepare a shorter analysis called an Environmental Assessment (EA), along with a Finding of No Significant Impact (FONSI).  *Id.* §§ 1508.9, 1508.13.

35.     NEPA requires an EIS or EA to discuss "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C) (EIS); *id.* § 4332(2)(E) (EA).  The range of alternatives is the "heart" of the NEPA analysis.  40 C.F.R. §§ 1502.14, 1508.9(b).  Consideration of alternatives ensures that the decision maker "has before him and takes into proper account all possible approaches to a particular project," *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971), including those "that will avoid or minimize adverse effects [to] . . . the human environment."  40 C.F.R. § 1500.2(e).  By requiring

consideration of alternatives, NEPA aims to ensure that the "most intelligent, optimally beneficial decision will ultimately be made." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006).

36.    Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," and explain why any alternatives were eliminated. 40 C.F.R. § 1502.14(a). "The existence of a viable but unexamined alternative renders an [EA] inadequate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (alteration in original) (quoting *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004)). The agency's NEPA analysis must give "full and meaningful consideration" to alternatives. *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988).

37.    Environmental analyses required by NEPA must be conducted at "the earliest possible time to insure that planning and decisions reflect environmental values." 40 C.F.R. § 1501.2; *see also Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002) ("NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done."). An agency's NEPA analysis must identify and address the direct, indirect, and cumulative impacts of its proposed action. 40 C.F.R. §§ 1502.16(a) & (b), 1508.7, 1508.8, 1508.9(b), 1508.25(c). Direct impacts are those "caused by the action and occur at the same time and

place." *Id.* § 1508.8(a).  Indirect impacts are "caused by the action and are later in

time . . . but are still reasonably foreseeable." *Id.* § 1508.8(b).  When issuing an oil

and gas lease, BLM considers development on that lease to be an indirect effect of

its decision to grant the lease.

38.     The "cumulative impact" of a proposed action refers to:

the impact on the environment which results from the incremental impact of
the action when added to other past, present and reasonably foreseeable
future actions regardless of what agency (Federal or non-Federal) or person
undertakes such other actions.  Cumulative impacts can result from
individually minor but collectively significant actions taking place over a
period of time.

*Id.* § 1508.7.  "Proper consideration of the cumulative impacts . . . requires some

quantified or detailed information." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387

F.3d 989, 993–94 (9th Cir. 2004).  General statements about possible effects "do

not constitute a hard look absent a justification regarding why more definitive

information could not be provided." *Id.*

## IV.   Endangered Species Act, 16 U.S.C. § 1531 *et seq.*

39.     The ESA is "the most comprehensive legislation for the preservation

of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437

U.S. 153, 180 (1978).  Congress passed the ESA to "provide a program for the

conservation of . . . endangered species and threatened species" and to "provide a

means whereby the ecosystems upon which endangered species and threatened

species depend may be conserved." 16 U.S.C. § 1531(b).

40.     To receive protection under the ESA, a species is listed by the U.S.

Fish & Wildlife Service (FWS) as "endangered" or "threatened." *Id.* § 1533.  The

ESA defines an "endangered species" as "any species which is in danger of

extinction throughout all or a significant portion of its range." *Id.* § 1532(6).  A

"threatened species" is "any species which is likely to become an endangered

species within the foreseeable future throughout all or a significant portion of its

range." *Id.* § 1532(20).

41.     Once a species is listed, an array of statutory protections applies.  For

example, the ESA requires all federal agencies to ensure that their actions do not

"jeopardize the continued existence" of any listed species or "result in the

destruction or adverse modification of [the critical] habitat of such species." *Id.* §§

1536(a)(2), (4).  The ESA and its regulations also prohibit, among other things, any

person from intentionally or incidentally "tak[ing]" listed species without a permit

from FWS.  *See id.* §§ 1532(19) (definition of "take"), 1538(a); 50 C.F.R. §§ 17.3,

17.32.

## PROCEDURAL BACKGROUND

## I.     BLM ADOPTS RANGE-WIDE SAGE-GROUSE CONSERVATION PLANS.

42.     In 2001, and again in 2010, FWS determined that listing sage-grouse

under the ESA was warranted but "precluded by higher priority listing actions."

