Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law
3860 Avenue B, Suite C East
Billings, MT 59102
(406) 403-7066 (phone)
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

Bret Sumner, CO Bar No. 38339
Malinda Morain, CO Bar No. 46986
Beatty & Wozniak, P.C.
216 16th Street, Suite 1100
Denver, CO 80202-5115
(303) 407-4499 (phone)
(800) 886-6566 (fax)
bsumner@bwenergylaw.com
mmorain@bwenergylaw.com

*Counsel for Defendant-Intervenor Western Energy Alliance*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| **MONTANA WILDLIFE FEDERATION,** *et al.*, | |
| Plaintiffs, | Case No. 4:18-cv-00069-BMM |
| v. | |
| **RYAN K. ZINKE,** Secretary of the Interior, *et al.*, | **MEMORANDUM IN SUPPORT OF JOINT MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING FEDERAL DEFENDANTS' MOTION TO SEVER AND TRANSFER WYOMING AND NEVADA CLAIMS** |
| Defendants, | |
| **WESTERN ENERGY ALLIANCE** and **STATE OF WYOMING** | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ........................................................... iii

LIST OF EXHIBITS .................................................................... iv

RULE 7.1 CERTIFICATION ........................................................... 2

BACKGROUND ........................................................................... 2

I.    Oil and Gas Leasing Decisions ................................................. 3

II.   Resource Management Plan Amendments .................................... 4

III.  Documents Central to the Complaint and This Motion ................... 5

    A.  BLM Instruction Memorandum 2016-143 .............................. 5

    B.  Internal Memorandum from Secretary Zinke to his Deputy ......... 6

    C.  Instruction Memorandum 2018-026 ..................................... 7

IV.  BLM Leasing Decisions ......................................................... 8

    A.  December 2017 Lease Sales .............................................. 9

    B.  March 2018 Lease Sales ..................................................10

    C.  June 2018 Lease Sales ....................................................11

    D.  Aggregate Data from All Challenged Leasing Decisions ...........11

LEGAL AUTHORITY ..................................................................12

I.    Motion for Reconsideration ....................................................12

II.   Venue ..............................................................................12

III.  Motion to Sever and Transfer..................................................14

ARGUMENT...............................................................................15

I.    Severance and Transfer is Proper Because Plaintiffs Misrepresented the
    Interaction Between the National-Level Documents and the Individual
    Leasing Decisions ................................................................15

    A.  The 2018 IM is Irrelevant to All of the Montana Challenged Sales,
        and Inapplicable to Six of the Remaining Seven Lease Sales .....................16

    B.  Regardless of Whether the Individual Field Offices Did Rely on One
        or More of the D.C.-Level Documents, Neither D.C.-Level Document
        is a Final Agency Action Giving Rise to an APA Challenge ......................19

II.  In Light of the New Facts Severance and Transfer of the Wyoming and Nevada Challenges is Warranted Under the Ninth Circuit's Interests of Justice Analysis ......................................................................22

   A.  Venue is Proper in the Transferee Districts .................................22

   B.  Transfer of the Wyoming and Nevada Lease Sale Challenges to their Home Districts is in the Interests of Justice........................25

CONCLUSION ..........................................................................................27

CERTIFICATE OF SERVICE............................................................30

# TABLE OF AUTHORITIES

**Cases**

*Bass Enters. Prod. Co. v. United States*, 45 Fed. Cl. 120 (Fed. Cl. 1999)..............13
*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................19, 20
*Colwell v. HHS.,* 558 F.3d 1112 (9th Cir. 2009)....................................................19
*Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834
  (9th Cir. 1986) ............................................................................................14, 25
*Fund for Animals v. U.S. BLM*, 357 F. Supp. 2d 225 (D.C. Cir. 2004).................21
*Initiative & Referendum Inst. v. U.S. Postal Serv.*, 154 F. Supp. 2d 10
  (D.D.C. 2001) ....................................................................................................15
*Jones v. GNC Franchising Inc.*, 211 F.3d 495 (9th Cir. 2000) .............................14
*Landis v. Watt*, 510 F. Supp. 178 (D. Idaho 1981) ..........................................23, 24
*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 8711 (1990).............................................21
*Mont. Wildlife Fed'n v. Zinke*, No. CV-18-69-GF-BMM,
  2018 U.S. Dist. LEXIS 189917 (D. Mont. 2018) ............................................13
*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006)........19, 21
*Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949 (9th Cir. 1968)....................14, 26
*Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491
  (9th Cir. 1979) ..................................................................................................12
*Union Oil Co. v. Morton*, 512 F.2d 743 (9th Cir. 1975) .................................13, 23
*Utah v. Babbitt*, 830 F. Supp. 586 (D. Utah 1993) ...............................................13
*W. Org. of Res. Councils v. BLM*, No. CV 16-21-GF-BMM,
  2017 U.S. Dist. LEXIS 10412 (D. Mont. Jan. 24, 2017) ......................12, 15, 23
*W. Watersheds Project v. Salazar,* No. 08-0516-E-BLW,
  2009 U.S. Dist. LEXIS 39364 (D. Idaho 2009)....................................13, 22, 23
*Western Watersheds Project v. Zinke*, No. 1:18-cv-00187,
  2018 U.S. Dist. LEXIS 152169 (D. Idaho 2018)........................................22, 23

