Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law
3860 Avenue B, Suite C East
Billings, MT 59102
(406) 403-7066 (phone)
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

Bret Sumner, CO Bar No. 38339
Malinda Morain, CO Bar No. 46986
Beatty & Wozniak, P.C.
216 16th Street, Suite 1100
Denver, CO 80202-5115
(303) 407-4499 (phone)
(800) 886-6566 (fax)
bsumner@bwenergylaw.com
mmorain@bwenergylaw.com

*Counsel for Defendant-Intervenor Western Energy Alliance*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| **MONTANA WILDLIFE FEDERATION,** *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>**RYAN K. ZINKE,** Secretary of the Interior, *et al.*,<br><br>    Defendants,<br><br>**WESTERN ENERGY ALLIANCE** and **STATE OF WYOMING,**<br><br>    Defendant-Intervenors. | Case No. 4:18-cv-00069-BMM<br><br>**REPLY IN SUPPORT OF JOINT MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING FEDERAL DEFENDANTS' MOTION TO SEVER AND TRANSFER WYOMING AND NEVADA CLAIMS** |

1

Defendant-Intervenor Western Energy Alliance (Alliance) respectfully files this Reply in Support of Joint Motion for Reconsideration of the Court's Order Denying Federal Defendants' Motion to Sever and Transfer Wyoming and Nevada Claims [Doc. 90]. The State of Wyoming joins this Reply. Alliance and the State of Wyoming are collectively referred to as Defendant-Intervenors for purposes of this Motion.

## INTRODUCTION

As this Court has succinctly explained, "artful pleading cannot change the nature of the case." *W. Org. of Res. Councils v. United States BLM*, No. 16-21-GF-BMM, 2017 U.S. Dist. LEXIS 10412, *17 (D. Mont. Jan. 24, 2017) ("*WORC*"). This principle is certainly applicable here.

Plaintiffs employed deliberately vague pleadings for their case in an attempt to justify venue for eleven separate federal leasing decisions in three different states. In doing so, however, Plaintiffs mischaracterized to the Court and the Parties the true nature of their claims. Upon being confronted with the fact that none of the Montana leasing decisions applied any of the policies complained of, Plaintiffs reversed course on the nature and scope of their claims in an effort to salvage venue.

Plaintiffs' Response underscores that—even if, for the sake of argument, Plaintiffs' allegations regarding BLM's "implicit" reliance on the Zinke memo are

true—this case still boils down to eleven discrete and separate leasing decisions. Doc. 92 at 15-25. Plaintiffs admit that the Montana decisions "do not present a clear application of the 2018 IM." Plaintiffs' Position on Phase One Brief, Parties' Joint Motion for Case Management Order, Doc. 64 at 6. Indeed, to argue that the Montana leasing decisions—Plaintiffs' self-described "anchor" to their complaint in the chosen venue—actually applied the so-called "National Directives," Plaintiffs themselves engage in a highly detailed record analysis that previews what this Court is facing in determining the veracity of Plaintiffs' claims. This analysis requires the Court to determine what policies were in effect when each leasing decision was made by reviewing the leasing-decision records one-by-one and comparing the language used in each leasing decision to the language in each subsequent guidance document to determine whether any BLM decision actually applied any of the national-level guidance documents.

As illustrated by Plaintiffs' Response, their case is not a unified challenge to any single guidance document. Rather, this case is eleven separate challenges to eleven separate leasing decisions based on the assertion that individual BLM field offices stopped complying with what Plaintiffs assert is the proper interpretation of the 2015 Plans.

Congress made clear its intent in 28 U.S.C. § 1391(e) that venue of actions with a federal defendant must have a substantial tie to that judicial district, either

because a *substantial* part of the events or omissions occurred in that district, or a *substantial* part of the property that is the subject of the action is located in that district. Under the statute, venue cannot be determined solely by choice of the Plaintiff, and creative and artful drafting of pleadings and claims cannot be allowed to subvert the statutes or underlying Congressional intent.

