# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| MONTANA WILDLIFE FEDERATION; THE WILDERNESS SOCIETY; NATIONAL AUDUBON SOCIETY; NATIONAL WILDLIFE FEDERATION; and MONTANA AUDUBON, | CV-18-69-GF-BMM |
| Plaintiffs, | ORDER |
| vs. | |
| RYAN ZINKE, in his official capacity as Secretary of the Interior; DONATO JUDICE, in his official capacity as Montana Bureau of Land Management Deputy State Director; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| Defendants, | |

Defendants have filed Motions to Reconsider (Docs. 86, 89) this Court's Order Denying the Federal Defendants' Motion to Sever and Transfer (Doc. 62). Federal Defendants allege that new material facts emerged during the parties' communications and negotiations regarding the Case Management Order (Doc.

1

67). This Court granted Federal Defendants' Motion for Leave to file this Motion for Reconsideration. (Doc. 69).

Federal Defendants present a narrow basis for the Motion for Reconsideration: the Court must determine whether the Montana lease sales challenged in this case applied the Zinke Memo or the 2018 IM (collectively the "National Directives") before making a decision whether to sever and transfer claims relating to lease sales in Wyoming and Nevada. Federal Defendants contend that this Court would lack jurisdiction over the remaining leases at issue if the Montana lease sales did not apply one of the challenged National Directives. Defendant-Intervenors Western Energy Alliance and Wyoming argue also that the National Directives fail to stand as final agency actions that give rise to an APA claim. The Court conducted a hearing on these motions on April 9, 2019.

## BACKGROUND

Plaintiffs Montana Wildlife Federation, The Wilderness Society, National Audubon Society, National Wildlife Federation, and Montana Audubon ("Plaintiffs") challenge BLM's alleged violations of the 2015 Sage Grouse Plans ("2015 Plans"). BLM developed the 2015 Plans to provide coordinated protections for the greater sage-grouse populations and habitats range-wide. (Doc. 40 at 3). The 2015 Plans directed BLM to prioritize oil and gas leasing outside of sage-grouse habitat in order to "limit future disturbance" and "guide development to

lower conflict areas and as such protect important habitat" for sage-grouse. (Doc. 19 at ¶ 47). BLM issued the 2016 Instruction Memorandum ("2016 IM") as a guidance document to implement the 2015 Plans. The 2016 IM directed BLM State Offices to follow a specific "prioritization sequence" for oil and gas leasing. (Doc. 63 at 3).

Secretary Zinke ordered review of the 2015 Plans. Secretary Zinke sought a report that would identify "provisions that may require modification or rescission." (Doc. 19 at ¶ 51). The Report in Response to Secretarial Order 3353 ("Report") outlined short-term and long-term recommendations as directed in the secretarial order. (Doc. 92-1 at 2). Secretary Zinke produced a memorandum on August 4, 2017, ("Zinke Memo") that directed BLM offices "to *immediately* begin implementing the short- and long-term recommendations in the Report." *Id.* (emphasis added).

The Report further directed BLM to immediately "modify or issue new policy on fluid mineral leasing and development, including the prioritization policy." *Id.* The Zinke Memo included a short-term step to "clarify" for BLM staff that "leasing is not restricted in [greater sage-grouse] habitat" and that this habitat would be open for leasing. (Doc. 19 at ¶¶ 52-54). BLM conducted lease sales in Montana, Wyoming, and Nevada four months after issuance of the Zinke Memo.

Federal Defendants claim that the alleged newly discovered evidence contradicts a premise central to this Court's transfer ruling. (Doc. 86 at 2). Federal Defendants contend that the newly discovered information illustrates that "*none* of the Montana leasing decisions" stem from either document that comprise the National Directives. *Id.* at 3 (emphasis in original). Federal Defendants allege that Plaintiffs advised them that BLM's Montana State Office did not apply the 2018 IM. (Doc. 67 at 4). Federal Defendants contend that further inquiry led to the conclusion that three of the Montana EA's (Miles City, Billings, and Hi-Line) applied the 2016 IM, while the fourth EA (Butte) did not apply an IM because the Butte parcels contain no designated sage-grouse habitat. *Id.* at 4-5.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) provides a district court an opportunity to reconsider and amend a previous order. Rule 59(e) offers an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003). A motion for reconsideration will not be granted absent "highly unusual circumstances" unless: (1) there exists newly discovered evidence; (2) the district court committed clear error; or (3) if there has been an intervening change in the controlling law. *Id.* (*citing Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877 (9th Cir. 2000). The party that moves for reconsideration based on newly

4

discovered evidence is "obliged to show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence at the hearing." *Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985).