66 Fed. Reg. 22,984 (May 7, 2001); 75 Fed. Reg. 13,910 (Mar. 23, 2010).  The

decisions not to list the grouse were challenged in court, and as part of a 2011 settlement, FWS pledged to make a new listing decision by September 30, 2016. *See In re Endangered Species Act Section 4 Deadline Litigation-MDL No. 2165*, 704 F.3d 972, 975 (D.C. Cir. 2013) (summarizing 2011 settlement).

43.     In anticipation of the 2016 deadline, BLM undertook (in the agency's words) "the largest single planning effort in BLM history," seeking to protect greater sage-grouse habitat and make an ESA listing unnecessary.[15]  That four-year planning effort led BLM and the U.S. Forest Service in 2015 to revise or amend 98 land management plans in 10 Western states, covering the bird's range across the West.[16]  The plans were developed with extensive input from state governors, energy and grazing industry representatives, public land users, and conservation and sportsmen's organizations.[17]

44.     Federal land management is critical to conservation of the greater sage-grouse because public lands make up more than 50 percent of the bird's currently occupied habitat.  Fully 45 percent of the grouse's habitat lies on land managed by BLM.  80 Fed. Reg. at 59,866 (Rangewide Totals in Table 2).

---

[15] BLM, *Greater Sage-Grouse Conservation and the Sagebrush Ecosystem*, https://goo.gl/YNjBxX (last visited Apr. 27, 2018).

[16] *Id.*

[17] U.S. Dep't of the Interior and U.S. Dep't of Agric., *Greater Sage-Grouse Conservation & the Sagebrush Ecosystem: Collaborative Conservation at Work* (2016), https://goo.gl/LYmgfb.



45.    The 2015 plans assign areas of sage-grouse habitat for varying levels

of protection.  The plans designate priority habitat management areas (PHMAs or

Priority Habitat), which are "[a]reas with limited impacts containing substantial

and high quality [greater sage-grouse] habitat that support sustainable [greater

sage-grouse] populations."[18]  They are generally considered the lands with the

"highest value,"[19] and "essential habitat for maintaining [greater sage-grouse]"

populations.[20]  Within Priority Habitat, the highest-quality areas are called

---

[18] *See, e.g.*, BLM, Billings Field Office Greater Sage-Grouse Approved Resource
Management Plan at 6-32 (Sept. 2015), https://goo.gl/hjXGTR.

[19] *Id.* at 2-1.

[20] *See, e.g.*, BLM, Miles City Field Office Approved Resource Management Plan
at 2-9 (Sept. 2015), https://goo.gl/J1bc5t.

sagebrush focal areas (SFAs), which are recognized "strongholds" for greater sage-grouse, containing the highest densities of grouse.[21]

46.     The RMPs also designate general habitat management areas (GHMAs or General Habitat), which are "lands where some special management will apply to sustain [greater sage-grouse] populations."[22]  General Habitat includes, for example, "occupied seasonal or year-round habitat outside of PHMAs."[23]

47.     The plans impose a number of requirements protecting greater sage-grouse habitat from oil and gas leasing and development.  In particular, the plans require BLM to give "priority" to leasing outside of Priority and General Habitat.[24] The purpose of the prioritization requirement "is to further limit future surface disturbance and encourage new development in areas that would not conflict with" greater sage-grouse.[25]  BLM explained that prioritization "is intended to guide development to lower conflict areas and as such protect important habitat and

---

[21] *See, e.g.*, Billings Field Office Approved RMP, *supra* note 18, at 2-3.

[22] *Id.* at 2-1.

[23] BLM, Casper, Kemmerer, Newcastle, Pinedale, Rawlins, and Rock Springs Field Offices (Wyoming) Approved Resource Management Plan Amendment for Greater Sage-Grouse at 10 (Sept. 2015), https://goo.gl/iExZ7i.

[24] *See, e.g.*, Miles City Field Office Approved RMP, *supra* note 20 at 2-8 ("Priority will be given to leasing and development of fluid minerals outside of PHMA and GHMA."); *see also,* BLM, HiLine District Office Greater Sage-Grouse Approved Resource Management Plan at 2-9 (Sept. 2015), https://goo.gl/AyvKRW (same).