**Statutes**

28 U.S.C. § 1391....................................................................... 13, 22, 23, 24, 25
30 U.S.C. § 191 ...................................................................................................12, 26
30 U.S.C. § 226 .................................................................................................... 3

**Regulations**

43 C.F.R. 3120.................................................................................................... 3

## LIST OF EXHIBITS

Exhibit 1          Zinke Cover Letter

Exhibit 2          IM 2018-026

Exhibit 3          WY Dec. 2017 Lease Sale EA

Exhibit 4          WY Dec. 2017 Lease Sale Press Release

Exhibit 5          WY HPD March 2018 Lease Sale EA

Exhibit 6          WY June 2018 Lease Sale EA

Exhibit 7          WY June 2018 Lease Sale Press Release

Defendant-Intervenor Western Energy Alliance (Alliance) respectfully moves the Court to Reconsider its Order [Dkt. 62] denying Federal Defendants' Motion to Sever and Transfer Wyoming and Nevada Claims (Motion) [Dkt. 20] (Order) in light of newly discovered evidence. The State of Wyoming joins this Motion.

In denying Federal Defendants' Motion, this Court relied upon Plaintiffs' representations that their Complaint is a facial challenge to a single, final agency action made at the national level in Washington, D.C. Plaintiffs represented that this national action impacted each of the challenged leasing decisions in the same way. Thus, this Court found the interests of justice weighed in favor of a single action in this District.

Contrary to Plaintiffs' assertions, there is no evidence that the documents drafted in D.C. actually impacted the "host venue" Montana leasing decisions. The Montana lease sale prioritization analyses pre-dated issuance of the documents that are the foundation of Plaintiffs' Complaint.

In any case, regardless of which challenged documents could have been applied to which leasing decision, the challenged documents cannot dictate the venue of this action because neither constitutes a final agency action under the Administrative Procedure Act (APA). As such, neither document can constitute a national decision raising common issues of law and fact. Thus, this Court must

look to the individual leasing decision records to determine the proper venue for Plaintiffs' claims.

Plaintiffs filed a challenge to eleven unique leasing decisions. Ninety-one percent of the land at issue in those decisions lies outside this District. Nearly 98% of the proceeds from the challenged lease sales came from Wyoming parcels. Clearly, more than "a substantial portion" of the real property interests at issue lie outside this District.

Under these facts and the governing legal framework articulated by the Ninth Circuit, the interests of justice favor reconsideration of the Court's Order and granting Federal Defendants' Motion to transfer the challenged Wyoming and Nevada leasing decisions to their home districts.

## RULE 7.1 CERTIFICATION

Under Local Rule 7.1, opposing counsel has been contacted about the Motion. Counsel for the Federal Defendants consent to the relief requested in the Motion, and Counsel for the State of Wyoming joins in the motion. Counsel for Plaintiffs opposes the Alliance's motion.

## BACKGROUND

When accurately explained and placed into proper context, the facts and content of the documents Plaintiffs rely on to allege a challenge to a national federal action underscore that Plaintiffs do not, in fact, challenge a single federal

action. The internal memo and BLM guidance documents they rely upon have no nexus to any of the challenged Montana leasing decisions. Nor can they. The record demonstrates that those decisions pre-date those documents and that BLM in fact relied upon the 2016 Instruction Memorandum from the previous administration. Plaintiffs challenge eleven distinct leasing decisions in three different states. The facts show that these separate and distinct leasing decisions are appropriate to transfer to their home districts.

## I.   OIL AND GAS LEASING DECISIONS

The Bureau of Land Management's (BLM) three-stage decision-making process for managing public lands for oil and gas leasing and development is fully described in Federal Defendants' Motion. Dkt. 21 at 10-12. Relevant here is the second, leasing stage of resource development, when BLM State Offices perform National Environmental Policy Act (NEPA) and other required analyses before holding mandatory quarterly competitive oil and gas lease sales under the Mineral Leasing Act. 30 U.S.C. § 226(b)(1)(A); *see* 43 C.F.R. Subpart 3120; 43 C.F.R. § 3120.1-2(a). Consistent with the 2015 federal land use plans and 2016 guidance, before conducting necessary NEPA review, BLM performs a prioritization analysis to determine: (1) which of these potential parcels to carry forward for further analysis for potential inclusion in that quarterly sale; and (2) what lease stipulations and development restrictions to impose on them.

## II.   RESOURCE MANAGEMENT PLAN AMENDMENTS

Beginning in December 2011, BLM launched a national planning process to incorporate greater sage-grouse (GrSG) conservation measures into the first stage of land use analysis—the land management plans in ten western states. *See* 76 Fed. Reg. 77,008 (Dec. 9, 2011). In September 2015, BLM and the U.S. Forest Service completed the planning process by each issuing two records of decision (RODs) approving the Plan Amendments for the Great Basin Region and the Rocky Mountain Region. *See* 80 Fed. Reg. 57,639 (Sept. 24, 2015) (notice of BLM's Rocky Mountain Region ROD).

These Resource Management Plan Amendments (RMPAs) approved, amended, or revised ninety-eight land use plans to establish increased protections for GrSG (2015 Plans). The 2015 Plans provide a management framework to inform future decision-making at the lease sale stage, including lease stipulations and development restrictions to include on parcels with sage-grouse habitat, as well as management guidance to inform future project-level development for oil and gas, grazing, and other resource uses. The 2015 Plans reflect BLM's intent to provide conservation for GrSG while complying with the Mineral Leasing Act's statutory leasing requirements and the Federal Land Policy and Management Act's (FLPMA) multiple-use management mandate.