Under the governing statutory framework, as evidenced by new facts, venue of the Wyoming and Nevada claims is proper where a substantial part of the relevant property is located and where a substantial part of the event—the BLM state and field offices' decisions to offer parcels for oil and gas leasing—occurred. Plaintiffs' attempts to complicate and obfuscate these issues in their Response only further confirm the true nature of their claims as eleven separate lease sale challenges that the interests of justice weigh in favor of being heard in their home districts.

## ARGUMENT

I. **PLAINTIFFS' ARGUMENT THAT THE MONTANA DECISIONS "IMPLICITLY" RELIED ON THE NATIONAL DIRECTIVES PROVES THAT THIS CASE IS NOT A UNIFIED CHALLENGE NECESSITATING REVIEW IN A SINGLE COURT.**

Regardless of what Plaintiffs now claim in their Response (*see* Doc. 92 at 17-25), Plaintiffs admit that the Montana decisions "do not present a clear application of the 2018 IM." Plaintiffs' Position on Phase One Brief, Parties' Joint Motion for Case Management Order, Doc. 64 at 6. This runs contrary to their

4

claims to this Court in the briefing on Federal Defendants' Motion to Sever and Transfer that "BLM relied on the same National Directives for the Nevada, Wyoming and Montana sales, and each sale violated NEPA in the same way." Doc. 40 at 38.

Plaintiffs now claim that individual BLM offices implicitly applied so-called "National Directives" because they "echoed" statements in those documents. Doc. 92 at 17. To attempt to prove implicit reliance, Plaintiffs engage in a ten-page detailed analysis of the individual administrative record for the Montana lease sales. Essentially, Plaintiffs argue that: (1) the 2015 Plans include a prioritization mandate prohibiting BLM from issuing oil and gas leases in sage-grouse habitat; (2) leasing decisions in Montana prior to the challenged actions followed that prioritization mandate; and (3) the challenged leasing decisions in Montana reversed course and do not follow that mandate, regardless of when any so-called "National Directive" was issued. Doc. 92 at 15-25.

### A. BLM Did Not Apply the National Directives to the Montana Leasing Decisions

What Plaintiffs fail to note is that the phrases that the post-Zinke Memorandum decisions supposedly "echoed" in the challenged lease sales were already present prior to issuance of the Zinke Memo. *See* Doc. 91 at 23, citing to versions of Draft EA for Miles City December 2017 Lease Sale issued prior to issuance of the Zinke Memo at BLM-MT-MC003782.

5

The July 11, 2017 Miles City Draft EA for the December 2017 Lease sale states:

> ***IM 2016-143 does not prohibit leasing or development in GHMA or PHMA as the GRSG Plans allow for leasing and development*** by applying prioritizing sequencing, ***stipulations***, required design features, and other management measures to achieve the conservation objectives and provisions in the GRSG Plans. This guidance was not intended to direct the Authorized Officer to wait for all lands outside GRSG habitat areas to be lease or developed before allowing leasing within GHMAs, and then to wait for all lands within GHMAs to be leased before allowing leasing or development within the next habitat area (PHMA, for example).

BLM-MT-MC003782 (emphasis added). The September 17, 2017 Miles City Draft EA for the same December 2017 lease sale, issued after the Zinke Memo on August 4, 2017, contains the exact same language. BLM-MT-MC-002737. There is no evidence that Secretary Zinke's memo caused the implicit reliance on new guidance, as this guidance was in existence prior to its issuance.

### B. That Plaintiffs Engage in a Detailed Record Analysis Only Proves the Point That This Case is not a Challenge to a Single National Decision

More importantly, however, the fact that Plaintiffs' Response is so record-dependent and divorced from actual dates of the so-called National Directives proves the point—that this case is not a unified challenge to any national decision, but rather a challenge to the consistency of the 2015 Plans with the leasing decisions.

In essence, this lawsuit must necessarily involve an analysis of each individual leasing decision to determine what guidance that individual BLM field, district, and state office relied on in deciding which parcels to offer for oil and gas lease in each individual leasing decision, and whether that leasing decision is contrary to the 2015 Plans. Thus, any perceived efficiency by having one court analyze the so-called "National Decision" is undermined by the fact that each individual leasing decision constitutes a separate basis for review of a separate and distinct administrative record for that individual leasing decision.