## DISCUSSION

Plaintiffs allege that the National Directives constituted a final agency action that required an environmental review and consideration of national management plans. (Doc. 19, at ¶ 4). Section 551(13) of the Administrative Procedure Act defines a final agency action to include "the whole or a part of an agency rule, order, license, relief, or the equivalent thereof, or failure to act." 5 U.S.C. § 551(13). Courts "apply the finality requirement in a 'flexible' and 'pragmatic' way.*" Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 435 (D.C. Cir. 1986). A court must look largely to whether "the agency's position is 'definitive'" and whether the agency "possesses a '*direct and immediate* . . . effect on the day-to-day business' of the parties challenging the action." *Id.* at 436 (*citing FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980)) (emphasis added). Plaintiffs argue that the Zinke Memo, one piece of the challenged National Directives, served as the actual final agency action that triggered a "direct and immediate" effect in BLM policy. (Doc. 92 at 33-44)

5

A direct and immediate impact analysis assists the Court in determining "whether the agency's position is merely tentative or whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Ciba-Geigy Corp.*, 801 F.2d at 435. No finality exists if the position proves tentative. Judicial review of a tentative position would intrude into an agency's decision-making process. *Id.* The moment an agency "publicly articulates an unequivocal position, however, and expects regulated entities to alter their primary conduct to conform to that position," then that agency "voluntarily relinquished the benefit of postponed judicial review." *Id.*

Plaintiffs contend that the Zinke Memo itself represents a final action. The 2015 Plans originally directed BLM to prioritize oil and gas leasing outside of sage-grouse habitat in order to "limit future disturbance" and "guide development to lower conflict areas and as such protect important habitat" for sage-grouse. (Doc. 19, at ¶ 47). Plaintiffs point out that Secretary Zinke directed federal and state agencies to identify provisions in the 2015 Plans and associated policies that "may require modification or recession . . . in order to give appropriate weight to the value of energy and other development of public lands . . . and to be consistent with . . . American Energy Independence." Office of the Secretary of the Interior, Secretarial Order 3353 at 5 (Aug. 4, 2017), https://goo.gl/EG5saz. BLM's Report

in Response to Secretarial Order 3353 identified short-term and long-term recommendations. (Doc. 92-1 at 2).

The first Montana lease sale at issue occurred four months after the Zinke Memo's directive to immediately implement new prioritization policies. (Doc. 91 at 14). The Montana lease sales applied the 2016 IM. The Montana lease sales appear to have incorporated, however, the Zinke Memo's significant reinterpretation of the 2015 Plans. The Zinke Memo directed BLM "to *immediately* begin implementing the short- and long-term recommendations in [BLM's] Report." (Doc. 92-1, at 2.) (emphasis added). The Zinke Memo directed BLM to immediately "[m]odify or issue new policy on fluid mineral leasing and development, *including the prioritization policy*." *Id.* The Report similarly directed BLM to immediately "modify or issue new policy on fluid mineral leasing and development, including the prioritization policy." *Id.*

Plaintiffs argue that the Zinke Memo "publicly articulate[d] an unequivocal position" and expected "regulated entities to alter their primary conduct" and ignore the 2015 Plan's prioritization sequence. *Ciba-Geigy Corp.*, 801 F.2d at 435. Plaintiffs cite this reinterpretation of the 2015 Plans pursuant to the Zinke Memo and BLM's Report as a clear and public departure from BLM's prior approach to prioritization. Plaintiffs suggest that BLM "voluntarily relinquished the benefit of postponed judicial review" through this immediate and final change in policy. *Id.*

7

Plaintiffs contend that the Montana sales illustrate BLM's decision to stop applying the 2015 Plans' prioritization sequence following the issuance of the Zinke Memo. BLM offered numerous leases in its March 2018 sale that Plaintiffs allege should not have been sold. In fact, there were "6 parcels in the March sale that were previously deferred for Sage Grouse." (Doc. 92-2). BLM's lease sale documentation shows that many leases under consideration were in Priority Habitat, close to a "lek" breeding area, or located far away from existing development. (Doc. 75-3 at 10-14). BLM chose to proceed, however, and allegedly offer leases in all of the prioritization categories. (Doc. 75-5 at 14). Plaintiffs argue that the reinterpretation represents a clear departure from BLM's prior prioritization approach.

The Court ultimately must determine whether the administrative record supports Plaintiffs' claim that BLM's leasing decisions in Montana changed following the Zinke Memo. The June 2017 Montana sale appears to have applied the original prioritization sequence to shield a number of parcels from leasing. *See* (Doc. 92-3). BLM seems to have changed course, however, with the December 2017 sale. Plaintiffs challenge the December 2017 sale.

The administrative record indicates that BLM's Montana offices adhered to the backlog approach adopted in the challenged National Directives. (Docs. 75-3 at 10-14; 77-1 at 2-3). BLM's Montana staff used the same language provided by

8

BLM headquarters in the protest dismissals for the December 2017 and March 2018 Montana sales. (Doc. 92 at 25). Federal Defendants attempt to cast this issue as one of newly discovered evidence regarding the standards applied by BLM to their own leasing decisions.

A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation. *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 2002). Federal Defendants have failed to persuade the Court that the standards applied to the lease applications at issue would not reasonably have been available to them at the time that they first filed their Motion to Sever and Transfer. *Id.; see also Frederick S. Wyle Prof'l Corp.*, 764 F.2d at 609. The administrative record reveals no newly discovered evidence that would support the "extreme remedy" of this Court reconsidering its earlier order (Doc. 62). *Carroll*, 342 F.3d at 945.

## **ORDER**

Accordingly, IT IS ORDERED that Defendants' Motions for Reconsideration (Docs. 86, 89) are DENIED.

DATED this 30th day of May, 2019.

_____
Brian Morris
United States District Court Judge