[25] Rocky Mountain ROD, *supra* note 1, at 1-25.

reduce the time and cost associated with oil and gas leasing and development by avoiding sensitive areas, reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation."[26]

48.    To guide implementation of the plans across numerous regional offices, BLM headquarters issued a series of instruction documents in September 2016.  One of those, Instruction Memorandum 2016-143 (the 2016 IM), addressed the leasing prioritization objective.  The 2016 IM established a "sequential prioritization" process, which called for first focusing oil and gas leasing outside of Priority and General Habitat "in order to minimize further fragmentation and impacts to [greater sage-grouse] habitat or populations," and then to consider leasing General Habitat before considering Priority Habitat lands.[27]  The 2016 IM also identified a list of site-specific factors to consider in evaluating proposed areas within each category of habitat.  For example, it instructed BLM to prioritize leasing parcels "immediately adjacent or proximate to existing oil and gas leases and development," and in areas of lower-value sage-grouse habitat.[28]  In contrast,

---

[26] *Id.*

[27] BLM, Instruction Memorandum 2016-143, Implementation of Greater Sage-Grouse Resource Management Plan Revisions or Amendments—Oil and Gas Development Sequential Prioritization (Sept. 1, 2016), https://goo.gl/qhnCuv.

[28] *Id.*

lands far from existing oil and gas development, and critical sage-grouse habitat such as leks, nesting areas, and winter range areas, were to be lower priorities for leasing.[29]

49.     In October 2015, FWS determined that listing the greater sage-grouse as threatened or endangered was not warranted under the ESA.  80 Fed. Reg. 59,858, 59,860 (Oct. 2, 2015).  That finding relied in large part on the assumption that the protections provided in BLM's 2015 plans would remove the threats otherwise driving greater sage-grouse to the brink of extinction.  *See, e.g., id.* at 59,874–75, 59,891 (plans "prioritize the future leasing and development of nonrenewable-energy resources outside of sage-grouse habitats . . . .  [They] requir[e] the agencies to . . . follow an avoidance, minimization, and mitigation approach").

## II.    BLM UNDERMINES GREATER SAGE-GROUSE PROTECTIONS.

50.     Following the change in presidential administration, BLM has sought to eliminate protections for greater sage-grouse in order to promote oil and gas development.  In March 2017, President Trump issued Executive Order 13783, *Promoting Energy Independence and Economic Growth*, which declared it a national priority to remove "regulatory burdens that unnecessarily encumber

---

[29] *Id.*

energy production." 82 Fed. Reg. 16,093 (Mar. 28, 2017). The Administration also announced a policy of seeking "energy dominance" by increasing domestic production of oil and gas and other energy sources.[30]

51.    As part of that effort, Secretary of the Interior Zinke on June 7, 2017 issued Secretarial Order No. 3353, which directed BLM to review "the 2015 Sage-Grouse Plans and associated policies, including seven BLM [IMs] issued in September 2016" to identify "provisions that may require modification or rescission, as appropriate, in order to give appropriate weight to the value of energy and other development of public lands."[31] The Order directed BLM to provide a report to the Secretary within 60 days providing recommendations.[32]

52.    BLM's Washington, DC headquarters issued the report on August 4, 2017. The report recommended that BLM focus on doing away with the sage-grouse plans' leasing prioritization mandate.[33] The report recommended "[c]larify[ing] to BLM staff that" oil and gas leasing is allowed "in all Greater

---

[30] White House, "President Trump Vows to Usher in Golden Era of American Energy Dominance" (June 30, 2017).

[31] Office of the Secretary of the Interior, Secretarial Order No. 3353 at 3 (June 7, 2017), https://goo.gl/EG5saz.

[32] *Id.*

[33] BLM, Report in Response to Secretarial Order 3353 at 5 (Aug. 4, 2017), https://goo.gl/gLc5U9 (recommending changes to prioritization requirement as a "suggested issue[ ] of focus for the BLM" in response to President Trump's Executive Order 13783).

Sage-Grouse habitat categories," including those most critical to the bird's survival.  It proposed a "[s]hort term option to clarify to staff [that] leasing is not restricted in [greater sage-grouse] habitat."[34]  The review team's report also recommended "[r]escind[ing] the national IM" from 2016 on leasing prioritization (IM 2016-143).[35]

53.    In addition, the report advocated making amendments to the 2015 sage-grouse plans as a "longer term" step.[36]

54.    On the same day the report was issued, Secretary Zinke issued a directive (the Zinke Memorandum) ordering BLM and other agencies in the Department of the Interior "to immediately begin implementing the short- and long-term recommendations in the Report."[37]

55.    BLM has not amended or revised the 2015 plans to eliminate the leasing prioritization requirement.  That "longer term" recommendation would require a variety of steps under FLPMA to allow for public input and to meet FLPMA standards for protection of wildlife and other natural resources.  *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017) (seeking public comment on 2015 plans).