The 2015 Plans provided a management goal (but not a mandatory requirement) that BLM prioritize the leasing and development of minerals outside GrSG habitat and impose stipulations and restrictions to achieve that goal. The RODs for the 2015 Plans, however, explicitly state that even with this prioritization objective, GrSG habitat remains open for oil and gas leasing under the management framework for these plans. Rocky Mountain ROD, BLM-MT-BI-000430 (stating that priority habitat, or PHMA, is open to fluid mineral leasing, subject to stipulations). Great Basin ROD at 1-17[1] (same).

## III.   DOCUMENTS CENTRAL TO THE COMPLAINT AND THIS MOTION

Plaintiffs' Complaint references three documents that provide guidance on BLM's prioritization objectives—a 2016 BLM Instruction Memorandum (IM), a 2018 BLM IM, and a 2018 internal memorandum from Secretary Zinke to his Deputy requesting improvement in coordination with states on GrSG conservation. The timing and purpose of each of these documents is relevant to the present motion.

### A.   BLM Instruction Memorandum 2016-143

On September 1, 2016, under President Obama's Department of the Interior, Steven A. Ellis, Deputy Director of the BLM, issued IM 2016-143 (2016 IM). The 2016 IM provides "guidance on how BLM will exercise . . . discretion with regard

---

[1] Available online at: https://eplanning.blm.gov/epl-front-office/projects/lup/1033 44/143604/176719/2015_Great_Basin_GRSG_ROD_ARMPA.pdf

to leasing activities in order to fulfill the conservation commitments in the [2015] GRSG Plans . . . ." 2016 IM, BLM-MT-BI-014728–29.

The 2016 IM states that BLM will accomplish the 2015 Plans' prioritization objective by following a prioritization sequence and allowing leasing if BLM applies appropriate stipulations. *Id.* BLM-MT-BI-014730–31. The 2016 IM also provides relevant factors for consideration during the prioritization review. These factors include whether proposed parcels are adjacent to existing development, within a unit, in an area with high potential for development, in close proximity to leks, have had disturbance triggers tripped, or are subject to existing NEPA analyses. *Id.* BLM-MT-BI-014731–32.

BLM only publishes its NEPA analyses for public comment after BLM finalizes the prioritization sequence and determines what parcels to carry forward for further analysis and possible sale. *Id.* BLM-MT-BI-014732. After responding to public comments on the NEPA analysis, BLM ultimately issues the decision record for the lease sale, when proposed parcels are either deferred, offered for sale, or offered for sale with additional stipulations and restrictions. *Id.*

## B. Internal Memorandum from Secretary Zinke to his Deputy

On June 7, 2017, Secretary of the Interior Zinke issued Secretarial Order 3353, establishing an internal review team tasked with improving GrSG

conservation and strengthening communication and collaboration between state and federal governments to achieve that goal. [2]

On August 4, 2017, Secretary of the Interior Zinke sent his Deputy Secretary a copy of Interior's Sage-Grouse Review Team's report in response to Secretarial Order 3353. Secretary Zinke attached a short cover memorandum to the August report, which Plaintiffs have dubbed the "Zinke Memo" in their Complaint. Dkt. 19 ¶ 54. A copy of the internal memo is attached as **Exhibit 1**.[3]

This internal memo does not declare or modify any policy, or instruct BLM to ignore the prioritization provisions in the 2015 Plans. Rather, the internal memo directs the Deputy Secretary to ensure implementation of the recommendations in the attached report and to "improve the compatibility of the 2015 Sage-Grouse Plans with the States." Ex. 1 at 1.

### C.   Instruction Memorandum 2018-026

Due to some confusion among BLM field offices about the guidance provided in the 2016 IM, BLM issued IM 2018-026 (2018 IM) on December 27, 2017 to clarify the 2016 IM. A copy of the 2018 IM is attached as **Exhibit 2**.[4] Importantly, the 2018 IM did not alter any provision of the 2015 RMPAs. The 2015 Plans explicitly allow leasing within habitat. Consistent with the guidance in

---

[2] Available online at https://www.doi.gov/sites/doi.gov/files/uploads/so_3353.pdf
[3] Available online at https://www.doi.gov/sites/doi.gov/files/uploads/so3353_memo_coverletter_report_080717.pdf
[4] Available online at https://www.blm.gov/policy/im-2018-026

the previous administration's 2016 IM, the 2018 IM clarified that "BLM does not need to lease and develop outside of GRSG habitat management areas before considering any leasing and development within GRSG habitat." Ex. 2 at 1–2; *see also* 2016 IM, BLM-MT-BI-014729 (2016 IM does not require lands outside habitat to be leased or developed before allowing leasing within habitat).

Significantly, the 2018 IM clarification is entirely consistent with the plain language of the 2015 Plans. Rocky Mountain ROD, BLM-MT-BI-000430 (PHMAs open to mineral leasing subject to appropriate stipulations.). Like the 2016 IM, the 2018 IM also explains again that the imposition of lease stipulations can be used to encourage lessees to acquire leases outside habitat. Ex. 2 at 2.

## IV.   BLM LEASING DECISIONS

Plaintiffs allege that BLM violated FLPMA and NEPA by "following Secretary Zinke's direction and the 2018 IM" in eleven lease sales in three different states: Montana, Nevada and Wyoming. Dkt. 19 ¶ 61. BLM field offices issued eleven distinct decision records authorizing these sales.