As is now evident from the newly discovered facts regarding the Montana leasing decisions, the court that ultimately hears each of these lease sales will need to determine which national-level documents, if any, impacted each of the eleven leasing decisions, prior to making a determination as to whether any of those leasing decisions violated NEPA or FLPMA. Plaintiffs acknowledge that this determination will require a review of each leasing-decision administrative record, including responses filed to leasing-decision-specific protests. Plaintiffs' Response, Doc. 92. at 17-25 (citing to specific portions of March 2018 and December 2017 Montana leasing decision records for the Miles City and Billings Field offices).

Whether that particular leasing decision relied on any of the national-level guidance will not advise this or any other court as to whether any other BLM field office, in a different lease sale, did or did not rely on that same guidance. Nor will

it instruct the Court as to whether any individual leasing decision relied on national guidance in the same way, or to the same degree, as any previously reviewed individual leasing decision from that or any other field or state office. Thus, ruling on even a single Montana leasing decision will not provide any efficiencies to the Court in ruling on any other leasing decision.

II. **BECAUSE THE MONTANA DECISIONS DID NOT RELY ON THE NATIONAL DIRECTIVES, THERE IS NO "SINGLE CHALLENGED NATIONAL CHALLENGE" JUSTIFYING RETENTION OF THE WYOMING AND NEVADA CLAIMS IN THIS COURT.**

Plaintiffs fail to grasp the basic premise of this Motion by asserting that the failure of the Montana leasing decisions to rely on the so-called "National Directives" cannot justify transfer of the Wyoming and Nevada claims because this fact is only "marginally relevant." *See* Doc. 92 at 8.

Contrary to Plaintiffs' fundamental misunderstanding, that BLM did not rely (or relied "implicitly") on the so-called "National Directives" in issuing the Montana leasing decisions is the entire basis on which this Court found the Motions for Reconsiderations proper. Doc. 69 at 2 (Finding that "Defendants did not apply the national directives at issue to all four Montana leasing decisions [are

facts that] prove new and material when considered in light of this Court's Transfer order[1].")

Because the Montana leasing decisions did not rely on Plaintiffs' so-called "National Directives" (or at best, impliedly relied on general statements of policy that do not constitute final agency action and were issued after BLM made its prioritization decisions), this case is not similar to the cases on which the Court relied in denying Federal Defendants' Motion to Sever and Transfer. This fact is therefore central to the venue determination.

In *Initiative & Referendum Inst. v. U.S. Postal Serv.* 154 F. Supp. 2d 10, 13 (D.D.C. 2001), plaintiffs challenged a postal service regulation that prohibited signature gathering on USPS property. Although the plaintiffs characterized their challenge as an as-applied challenge to a limited number of USPS locations, the court found that the challenged regulation applied to every single postal office nation-wide. Thus, severing and transferring analysis of the constitutionality of a single regulation to the individual field offices did not serve the interests of justice.

In contrast here, as Plaintiffs' Response shows, this case essentially requires this court to analyze the consistency of each leasing decision record with the 2015 Plans, whether or not those plans implicitly or explicitly applied the so-called

---

[1] Because this Court has already found that this constitutes "new evidence," [Doc. 69 at 2] Intervenor-Defendants will not address Plaintiffs' argument to the contrary. Doc. 92 at 16.

National Directives. This is not an endeavor that is more efficiently accomplished in a single court rather than multiple courts.

Similarly, in *WORC,* this Court declined to sever and transfer claims challenging a single Record of Decision, which it notes was the "final agency action that triggered the ability of the Plaintiffs to challenge the BLM's decision-making process." 2017 U.S. Dist. LEXIS 10412 at *28. In contrast here, the eleven leasing decisions each constitutes a discrete "final agency action" triggering review under the APA[2]. *See* Defendant-Intervenors' Motion, Doc. 91 at 24-27. Thus, this case is distinguishable from *WORC* and the fact that it is different is central to the analysis of whether to sever and transfer the Wyoming and Nevada claims.