---

[34] *Id.* Appx. A at 2.

[35] *Id.*

[36] *Id.* at 1.

[37] *Id.* (Aug. 4, 2017 cover memorandum from Secretary Zinke).

56.    On December 27, 2017, as directed by Secretary Zinke, BLM revoked the 2016 IM and replaced it with the 2018 IM.  While the 2015 plans remain in effect, IM 2018-026 directs BLM to disregard the plain language and purpose of the plans' leasing prioritization requirement.  The new guidance states that "BLM does not need to lease and develop outside of [greater sage-grouse] habitat management areas before considering any leasing and development within [greater sage-grouse] habitat."[38]  Unlike the 2016 IM, the new guidance does not contain site-specific prioritization factors, such as instructions to prioritize leasing away from high-value sage-grouse habitat.

57.    BLM's 2018 IM and the Zinke Memorandum do not conform with the prioritization requirement of the plans.  BLM also has not prepared a NEPA analysis addressing the reasonably foreseeable impacts to the greater sage-grouse from the changes directed in the 2018 IM and the Zinke Memorandum.

## III.    BLM DRAMATICALLY INCREASES LEASING IN SAGE-GROUSE HABITAT.

58.    Following Secretary Zinke's direction, BLM has disregarded the 2015 plans' prioritization mandate by offering hundreds of oil and gas leases in Priority

---

[38] BLM, Instruction Memorandum 2018-026, Implementation of Greater Sage-Grouse Resource Management Plan Revisions or Amendments—Oil & Gas Leasing and Development Prioritization Objective (Dec. 27, 2017), https://www.blm.gov/policy/im-2018-026.

and General Habitat.  A recent analysis shows that for the period from June

through December 2018, more than 76% of the acreage offered or proposed by

BLM for leasing in several states lies in habitat protected under the 2015 plans.

This leasing violates FLPMA because it does not conform to the 2015 plans.  The

agency also has failed to present a rational or valid explanation of how its

decisions to offer each of the leases complies with the sage-grouse plans'

prioritization mandate.

59.     BLM also violated NEPA when leasing greater sage-grouse habitat

because it has failed to consider alternatives that would avoid large-scale leasing in

that habitat.  Instead, BLM's NEPA analyses for lease sales have analyzed only

two alternatives: a proposed action offering virtually every parcel proposed for

leasing by oil and gas companies, and a no-action alternative that would offer no

leases at all.  This "all or nothing" approach fails to consider a range of reasonable

alternatives, including alternatives that would protect important greater sage-

grouse habitat.

60.     In addition, BLM has violated NEPA by failing to take a hard look at

the impacts to greater sage-grouse from leasing large areas of its habitat for oil and

gas development.  In particular, BLM has fragmented its environmental analysis

into numerous EAs for individual lease sales, rather than preparing an EIS

evaluating the cumulative impacts of that leasing.

61.    In following Secretary Zinke's direction and the 2018 IM, BLM has violated FLPMA and NEPA in each of the lease sales described below.

**A.  December 2017 Montana Lease Sale**

62.    BLM held an oil and gas lease sale on December 12, 2017, offering 204 lease parcels totaling 98,889 acres in Montana.  Nearly 90%—180 out of 204 parcels—covered General Habitat.

63.    BLM's EA for the December 2017 Montana lease sale discusses only two alternatives: the no-action alternative (offering zero leases), and the proposed action, which is to lease all parcels being considered.  BLM failed to consider a middle-ground alternative that would avoid some or all greater sage-grouse habitat while offering leases in other areas.

64.    The EA also fails to analyze what the direct, indirect and cumulative impacts of issuing the leases will be on greater sage-grouse.  Instead, BLM deferred its analysis of those impacts until a later date when applications for permits to drill on the leases are filed.  Nonetheless, BLM concluded that there would be no significant impacts to the environment and thus decided that no EIS was needed.

33

### B.  March 2018 Montana Lease Sale

65.    On March 13, 2018, BLM held a lease sale offering 83 parcels totaling approximately 46,174 acres in Montana, of which at least 70% covered Priority or General Habitat.