To determine whether Plaintiffs' Complaint challenges eleven individual leasing decisions or a single national directive, it is instructive to compare the dates of the prioritization analyses, draft and final EAs, and lease sales with the issuance dates of the internal memo from Secretary Zinke to his Deputy (August 27, 2017) and the 2018 IM (December 27, 2017) to determine which of the documents could

have impacted any individual leasing decision. Notably, the date that BLM performed its prioritization processes for each of the lease sales pre-dates issuance of the draft EAs. When viewed in light of the timing of these individual leasing decisions, it becomes clear that this action does not involve a singular challenge.

## A.  December 2017 Lease Sales

One lease sale occurred in Montana and one in Nevada on December 12, 2017, and one lease sale occurred on December 14, 2017 in Wyoming.

These lease sales predated the December 27, 2017 issuance of the 2018 IM. The environmental assessments (EA) analyzing whether to offer parcels for lease specifically state that the field offices relied on guidance from the 2016 IM. *See, e.g.,* Wyoming December 2017 Lease Sale EA at 1–2, 52–53 (describing review of parcels and prioritization factors consistent with the 2016 IM, and review of whether appropriate stipulations are included) (referenced pages are attached as **Exhibit 3**[5]); Miles City September 14, 2017 EA for December Lease Sale at BLM-MT-MC-002482, BLM-MT-MC-002737–38 (describing BLM's review of parcels consistent with the 2016 IM).

Moreover, BLM completed the 2016 IM prioritization sequencing and drafted the EAs for each lease sale before the Secretary sent his internal memo to

---

[5]Available online at https://eplanning.blm.gov/epl-front-office/projects/nepa/65707/127633/155332/20171129.HDD_EA_for_December_2017_Lease_Sale_v.3.mg.pdf

his Deputy. *See* **Exhibit 4**, April 25, 2017 Press Release (providing EA and parcels to be included in Wyoming December sale);[6] July 11, 2017 draft of Miles City Field Office EA for December 2017 Lease Sale, BLM-MT-MC-003528, BLM-MT-MC-003782–83 (describing that prioritizing sequencing was conducted under the 2016 IM).

### B.     March 2018 Lease Sales

Four lease sales occurred on March 13, 2018—three in Montana and one in Nevada. Two lease sales occurred on March 21–22, 2018 in Wyoming.

Significantly, the record reflects that the field offices applied the 2016 IM to all the March 2018 sales. *See, e.g.,* Billings March 2018 Lease Sale EA at BLM-MT-BI-000333–37 (detailing prioritizing sequencing done under the 2016 IM in Appendix F); Wyoming High Plains District March 2018 Lease Sale EA at 4 (stating that the Buffalo Field Office performed separate review to recommend one parcel for deferral based on review under the 2016 IM, but the High Plains District determined stipulations were appropriate to conserve habitat) (referenced pages are attached as **Exhibit 5**).[7]

Moreover, the administrative record shows that BLM completed its prioritization review for the Montana lease sales on June 26, 2017, more than one

---

[6] Available online at https://eplanning.blm.gov/epl-front-office/projects/nepa /65707/105887/129462/Press_Release.2017Apr25.pdf

[7] Available online at https://eplanning.blm.gov/epl-front-office/projects/nepa /85072/138343/170198/Environmental_Assessment_High_Plains_V3.pdf

month before the conveyance of Secretary Zinke's internal memo. Flowchart for HiLine March 13, 2018 Lease Sale at BLM-MT-BI-018139.

BLM completed its prioritization sequencing for the March 2018 lease sales under the 2016 IM and drafted the EAs before issuance of the 2018 IM. Moreover, the Decision Records and the attendant EAs for those sales do not mention the 2018 IM or the Zinke internal memo.

### C.     June 2018 Lease Sales

One lease sale occurred in Wyoming on June 20–21, 2018, and one in Nevada on June 12, 2018.

The June 2018 Wyoming lease sale EA indicates that BLM applied the sequencing and review of the proposed parcels for this sale under the 2016 IM. Wyoming June 2018 Lease Sale EA at 76–77 (referenced pages are attached as **Exhibit 6**).[8] In fact, this review occurred before the issuance of the 2018 IM. *See* **Exhibit 7**, Oct. 24, 2017 Press Release (providing EA and parcels to be included in Wyoming June 2018 sale).[9]

### D.     Aggregate Data from All Challenged Leasing Decisions

In total, the BLM sold and leased 492 parcels, generating $59,109,708 in

---

[8]   Available online at https://eplanning.blm.gov/epl-front-office/projects/nepa/85072/149039/183060/Environmental_Assessment_-_High_Desert_District_-_Final.pdf

[9]   Available online at https://eplanning.blm.gov/epl-front-office/projects/nepa/85072/126353/153901/Press_Release.2017Oct24.pdf

revenue. Consistent with statutory obligations, 48% of those funds went to the state where the parcels are located. 30 U.S.C. § 191(a), (b) (50% of all money received from sales, bonuses, royalties and rentals of lands are paid to the State where leased lands are located, minus 2% administrative fee).

In aggregate, 74.25% of the relevant acreage from the challenged leasing decisions is located in Wyoming, 16.44% in Nevada, and only 9.31% in Montana. Significantly, 97.54% of lease sale proceeds and revenue from the challenged lease sales came from Wyoming lease sales. Thus, more than $27,732,000 of the total proceeds from the Wyoming lease sales alone is returned to the State of Wyoming to help fund Wyoming schools, infrastructure, and conservation programs.