### III. THE COURT CAN GO BEYOND THE PLEADINGS TO DETERMINE VENUE.

Plaintiffs argue that this Court is bound to the pleadings and Plaintiffs' allegations as to their pleadings in determining venue. Doc. 92 at 20. However, as this Court has recognized, "[a]rtful pleading cannot change the nature of the case." *WORC*, 2017 U.S. Dist. LEXIS 10412, at *17.

---

[2] Plaintiffs also allege that the Defendant-Intervenors fail to cite any support for their position that venue must be determined in relation to the challenged final agency action under the APA. In fact, this Court's opinion in *W. Org. of Res. Councils*, cited extensively in Plaintiffs' Response to Federal Defendants' Original Motion to Sever and Transfer (Doc. 40 at 11-12), as well as in the Court's Order and the Joint Motion, relies on the final agency action analysis for the purposes of determining venue. *See WORC,* 2017 U.S. Dist. LEXIS 10412, at *16.

Although Plaintiffs couch their Complaint as a single challenge to the so-called "National Directives," it is clear from their Response that this case is a challenge to eleven separate leasing decisions nearly identical to the *WildEarth Guardians* case discussed by this Court in *WORC*. *Id.* at *14-15. In *WORC*, this Court distinguished the *WildEarth Guardians* case as a case appropriate for sever and transfer because the *WildEarth Guardians* court found that the plaintiffs' complaint, drafted as six claims containing "as applied" challenges to four separate mining plans, was more accurately characterized as presenting twenty-four different claims. *Id. WildEarth Guardians* was not a unified challenge to one decision "as applied" to four mining plans. In *WildEarth Guardians*, therefore, the interests of justice would not be served by having a single court review six separate challenges to four separate records rather than transfer the claims regarding the Wyoming and New Mexico mines to their home districts for separate review.

Similarly, here, although Plaintiffs characterize their Complaint as six legal challenges to eleven identical leasing decisions, it is actually at least 66 challenges to various alleged deficiencies in those eleven leasing decisions. The Complaint challenges whether any of those eleven leasing decisions are inconsistent with the 2015 Plans or whether those leasing decisions otherwise violated NEPA (separate and apart from the so-called "National Directives" or consistency with the 2015 Plans).

When viewed in the true light of their separate challenges, there is no evidence that requiring this Court to litigate all of these challenges in a single forum is more in the interests of justice than having the Wyoming and Nevada lease sale challenges heard where the environmental impacts of those decisions "resonate most deeply." *WORC*, 2017 U.S. Dist. LEXIS 10412 at *16 (citing *WildEarth Guardians v. U.S. Office of Surface Mining Reclamation & Enforcement*, Civil Action No. 1:13-cv-00518, 2014 U.S. Dist. LEXIS 16062 (D. Colo. Feb. 7, 2014).

Looking beyond the pleadings, it is clear that this case is not a challenge to one single national decision. Thus, material facts differ from those before the Court in its original Order on the Motion to Sever and Transfer, and sever and transfer of the Wyoming and Nevada challenges is warranted.

### IV. THE RANGE-WIDE ANALYSIS ARGUMENT DOES NOT ALTER THE VENUE REQUIREMENTS OF 28 U.S.C. § 1391

Finally, Plaintiffs' arguments as to range-wide analysis do not make venue of the Wyoming and Nevada decisions proper in Montana under 28 U.S.C. §1391(e), nor do they override the other "interests of justice" factors. Plaintiffs argue that their NEPA claims allege "common flaws" in all the Montana, Wyoming, and Nevada lease sales by arguing that: (1) each of the leasing decisions failed to consider cumulative impacts; and (2) failure to prepare an EIS addressing the lease sales across multiple states is contrary to law. Doc. 92 at 29-31. Plaintiffs

also argue that the impacts of this failure to consider cumulative impacts are "intertwined among all three states" and that this intertwining justifies venue in a single District. *Id.*

This argument contains a fundamental flaw—it conflates the range-wide effects of the "impacts" of a failure to consider cumulative impacts in making a leasing decision with the leasing decision itself. Even accepting that the impacts of a Montana leasing decision may be felt across the entire range (which Defendant-Intervenors' dispute for the reasons previously outlined by Federal Defendants [Doc. 44 at 6-10]), the Court's analysis of whether a particular leasing decision violated NEPA because it did not address cumulative impacts will not affect the Court's analysis of whether a separate leasing decision, made by a different field office, and based on a separate Administrative Record, failed or did not fail to sufficiently address the cumulative impacts of that separate decision.