66.    Although BLM held a single auction for the leases, it prepared three separate EAs that each covered a subset of the leases in different regions of Montana.  The three EAs each discuss only two alternatives: a no-action alternative (offering no leases) and the proposed action, which is to lease all parcels being considered.  BLM failed to consider a middle-ground alternative that would avoid greater sage-grouse habitat while offering leases in other areas.

67.    The three EAs do not mention each other or analyze the cumulative effects of leasing all 83 parcels.  The EAs also fail to analyze what the direct and indirect impacts of issuing the leases will be on greater sage-grouse.  Instead, BLM deferred its analysis of those impacts until a later date when oil and gas companies file applications for permits to drill on the lease sites.  Nonetheless, BLM concluded that there would be no significant impacts to the environment and thus decided that no EIS was needed.

### C.  December 2017 Nevada Lease Sale

68.    BLM held a lease sale on December 12, 2017, offering 208 lease parcels totaling 388,697 acres in Nevada.  BLM's EA for the December 2017 sale

indicates that most groups of lease parcels contain greater sage-grouse habitat, but does not mention or discuss the prioritization requirement.

69.     BLM's EA for the December 2017 Nevada lease sale discusses only two alternatives: a no-action alternative (offering no leases), and the proposed action, which was to lease all of the parcels being considered.  BLM failed to consider a middle-ground alternative that would avoid greater sage-grouse habitat while offering leases in other areas.

70.     The EA also fails to analyze what the direct, indirect and cumulative impacts of issuing the leases will be on greater sage-grouse.  Instead, BLM deferred its analysis of those impacts until a later date when applications for permits to drill on the leases are filed.  Nonetheless, BLM concluded that there would be no significant impacts to the environment and thus decided that no EIS was needed.

**D.  March 2018 Nevada Lease Sale**

71.     BLM held a lease sale on March 13, 2018, offering 39 leases totaling 67,791 acres in Nevada.  Nearly 30,000 acres of the leases consist of Priority or General Habitat.  BLM's EA for the March 2018 Nevada lease sale, however, does not mention the prioritization requirement.

72.     BLM's EA discusses only two alternatives:  a no-action alternative (offering no leases), and the proposed action, which was to lease all of the parcels

being considered.  BLM failed to consider a middle-ground alternative that would avoid greater sage-grouse habitat while offering leases in other areas.

73.     The EA also fails to analyze what the direct, indirect and cumulative impacts of issuing the leases will be on greater sage-grouse.  Instead, BLM deferred its analysis of those impacts until a later date when applications for permits to drill on the leases are filed.  Nonetheless, BLM concluded that there would be no significant impacts to the environment and thus decided that no EIS was needed.

### E.     June 2018 Nevada Lease Sale

74.     BLM held a sale on June 12, 2018, offering 166 leases totaling 313,715 acres in Nevada.  While dozens of those leases cover Priority or General Habitat, BLM's EA for the June 2018 Nevada lease sale does not mention the prioritization requirement.  In responding to public comments, BLM relied on the 2018 IM to justify leasing so much sage-grouse habitat.

75.     BLM's EA discusses only two alternatives:  a no-action alternative (offering no leases), and the proposed action, which was to lease all of the parcels being considered.  BLM failed to consider a middle-ground alternative that would avoid greater sage-grouse habitat while offering leases in other areas.

76.     The EA also fails to analyze what the direct, indirect and cumulative impacts of issuing the leases will be on greater sage-grouse.  Instead, BLM

deferred its analysis of those impacts until a later date when applications for permits to drill on the leases are filed.  Nonetheless, BLM concluded that there would be no significant impacts to the environment and thus decided that no EIS was needed.

### F.  December 2017 Wyoming Lease Sale

77.     BLM held an oil and gas lease sale on December 14, 2017 at which it offered 45 parcels totaling 72,884 acres in Wyoming.  Of the 45 parcels, 26 were in Priority Habitat and 24 parcels included General Habitat.  Only three of the 45 parcels did not overlap with either Priority or General Habitat.