## LEGAL AUTHORITY

### I. MOTION FOR RECONSIDERATION

This Motion incorporates the legal standard articulated in Federal Defendants' Motion for Reconsideration. Dkt. 86 at 5-6.

### II. VENUE

The plaintiff bears the burden of showing proper venue. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). Plaintiff must establish venue as to each claim. *W. Org. of Res. Councils v. BLM*, No. CV 16-21-GF-BMM, 2017 U.S. Dist. LEXIS 10412, at *11 (D. Mont. Jan. 24, 2017) (*WORC*).

Under 28 U.S.C. § 1391(e)(1), venue in an action with a federal defendant is proper in a judicial district: (A) "where a defendant in the action resides"; (B) "*where a substantial part of the events or omissions giving rise to the claim occurred,* or a *substantial part of property* that is the subject of the action *is situated"*; or (C) "where the plaintiff resides *if the action involves no real property*." *Mont. Wildlife Fed'n v. Zinke*, No. CV-18-69-GF-BMM, 2018 U.S. Dist. LEXIS 189917, at *12 (D. Mont. 2018) (emphasis added).

Federal oil and gas leases constitute real property interests in the context of Section 1391(e)(1)(B). *See Union Oil Co. v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975) (stating that a mineral lease granted under the Mineral Leasing Act "does convey a property interest enforceable against the Government. . ."); *Utah v. Babbitt*, 830 F. Supp. 586, 594 n.14 (D. Utah 1993) ("A traditional oil and gas lease is an actual conveyance of a real property interest . . . ."); *Bass Enters. Prod. Co. v. United States*, 45 Fed. Cl. 120 (Fed. Cl. 1999) (holding that BLM's refusal to permit drilling on lease land constituted taking of cognizable property right). Thus, conveyance of an interest in property via an oil and gas lease constitutes a matter of "right, title, and interest" under 28 U.S.C. § 1391(e)(1)(B). *Cf. W. Watersheds Project v. Salazar,* No. 08-0516-E-BLW, 2009 U.S. Dist. LEXIS 39364, at *6 (D. Idaho 2009) (finding that a challenge to the issuance of a land use

plan, distinguished from the issuance of an oil and gas lease, does not constitute real property).

## III.   MOTION TO SEVER AND TRANSFER

Deference to a plaintiff's choice of forum diminishes where "the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter." *Pac. Car & Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968).

After determining whether venue is proper, courts engage in a consideration of convenience and fairness of the transfer, including a determination of whether transfer is in the interests of justice. *Jones v. GNC Franchising Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). The "interests of justice" consideration includes: (1) the local interests in having localized controversies decided at home; (2) the relative intensity in the two jurisdictions of any local interests that the litigation might implicate; (3) the administrative difficulties flowing from court congestion; (4) the interest in having a case heard in the state most familiar with the governing law; (5) the relevant public policy of the forum state; and (6) the desire to avoid multiple litigation from a single transaction and to promote consistency among court rulings that affect the development of the case. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

## ARGUMENT

Based on Plaintiffs' characterization of their Complaint as challenging a "single action by a federal agency that presents common questions of law and fact," this Court declined to sever and transfer the Wyoming and Nevada claims. Order at 9-10 [Dkt 62]. Because: (1) Plaintiffs misrepresented the facts as to the timing of the national-level documents and their application to the leasing decisions; (2) the national-level documents cannot serve as the challenged action for purposes of a severance and transfer analysis; and (3) venue is proper in the transferee districts, this Court should reverse its Order and grant Federal Defendants' Motion to Sever and Transfer.

## I.   SEVERANCE AND TRANSFER IS PROPER BECAUSE PLAINTIFFS MISREPRESENTED THE INTERACTION BETWEEN THE NATIONAL-LEVEL DOCUMENTS AND THE INDIVIDUAL LEASING DECISIONS

Because this Court found that Plaintiffs brought a challenge to national-level decisions, it determined that this case was similar to the legal challenges in *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 154 F. Supp. 2d 10, 13 (D.D.C. 2001) (*I&R*) and *WORC* where the plaintiffs challenged a single, final agency action made at the national level. In those cases, the courts found that severance and transfer was not warranted under the Ninth Circuit's interests of justice test because plaintiffs challenged a single, national action that would be heard more efficiently in a single court.

In light of the new facts, this Court should grant Federal Defendants' Motion to Sever and Transfer because Plaintiffs' Complaint is not a challenge to a singular agency action "that presents common questions of law and fact." Order at 9 [Dkt 62]. First, that assertion is not factually correct. Not all of the leasing decisions (and none of the Montana decisions) applied the national-level documents that are the foundation of Plaintiffs' Complaint.

Second, Plaintiffs' characterization of its Complaint as a challenge to two final agency actions is not legally correct. Neither of the challenged national-level documents constitutes final agency action ripe for judicial review under the APA and thus they cannot serve as the challenged action in the Ninth Circuit interests of justice review for the purposes of determining proper venue. Vehement disagreement with policy statements is not actionable under the APA without a final agency action actually implementing those policies.

Because Plaintiffs' Complaint is not properly characterized as a single challenge to national-level final agency action, the cases relied upon by this Court in denying severance and transfer are neither applicable nor instructive.