For example, as noted by Federal Defendants in their Motion for Leave (Doc. 67 at 4-5), the Court's assessment of whether the Butte field office failed to consider the cumulative impacts of its decision to offer parcels outside of designated sage-grouse habitat in the March 2018 Montana Sale will not have any bearing on the Court's determination as to whether, under a separate administrative record, a field office in Wyoming in June of 2018 did or did not fully consider the cumulative impacts of its decision whether to offer parcels within sage-grouse

13

habitat for leasing. Even if the *impacts* of a decision may be felt range-wide, which Defendant-Intervenors' dispute, the decision record of any particular decision is limited to the administrative record for that decision. There is no efficiency to be gained by this Court engaging in sequential analysis of each decision rather than having the Wyoming and Nevada decisions analyzed simultaneously in their home districts.

Again, as these cases involve individual NEPA challenges to separate final agency actions wholly divorced from the so-called "National Directives," the fact that *impacts* of leasing decisions are allegedly experienced range-wide has no bearing on whether any other final agency action appropriately considered the cumulative effects of that action. Any alleged range-wide effects cannot override the statutory requirements for venue laid out in 28 U.S.C. § 1391(e)

## CONCLUSION

For the reasons stated above, the Court should grant Defendant-Intervenors' motion and reverse its decision to deny Federal Defendants' Motion to Sever and Transfer Wyoming and Nevada Claims.

Dated this 2nd day of April, 2019.

        FOR DEFENDANT-INTERVENOR
        WESTERN ENERGY ALLIANCE

        */s/ Malinda Morain*
        Bret Sumner, CO Bar No. 38339
        (admitted pro hac vice)
        Malinda Morain, CO Bar No. 46986
        (admitted pro hac vice)
        Beatty & Wozniak, P.C.
        216 16th Street, Suite 1100
        Denver, CO 80202-5115
        (303) 407-4499 (phone)
        (800) 886-6566 (fax)
        bsumner@bwenergylaw.com
        mmorain@bwenergylaw.com

        Adrian A. Miller
        Michelle M. Sullivan
        Sullivan Miller Law PLLC
        3860 Avenue B
        Suite C East
        Billings, Montana 59102
        (406) 403-7066 (phone)
        (406) 294-5702 (fax)
        adrian.miller@sullivanmiller.com
        michelle.sullivan@sullivanmiller.com

FOR DEFENDANT-INTERVENOR
STATE OF WYOMING

*/s/ Adrian A. Miller*
Adrian A. Miller
Michelle M. Sullivan
Sullivan Miller Law PLLC
3860 Avenue B
Suite C East
Billings, Montana 59102
(406) 403-7066 (phone)
(406) 294-5702 (fax)
adrian.miller@sullivanmiller.com
michelle.sullivan@sullivanmiller.com

Erik E. Petersen, WSB No. 7-5680
Wyoming Attorney General's Office
2320 Capitol Ave
Cheyenne, WY 82002
307-777-6946 (phone)
(307)777-3542 (fax)
erik.petersen@wyo.gov
mike.robinson@wyo.gov

16

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.1(d)(2) of the Local Rules of Procedure of the United States District Court, for the District of Montana, the undersigned certifies that the word count is 2,979 words (including footnotes and excluding the caption, Certificate of Compliance, and Certificate of Service).

DATED this 2nd day of April, 2019.

*/s/ Malinda Morain*

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2019, the foregoing was served by the Clerk of the U.S. District Court of Montana, Missoula Division, through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

*/s/ Malinda Morain*
Malinda Morain