78.     BLM's EA for the December 2017 Wyoming lease sale discusses only two alternatives: the no-action alternative (offering zero parcels), and the proposed action, which is to lease all parcels being considered.  In declining to consider alternatives that would have offered some leases while avoiding important sage-grouse habitat, BLM invoked President Trump's Executive Order.  The agency stated that:

> deferring parcels in PHMA and/or GHMA would not be consistent with the
> Presidential Executive Order (March 28, 2017), which specifies that: 'It is in
> the national interest to promote clean and safe development of our Nation's
> vast energy resources, while at the same time avoiding regulatory burdens
> that unnecessarily encumber energy production, constrain economic growth,

and prevent job creation.' A decision to defer parcels in PHMA and/or GHMA would not be consistent with these objectives.[39]

79.     The EA also fails to analyze what the direct, indirect, and cumulative impacts of issuing the leases will be on greater sage-grouse.  Instead, BLM deferred its analysis of those impacts until a later date when applications for permits to drill on the leases are filed.  Nonetheless, BLM concluded that there would be no significant impacts to the environment and thus decided that no EIS was needed.

**G. March 2018 Wyoming Lease Sale**

80.     On March 21–22, 2018, BLM held an oil and gas lease sale offering 170 parcels totaling more than 170,500 acres in Wyoming, located in the agency's Wind River/Bighorn Basin District office and its High Plains District office.  Of the 89 parcels in the Wind River/Bighorn Basin District, 78 were within Priority Habitat and an additional parcel included General Habitat.  Of the 81 parcels in the High Plains District, 14 were within Priority Habitat and 23 were within General Habitat.

---

[39] BLM, Environmental Assessment December 14, 2017 Competitive Lease Sale Parcels (Dec. 2017) at 7, https://eplanning.blm.gov/epl-front-office/projects/nepa/65707/127633/155332/20171129.HDD_EA_for_December_2017_Lease_Sale_v.3.mg.pdf.

81.     Although BLM held a single auction for the leases, it prepared two separate EAs for the Wind River/Bighorn Basin leases and the High Plains District leases.  The two EAs each discuss only two alternatives: a no-action alternative (offering no leases), and the proposed action, which was to lease all parcels being considered.  BLM failed to consider an alternative that would avoid greater sage-grouse habitat while offering leases in other areas.

82.     The two EAs do not mention each other or analyze the cumulative effects of selling all 170 parcels.  The EAs also fail to evaluate what the direct and indirect impacts of issuing the leases will be on greater sage-grouse.  Instead, BLM deferred its analysis of those impacts until a later date when applications for permits to drill on the leases are filed.  Nonetheless, BLM concluded that there would be no significant impacts to the environment and thus decided that no EIS was needed.

### H.     June 2018 Wyoming Lease Sale

83.     BLM held a lease sale on June 26–27, 2018, offering 159 leases totaling nearly 194,000 acres in Wyoming.  All 159 of the leases cover Priority or General Habitat.  In responding to public comments, BLM relied on the 2018 IM to justify leasing so much sage-grouse habitat.  The agency stated that the new IM provides "BLM does not need to lease and develop outside of [sage-grouse] habitat

management areas before considering any leasing and development within [sage-grouse] habitat."[40]

84.    BLM's EA for the June 2018 Wyoming lease sale discusses only two alternatives: the no-action alternative (offering zero parcels), and the proposed action, which is to lease all parcels being considered.

85.    The EA also fails to analyze what the direct, indirect, and cumulative impacts of issuing the leases will be on greater sage-grouse.  Instead, BLM deferred its analysis of those impacts until a later date when applications for permits to drill on the leases are filed.  Nonetheless, BLM concluded that there would be no significant impacts to the environment and thus decided that no EIS was needed.

## FIRST CLAIM FOR RELIEF
### *(Violation of FLPMA – 2018 IM, Zinke Memorandum,*
### *and Application of 2016 IM)*

86.    The allegations in all preceding paragraphs are incorporated by reference.

87.    FLPMA requires that the Interior Department manage public lands "in accordance with the [RMPs] developed" under that statute.  43 U.S.C. § 1732(a);

---

[40] BLM, Environmental Assessment June 2018 Competitive Lease Sale Parcels (June 2018) Appx E, response to comment # 10, https://eplanning.blm.gov/epl-front-office/projects/nepa/85072/144153/177709/182Q_HDD_Appendix_E_ Public_Comments.mg05012018.pdf.

*see also*, 43 C.F.R. § 1610.5-3(a) (The Secretary shall manage public lands in accordance with land use plans, and BLM resource management decisions "shall conform" to approved plans).

88.     While purporting to implement the 2015 sage-grouse plans, the Zinke Memorandum and BLM's 2018 IM do not conform with the plans' requirement to prioritize oil and gas leasing outside of Priority and General Habitat.