### A. The 2018 IM is Irrelevant to All of the Montana Challenged Sales, and Inapplicable to Six of the Remaining Seven Lease Sales

Plaintiffs repeatedly made incorrect statements that supported this Court's finding that their Complaint was a challenge to a decision made at the national level. Dkt. 40 at 19 ("And because BLM's decisions all follow the National

16

Directives, Plaintiffs' claims are intertwined and allege the same flaws in every lease sale."); *Id.* at 30 ("BLM relied on the same National Directives for the Nevada, Wyoming and Montana sales, and each sale violated NEPA in the same way.").

Based upon the chronology explained in Section IV above, Plaintiffs' characterizations regarding identical application are factually impossible, particularly as to all four of the Montana lease sales. There is no evidence in any decision record that the parcel prioritization analyses for any of the eleven lease sales modified their analyses based on any portion of Secretary Zinke's internal cover letter to his Deputy (Plaintiffs' "Zinke Memo") or the 2018 IM.

In fact, at least the four Montana lease sale decisions explicitly state that they relied on the previous administrations' 2016 IM in determining which parcels to offer for sale. *See, e.g.,* Dkt. 68-1 at 12 of 18 (noting that the "Washington Office (WO) Instruction Memorandum (IM) 2018-026 was not issued until December 27, 2017, and was not in effect during parcel prioritization for this sale."). Further, all of the prioritization analyses performed for Montana lease sales pre-date the issuance of either the internal memo or the 2018 IM. *See* Facts at Section IV, A-B, *supra; see also* Dkt. 86 at 8, record cites indicating no Montana leasing decision based on 2018 IM or Zinke internal memorandum.

The Montana December 2017 lease sale further illustrates that the local field office did not change its prioritization analysis upon issuance of the Zinke memo. BLM issued its draft EA for the Montana December 2017 lease sale in July (before the Zinke memo), and issued the final EA that addressed public comments in September (after the Zinke memo). Comparison of these two drafts shows that the Miles City BLM field office uses the exact same language for lease sale prioritization before and after issuance of the Zinke memo. *Compare* July 11, 2017 Miles City Draft EA for December 2017 Lease Sale at BLM-MT-MC-003528, BLM-MT-MC-003782–83 *with* September 14, 2017 Miles City Draft EA for December 2017 at BLM-MT-MC-002482, BLM-MT-MC-002737–38.

As evidenced by the above example, Plaintiffs do not assert a national challenge. Nor can they. Rather, at best, they challenge eleven separate Decision Records for eleven separate lease sales. Each lease sale Decision Record tiered to one of two 2015 GrSG RODs, and one of nine different 2015 Plans and environmental impact statements (EIS). Many leasing decisions occurred before the issuance of the 2018 IM, and at least seven of BLM's prioritization reviews occurred before the conveyance of the Zinke memo or 2018 IM, including all the Montana reviews. Thus, it is factually incorrect to treat Plaintiffs' Complaint as a facial challenge to two national-level documents applied identically across the

challenged leasing decisions when the facts show that each BLM field office incorporated different guidance in prioritizing parcels for sale.

**B.** **Regardless of Whether the Individual Field Offices Did Rely on One or More of the D.C.-Level Documents, Neither D.C.-Level Document is a Final Agency Action Giving Rise to an APA Challenge**

Critically, neither the 2018 IM nor the Zinke memo can constitute a "final agency action" such that either one is fairly characterized as a challenge to a single decision. Plaintiffs' claims are brought under the APA. Dkt. 19 ¶ 5. The APA requires that a plaintiff challenge final agency action. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). An agency action is "final" if (1) it "mark[s] the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation and citations omitted).

General statements of policy leave greater discretion to the agency than substantive rules. A final agency action "effectively replaces agency discretion with a new 'binding rule of substantial law.'" *Colwell v. HHS.,* 558 F.3d 1112, 1124 (9th Cir. 2009) (citation omitted).

Neither the 2018 IM nor the Zinke internal memo rises to the level of a binding rule of substantive law that constitutes a "final agency action" under the APA. Plaintiffs' self-named "Zinke Memo" is an internal memo from the Secretary

to the Deputy Secretary that attaches a larger report. It simply reiterates the report's recommendations, and Secretary Zinke instructs the Deputy Secretary to have BLM *begin the process* of determining how to implement the recommendations in BLM's report. Ex. 1 at 1 (recommending BLM improve the compatibility of the 2015 Sage-Grouse Plans with the States, including to "[m]odify or issue new policy on fluid mineral leasing and development, including the prioritization policy . . . ."). At best, it directs future action—but does not rise to the level of final agency action under the governing legal framework. Directing an agency to update a policy cannot constitute a final agency action sufficient to rise to the level of an APA challenge under *Bennett*. While Plaintiffs disagree with these recommendations, and disagree with the overall energy policies of the current Administration, these policy disagreements are not actionable under the APA.

A finding that an internal memo from the Secretary to the Deputy Secretary requesting future policy clarifications constitutes "final agency action" is contrary to law. This memo neither marks the end of a decision-making process nor does it determine any rights, obligations, or legal consequences. *Bennett*, 520 U.S. at 177-78. Thus, it cannot serve as the final agency action sufficient to cast Plaintiffs' claims as a challenge to a national-level decision.