89.     BLM has not amended or revised the 2015 plans to eliminate the leasing prioritization requirement.

90.     BLM's issuance of the 2018 IM, and the Zinke Memorandum, violated FLPMA and were arbitrary and capricious, an abuse of discretion, and not in accordance with the law.  5 U.S.C. §§ 706(2)(A), (D).

91.     BLM also has applied and interpreted the 2016 IM in a manner that does not conform to the 2015 plans.  For example, BLM has interpreted the 2016 IM to permit leasing of any and all lands in grouse habitat so long as the agency has time and resources to process the proposed tracts.  As applied, the 2016 IM violated FLPMA and was arbitrary and capricious.

**SECOND CLAIM FOR RELIEF**
*(Violation of FLPMA – Lease Sales)*

92.     The allegations in all preceding paragraphs are incorporated by reference.

93.     FLPMA requires that the Interior Department manage public lands "in accordance with the [RMP]s developed" under that statute.  43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) (BLM resource management decisions "shall conform" to the approved plan).

94.     The 2015 sage-grouse plans require BLM to prioritize oil and gas leasing outside of Priority and General Habitat.

95.     BLM has implemented the 2018 IM and the Zinke Memorandum, and interpreted the 2016 IM, by offering hundreds of leases within Priority and General Habitat in Montana, Nevada, and Wyoming.  In doing so, the agency has not prioritized leasing outside those areas and has not explained how its leasing decisions conform with the RMPs' prioritization mandate.

96.     BLM's offering of leases in the Montana, Nevada, and Wyoming sales violated FLPMA and was arbitrary and capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. §§ 706(2)(A), (D).

### THIRD CLAIM FOR RELIEF
*(Violation of NEPA – Failure to Consider Range of Reasonable Alternatives)*

97.     The allegations in all previous paragraphs are incorporated by reference.

98.     NEPA requires an EIS or EA to discuss "alternatives to the proposed action."  42 U.S.C. §§ 4332(2)(C), (E).  Agencies must "rigorously explore and

objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), and the alternatives in an EA must represent the spectrum of available options.

99.     In the EAs for the December 2017, March 2018, and June 2018 lease sales for Montana, Nevada, and Wyoming, BLM took an "all or nothing" approach that considered only two options:  the no-action alternative (offering no leases at all) and the alternative of leasing virtually every parcel under consideration.  These EAs did not consider a range of reasonable alternatives.  In particular, BLM failed to analyze an option that would have avoided or limited leasing of greater sage-grouse habitat.

100.   The lease sales violated NEPA and were arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law.  5 U.S.C. §§ 706(2)(A), (D).

## FOURTH CLAIM FOR RELIEF
### *(Violation of NEPA – Failure to Analyze and Disclose Reasonably Foreseeable Impacts)*

101.   The allegations in all previous paragraphs are incorporated by reference.

102.   NEPA requires that agencies "consider every significant aspect of the environmental impact of a proposed action" and inform the public of the environmental impacts of agency proposals.  *Baltimore Gas & Elec. Co.*, 462 U.S. at 97.

103.   An agency's NEPA analysis must identify and address the direct, indirect, and cumulative impacts of its proposed action.  40 C.F.R. §§ 1502.16(a), (b), 1508.7, 1508.8, 1508.25(c).  That analysis must be done at the earliest possible time.  40 C.F.R. § 1501.2; *Kern*, 284 F.3d at 1072.

104.   Defendants have failed to analyze the direct and indirect impacts to greater sage-grouse from the 2018 IM and the Zinke Memorandum.  Defendants did not prepare any NEPA analysis in issuing those decisions.

105.   When implementing its policy shift by selling numerous oil and gas leases in Priority and General Habitat, BLM also failed to analyze the direct and indirect impacts of those sales.  The EAs BLM prepared for the December 2017, March 2018, and June 2018 lease sales in Montana, Nevada, and Wyoming fail to analyze the site-specific impacts of oil and gas development on the leases being offered.

106.   The 2018 IM, the Zinke Memorandum, and BLM's decisions to hold the lease sales, violated NEPA and were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. §§ 706(2)(A), (D).

**FIFTH CLAIM FOR RELIEF**
*(Violation of NEPA – Failure to Analyze and Disclose*
*Cumulative Impacts)*

107.   The allegations in all previous paragraphs are incorporated by reference.

108.   An agency's NEPA analysis must identify and address the cumulative impacts of its proposed action and other past, present and reasonably foreseeable future actions.  40 C.F.R. §§ 1508.7, 1508.8, 1508.9, 1508.25(a)(2), 1508.25(c).