Nor does the 2018 IM constitute the consummation of the agency's decision-making process. Final agency actions under the APA require a concrete decision applying the program to harm a plaintiff. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see also Fund for Animals v. U.S. BLM*, 357 F. Supp. 2d 225, 229 (D.C. Cir. 2004) (finding that BLM issuance of a policy is not a final agency action because further decision-making under that policy constitutes the final action). The 2018 IM does not constitute the consummation of the agency's decision-making. Thus, it cannot constitute the "decision" on which this Court bases its venue determination.

Finally, the Zinke memo, 2016 IM, and 2018 IM are not final agency actions because each reserves to the individual field offices the discretion to make a final decision. *See Or. Natural Desert Ass'n v. United States Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006) (final agency action must be "last word" on matter, such as authorization for permit holder to graze). Neither the 2016 IM nor the 2018 IM is the final word on what parcels BLM may offer for lease in a given leasing decision. They offer guidance on how to prioritize. *See, e.g.,* 2016 IM at BLM-MT-BI-014728 (stating that the 2015 Plans "will allow for leasing and development by applying prioritizing sequencing, stipulations, required design features, and other management measures to achieve the conservation objectives and provisions in the GRSG Plans.").

21

Thus, the policy statements contained in the IMs and the memo from Secretary Zinke leave the individual BLM field offices the "last word" on the determination of whether to offer for lease individual parcels after completion of the prioritization process and imposition of applicable leasing stipulations. Neither of the national documents mandate leasing or development. At most, the 2018 IM provides guidelines for BLM field offices to consider in their final decision-making process.

## II.    In Light of the New Facts Severance and Transfer of the Wyoming and Nevada Challenges is Warranted Under the Ninth Circuit's Interests of Justice Analysis

In light of the new facts, venue is proper for the Wyoming and Nevada lease sale challenges in the Districts of Wyoming and Nevada, respectively. In addition, because these challenges affect real property and other interests in their home districts, it is in the interests of justice to have these challenges heard in their home districts.

### A.    Venue is Proper in the Transferee Districts

Plaintiffs' factual misrepresentations also colored the Court's analysis as to whether venue was proper in the transferee districts. Relying on *Western Watersheds Project v. Zinke*, No. 1:18-cv-00187, 2018 U.S. Dist. LEXIS 152169 (D. Idaho 2018) and *Salazar*, this Court found that venue was not proper under Section 1391(e)(1)(B) because "Plaintiffs do not challenge how a local BLM office

handled a lease sale. Plaintiffs challenge, rather, the 2018 IM and the Zinke Memo that allowed the leasing decisions." Order at 13 [Dkt. 62]. As explained above, at best, Plaintiffs' Complaint can only stand as a challenge to the individual leasing decisions. Thus, the Complaint involves "real property" under Section 1391(e)(1)(B) and venue is not proper based on Plaintiffs' residence.

*Salazar,* relied on by the Idaho District Court in *Western Watersheds Project,* is not binding on this Court. In any case, its differences are instructive. In *Salazar,* plaintiffs did not challenge the issuance of oil and gas leases. *Salazar,* 2009 WL 1299626 at 3. Rather, the court found that real property was not involved because the plaintiffs challenged the issuance of several EISs supporting a resource management plan. *Id.* Thus, the Plaintiffs in *Salazar* only challenged a federal land use plan and its underlying environmental analyses, and did not challenge the issuance of a right, title, or interest—as is granted with BLM's issuance of an oil and gas lease. *See Morton,* 512 F.2d at 747 (indicating a mineral lease "convey[s] a property interest enforceable against the Government. . .").

As explained above, unlike *Salazar* or *WORC,* Plaintiffs here do not challenge a single federal decision. This case is more analogous to *Landis v. Watt,* 510 F. Supp. 178, 180 (D. Idaho 1981). In *Landis,* the court confirmed that a challenge to BLM's oil and gas leasing decisions involves "real property interests" under 28 U.S.C. § 1391(e). *Landis,* 510 F. Supp. at 180. Relying on the legislative

23

history of Section 1391, the *Landis* court acknowledged that the "principal demand for [Section 1391(e)] comes from those who wish to seek review of decisions relating to public lands, ***such as the awarding of oil and gas leases*** . . . . The applicants may reside in any State, or several States of the Union, and it would be unwise to have the Secretary sued in Maine with respect to an oil and gas lease in Wyoming." *Id.* at 180–81 (citing S. Rept. No. 1992, 87th Cong., 2d Sess., reprinted in (1962) U.S. Code Cong. & Adm. News 2789) (emphasis added).

The *Landis* court further found that the Senate adopted the Justice Department's opinion that suits about oil and gas leases fell under Section 1391(e), as the Senate report said: "[f]requently, these proceedings involve problems which ***are recurrent but peculiar to certain areas, such as . . . mineral rights***. These are problems with which judges in those areas are familiar and which they can handle expeditiously and intelligently." *Id.* (emphasis added). Therefore, Congress intended that suits challenging the issuance and cancellation of oil and gas leases, such as the one at issue here, should be governed by Section 1391(e)(1)(B) and heard in their home venues.