109.   BLM failed to analyze and disclose to the public the cumulative impacts of offering hundreds of new oil and gas leases in key sage-grouse habitat. Each of BLM's EAs for the December 2017, March 2018, and June 2018 lease sales does not address the incremental impact of that sale when added to the other planned, concurrent or past lease sales where BLM also offered large numbers of leases in Priority and General Habitat.  Nor did the EAs address the impacts from BLM's 2018 IM on greater sage-grouse.

110.   For several lease sales, including the March 2018 Montana sale and March 2018 Wyoming sale, BLM prepared multiple EAs covering different subsets of the leases to be offered in the same sale.  Each of the EAs fails to mention the leases covered by the other EAs, and does not analyze and disclose the cumulative impacts of offering all the leases in that sale.

111.   BLM's decisions to hold the December 2017, March 2018, and June 2018 lease sales in Montana, Nevada, and Wyoming violated NEPA and were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. §§ 706(2)(A), (D).

## SIXTH CLAIM FOR RELIEF
### *(Violation of NEPA – Failure to Prepare EIS)*

112.   The allegations in all previous paragraphs are incorporated by reference.

113.   NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.

114.   The 2018 IM and Zinke Memorandum represent major federal actions significantly affecting the quality of the human environment because they will affect greater sage-grouse habitat on millions of acres of public lands in the western United States.

115.   BLM's December 2017, March 2018, and June 2018 lease sales in Montana, Nevada, and Wyoming each represented a major federal action significantly affecting the quality of the human environment.  Each of the six lease sales offered tens or hundreds of thousands of acres for oil and gas development, which will have a significant impact on the greater sage-grouse.  BLM's issuance of a "finding of no significant impact" for each sale was arbitrary and capricious.

116.   Moreover, the cumulative impacts of the 2018 IM, the Zinke Memorandum, and the eight lease sales, on the sage-grouse will be significant and must be discussed in the same EIS.  *See* 40 C.F.R. §§ 1508.25(a), (c).

117.    BLM's failure to prepare an EIS for the eight lease sales, the 2018 IM, and the Zinke Memorandum, either individually or in combination, violated NEPA and was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. §§ 706(2)(A), (D).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Issue a declaratory judgment that Defendants violated FLPMA and NEPA, and acted arbitrarily, capriciously, contrary to law, and in excess of statutory authority by issuing the Zinke Memorandum and the 2018 IM, in their application of the 2016 IM, and by holding the eight lease sales discussed above;

2.    Set aside the 2018 IM and Zinke Memorandum, the decision records approving the eight oil and gas lease sales as well as their supporting EAs and FONSIs, and all leases sold in the challenged sales;

3.    Award Plaintiffs' costs, expenses, and reasonable attorney fees; and

4.    Provide such other relief as the Court deems just and proper.

Respectfully submitted this 28th day of June, 2018,

/s/ Joshua R. Purtle
Timothy J. Preso, MT Bar No. 5255
Joshua R. Purtle, MT Bar No. 46334239
Earthjustice
313 East Main Street
Bozeman, MT  59715
Phone: (406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
jpurtle@earthjustice.org

/s/ Michael S. Freeman
Michael S. Freeman (*admitted pro hac vice*)
Alex J. Hardee (*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO  80202
Phone: (303) 623-9466
Fax: (303) 623-8083
mfreeman@earthjustice.org
ahardee@earthjustice.org

*Counsel for Plaintiffs Montana Wildlife Federation, The Wilderness Society, National Audubon Society, National Wildlife Federation, and Montana Audubon*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of June, 2018, I electronically transmitted the attached **FIRST AMENDED COMPLAINT** to the Clerk's Office using the CM/ECF System for filing, thereby generating service upon the following parties of record:

JOHN S. MOST
E-mail: john.most@usdoj.gov

*Attorney for Defendants*

ERIK E. PETERSON
MICHAEL M. ROBINSON
erik.petersen@wyo.gov
mike.robinson@wyo.gov

*Attorneys for Proposed Defendant-Intervenor State of Wyoming*

JAMES PARROT
BRET SUMNER
jparrot@bwenergylaw.com
bsumner@bwenergylaw.com

*Attorneys for Proposed Intervenor Western Energy Alliance*


/s/ Michael S. Freeman
Michael S. Freeman