In addition, transferring the Wyoming and Nevada claims to their home districts is in line with the plain language of Section 1391(e), which states that venue is proper in a judicial district "where a ***substantial*** part of the events or omissions giving rise to the claim occurred, ***or*** a ***substantial*** part of the real

property that is the subject of the action is situated." 28 U.S.C. § 1391(e)(1)(B) (emphasis added). Only approximately 9.3% of the land at issue in the challenged lease sales is located in Montana. The **substantial** portion of the real property at issue here (approximately 74.25% of the total acreage at issue across all eleven leasing decisions) is located in Wyoming. Of the lease sales that were timed to have possibly applied the so-called "National Directives," Wyoming constitutes approximately 83% of the total acreage at issue, and Montana zero percent. A substantial portion of the land at issue is not located in Montana.

**B.     Transfer of the Wyoming and Nevada Lease Sale Challenges to their Home Districts is in the Interests of Justice.**

The first, second, and fifth factors of the Ninth Circuit interests of justice test weigh greatly in favor of severance and transfer: (1) the local interests in having localized controversies decided at home; (2) the relative intensity in the two jurisdictions of any local interests that the litigation might implicate; and the (5) the relevant public policy of the forum state are particularly relevant to the justification to sever and transfer the Wyoming and Nevada claims to their respective states. *Decker Coal Co.*, 805 F.2d at 843.

Most glaringly, none of the land implicated by Plaintiffs' allegations as to the Zinke memo and 2018 IM is located in the host venue because these leasing decisions predate, or specifically disclaim, implementing these policy statements. Furthermore, all of the prioritization sequencing for the Montana lease sales

occurred before the issuance of the memo from Secretary Zinke to his Deputy. *See* Miles City July 11, 2017 Draft EA at BLM-MT-MC-003528; March 13, 2018 HiLine Lease Chart at BLM-MT-BI-018139. Thus, the alleged implementation of these documents did not affect any real property or other "local interests" in the District of Montana. Montana, then, "has no particular interest" in either challenged national document. *Pence*, 403 F.2d at 954. At minimum, the relevant intensity of the interests in the three jurisdictions favors venue in Nevada and Wyoming over Montana.

In contrast, the Wyoming lease sales (which constitute over 97% of the total revenues across all the challenged leasing decisions): affect Wyoming property; were commented on by local stakeholders; analyze the unique Wyoming GrSG conservation plan; and affect local jobs. Moreover, 48% of revenue raised at Wyoming lease sales—over $27 million—goes directly to the State of Wyoming. 30 U.S.C. § 191. These significant local interests show why the Ninth Circuit's "interests of justice" factors favor severing and transferring these claims.

The 2016 IM sets forth factors for field offices to consider as part of the prioritization process in "accordance with BLM's leasing discretion." 2016 IM at BLM-MT-BI-014731–32. These factors involve site-specific issues, such as existing surface disturbance calculations, proximity to existing development, and evaluation of the value of the GrSG habitat. *Id.* These determinations were

considered and made at the local field office and should be adjudicated at the local district level.

Nor do any interests in the third, fourth, or sixth factors weigh heavily against transferring the claims. As Plaintiffs allege claims related to eleven different leasing decisions that did not arise from a "single transaction," there is little efficiency to be gained from phasing the litigation by individual lease sale in one court. The prioritization analyses for all of the Montana lease sales predate the memo from Secretary Zinke and the 2018 IM. Thus, determination of the validity of the Montana leasing decisions will not narrow the issues for Wyoming and Nevada. There are few, if any, efficiencies to be gained by determining the Wyoming and Nevada leasing decisions in this Court as compared to simultaneous review in their home districts.

## CONCLUSION

In light of the new facts underlying Plaintiffs' claims, venue is proper in the transferee districts because Plaintiffs challenge not a single decision from the Washington, D.C. office, but eleven separate and differing final agency actions. Furthermore, a substantial portion of the lease sales—the real property at issue— falls within the jurisdiction of the transferee districts. Fairness dictates these claims should be heard in their home districts.

Thus, Alliance respectfully requests the Court grant this motion and reverse its decision to deny Federal Defendants' Motion to Sever and Transfer Wyoming and Nevada Claims.

Dated this 6th day of March, 2019.

FOR DEFENDANT-INTERVENOR
WESTERN ENERGY ALLIANCE

*/s/ Malinda Morain*
Bret Sumner, CO Bar No. 38339
(admitted pro hac vice)
Malinda Morain, CO Bar No. 46986
(admitted pro hac vice)
Beatty & Wozniak, P.C.
216 16th Street, Suite 1100
Denver, CO 80202-5115
(303) 407-4499 (phone)
(800) 886-6566 (fax)
bsumner@bwenergylaw.com
mmorain@bwenergylaw.com

Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
3860 Avenue B
Suite C East
Billings, Montana 59102
(406) 403-7066 (phone)
(406) 294-5702 (fax)
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

FOR DEFENDANT-INTERVENOR
STATE OF WYOMING

*/s/ Adrian A. Miller*
Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
3860 Avenue B
Suite C East
Billings, Montana 59102
(406) 403-7066 (phone)
(406) 294-5702 (fax)
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

Erik E. Petersen, WSB No. 7-5680
Wyoming Attorney General's Office
2320 Capitol Ave
Cheyenne, WY 82002
307-777-6946 (phone)
(307)777-3542 (fax)
erik.petersen@wyo.gov
mike.robinson@wyo.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2019, the foregoing was served by the Clerk of the U.S. District Court of Montana, Missoula Division, through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

*/s/ Malinda Morain*
Malinda Morain

## **CERTIFICATE OF COMPLIANCE**

The undersigned, Malinda Morain certifies that this Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 6068 words, excluding caption and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

*/s/ Malinda Morain*
Malinda Morain