# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| **MONTANA WILDLIFE FEDERATION**, *et al.*, | **CV-18-69-GF-BMM** |
| Plaintiffs, | |
| vs. | **ORDER** |
| **DAVID BERNHARDT**, in his official capacity as Secretary of the Interior, *et al.*, | |
| Defendants, | |
| **WESTERN ENERGY ALLIANCE**, *et al.*, | |
| Defendant-Intervenors. | |

## BACKGROUND

The Bureau of Land Management ("BLM") issued a number of amended resource management plans as part of an effort to save the sage-grouse from endangered species designation. These plans adopted a number of measures to save the sage-grouse. One of those measures states that "[p]riority will be given to leasing and development of fluid minerals outside of [sage-grouse habitat]." The central question between the parties is what it means to give something priority.

1

*APA*

Courts review compliance challenges for the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA") under the Administrative Procedure Act ("APA"). Under the APA, courts "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action proves arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court exercises "highly deferential" review and presumes agency action to be valid. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012) (quoting *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). The APA standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle*, 463 U.S. at 43.

*NEPA*

NEPA represents the country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA generally requires that federal

agencies consider the environmental consequences of their actions. *See* 40 C.F.R. § 1501.1. NEPA requires agency decisionmakers to identify and understand the environmental effects of proposed actions and to inform the public of those effects so that it may "play a role in both the decisionmaking process and the implementation of [the agency's] decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also* 42 U.S.C. § 4321; 40 C.F.R. § 1501.1. In other words, NEPA "insure[s] a fully informed and well-considered decision.'" *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

## *Oil and Gas Leasing on Federal Land*

BLM retains discretion to make lands "which are known or believed to contain oil or gas deposits" available for leasing under the Mineral Leasing Act. 30 U.S.C. § 226(a). They may only make these lands available, however, in conjunction with BLM's duties under the FLPMA, which dictates the framework under which BLM manages public lands. FLPMA requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA further states that the policy of the United States requires that BLM "receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(9).

3

BLM accomplishes this directive by developing, maintaining, and revising Resource Management Plans ("RMPs"). 43 U.S.C. § 1712(a)-(b); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions." 43 C.F.R. § 1601.0–2. RMPs establish "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. § 1601.0-5(n)(1)–(2). Before federal coal, oil, or gas resources may be developed, however, BLM must follow additional procedures.

BLM allows entities to develop oil and gas resources through a competitive leasing process. This process generally looks as follows. A party submits an expression of interest ("EOI") to nominate a parcel of land for inclusion in a competitive lease sale. Once BLM has received an EOI, that parcel of land generally gets included in the lease sale. That said, BLM may withdraw parcels "for cause." 43 C.F.R. § 3120.3-4; *see* 43 C.F.R. § 3120.3-1. BLM may withhold or defer these parcels for various reasons, including environmental concerns. *See* BLM-MT-BU-000001. BLM must post a notice of future competitive lease sales, at which time other entities may file protests to all or part of the lease sale. *See id.* §§ 3120.4-2, 3120.1-3. BLM then conducts the lease sale. *See id.* § 3120.5. The entity that receives the lease must then submit an Application for Permit to Drill

("APD") at least thirty days before commencement of operations. *See id.* § 3162.3-1(c)-(d).

*2015 Plans and their Prioritization Requirement*

BLM undertook a large multi-state planning effort to protect the sage-grouse and its habitat in response to concerns that sage-grouse may need to be listed as an endangered species under the ESA. Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition To List Greater Sage-Grouse (Centrocercus urophasianus) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858, 59,874 (Oct. 2, 2015). BLM revised or amended 98 land management plans ("2015 Plans") to adopt sage-grouse protections across the bird's range in ten Western states. *Id.*

The 2015 Plans assign areas of sage-grouse habitat for varying levels of protection. The plans designate priority habitat management areas ("PHMAs"), which are "[a]reas with limited impacts containing substantial and high quality [sage-grouse] habitat that support sustainable [sage-grouse] populations." *See, e.g.*, BLM_MT_BI-000758 (Billings Field Office plan). These PHMAs generally are considered the lands with the highest value and "essential habitat for maintaining [sage-grouse]" populations. *See, e.g.*, BLM-MT-MC-000183 (Miles City Field Office plan). The plans also designate general habitat management areas ("GHMAs"), which are "lands where some special management will apply to

5

sustain [sage-grouse] populations." BLM-MT-MC-000175. GHMAs include, for

example, "occupied seasonal or year-round habitat outside of PHMAs."

WY066635.

BLM took an approach that directed BLM field offices to prioritize leasing

outside sage-grouse habitat to avoid closing all public land to oil and gas leasing.

The Wyoming RMPA and Montana ARMPs all contain the same language with

respect to prioritization:

> Priority will be given to leasing and development of fluid minerals outside of [priority and general habitat]. When analyzing leasing and authorizing development of fluid mineral resources in PHMA and GHMA, and subject to applicable stipulations for the conservation of [sage-grouse], priority will be given to development in nonhabitat areas first and then in the least suitable habitat for [sage-grouse].

See WY066649 (Wyoming RMPA); BLM-MT-MC-000182 (Miles City ARMP),

BLM-MT-BI-000596 (Billings ARMP), BLM-MT-HL-000380 (HiLine ARMP).

BLM's Record of Decision ("ROD") for these plans explained that this

prioritization aimed "to further limit future surface disturbance and encourage new

development in areas that would not conflict with [sage-grouse]." BLM-MT-BI-

000437. Further, the prioritization "intended to guide development to lower

conflict areas and as such protect important habitat." *Id.* The 2015 Plans also stated

that BLM would provide "additional guidance" to "clarify how the BLM will

implement the objective of prioritizing future oil and gas leasing and development outside of [sage-grouse] habitat." BLM-MT-BI-000452.

*2016 IM*

BLM "satisfie[d] the BLM's commitment in the [sage-grouse] ROD's to provide policy direction" when it issued Instruction Memorandum 2016-143 ("2016 IM"). BLM-IM026-000759.  The "Introduction" states that the 2016 IM sought "to ensure consistency across BLM offices when implementing the [2015 Plans] decisions aimed at avoiding or limiting new surface disturbance in . . . PHMAs . . . , and minimizing surface disturbance in . . . GHMAs." BLM-IM026-00749. The 2016 IM also sought "to provide clarity . . . on how to move forward with oil and gas leasing development activities within designated [sage-grouse] habitats." *Id.* The 2016 IM did "not prohibit leasing or development" in sage-grouse habitat. BLM-IM026-00750. Similarly, the 2016 IM does not require BLM to offer "all lands outside [sage-grouse] habitat areas to be leased or developed before allowing leasing within GHMAs." *Id.* The 2016 IM then outlined how BLM should implement the 2015 Plans's priority requirement.

The 2016 IM took a broad approach to prioritization. The 2016 IM contains two sections—one for leasing and one for development—because the 2015 Plans require prioritization at both the "leasing and development" stages. *See, e.g.*, WY066649. The 2016 IM addresses how BLM should address prioritization at the

leasing stage first. The 2016 IM breaks down leasing stage prioritization into six broad sections that each contain different actions that would ensure BLM would "achieve the conservation objectives" in the 2015 Plans. BLM-IM026-000750. The first section contains the "Prioritization Sequence for Leasing in or near [sage-grouse] Habitats." BLM-IM026-000751. This section provided that BLM "will use the following prioritization sequence for considering leasing in or near" sage-grouse habitat. *Id.* That sequence made lands outside of GHMAs and PHMAs "the first priority for leasing in any given lease sale," followed by "lands within the GHMAs," followed by "lands within PHMAs." BLM-IM026-000752. The 2016 IM required BLM to follow this sequence "for considering leasing . . . , while also considering" a list of seven factors outlined in the 2016 IMs second section. BLM-IM026-000751-752. These factors, titled "Factors to Consider While Evaluating EOIs in each category," left it to the discretion of BLM to even consider certain parcels for inclusion in a lease sale. For example, parcels "in areas with higher potential for development . . . are more appropriate for consideration than parcels with lower potential for development." *Id.*  This section ends by instructing BLM to "inform [an] applicant of the reason the parcel was not included in the sale," if BLM chooses not to include a parcel in the next lease sale. BLM-IM026-000753.

The third section outlined how BLM should implement the 2015 Plans' priority requirement when dealing with EOIs and leases that it had sold but not yet

issued. The fourth section consisted of "other tools to reduce impacts to

PHMA . . . and GHMA habitat." BLM-IM026-000754. Among other things, this

category "authorized BLM to suspend all operations and production by direction or

consent in the interest of conservation of natural resources," including "the interest

of the conservation of [sage-grouse] populations and habitats." BLM-IM026-0755.

The fifth section directed BLM to "take into account the EOIs, the [sage-grouse]

plan decisions and goals, this prioritization sequence policy, other resource values,

and workload capacity in configuring quarterly lease sales." BLM-IM026-000756.

The final section directed BLM to provide a preliminary lease sale summary to the

WO-300 before NEPA documentation was posted for a lease sale and a briefing

memo summarizing lease sale parcel protests related to sage-grouse. *Id.*

The 2016 IM then explains how BLM will implement prioritization at the

development stage. The development stage portion of the IM also breaks down into

sections. The first two sections largely mirror the first two sections of the leasing

portion of the 2016 IM. These two sections outline a prioritization sequence and

factors to consider in addition to the prioritization sequence. Like the leasing

sections, the development section also directs BLM to consider "workload

capacities" in addition to "the above prioritization sequence." BLM-IM026-

000758.

9

*Secretary Zinke Changes*

President Trump issued an executive order two months into his presidency directing agencies to "review all existing . . . guidance documents . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil" and other natural energy resources. Promoting Energy Independence and Economic Growth, 82 Fed. Reg. 16,093, 16,093 (March 28, 2017). As a part of this review process, then-Secretary Zinke issued a memorandum ("Zinke Memorandum") that directed BLM to "collaborate" with stakeholders on certain actions aimed at improving the 2015 Plans compatibility with state governments. BLM-IM026-000900. Secretary Zinke directed BLM to "[m]odify or issue new policy on fluid mineral leasing and development, including the prioritization policy." *Id.*

In response to Secretary Zinke's memorandum, BLM issued Instruction Memorandum 2018-026 ("2018 IM"). The 2018 IM replaced the 9.5-pages of the 2016 IM with five paragraphs. *Compare* BLM-IM026-000749-760 *with* BLM-IM026-001071-072. The 2018 IM states that "[i]n effect, the BLM does not need to lease and develop outside of [sage-grouse] habitat management areas before considering any leasing and development within [sage-grouse] habitat." The 2018 IM then stated how BLM should implement the new prioritization policy:

> Where the BLM has a backlog of Expressions of Interest
> for leasing, the BLM will prioritize its work first in non-

10

> habitat management areas, followed by lower priority habitat management areas (e.g., GHMA) and then higher priority habitat management areas (i.e., PHMA, then SFA).

BLM-IM026-001071.

### *2017 Montana Sale*

BLM posted a "Lease Sale Notice" on September 13, 2017, for a lease sale to occur on December 12, 2017, for lands in Montana. (Doc. 77-1 at 1.) The Wilderness Society and National Audubon Society protested the inclusion of 204 parcels of land in the lease sale. These protests included, among other issues, the fact that BLM had failed to prioritize leasing outside of sage-grouse habitats as required under the 2016 IM. (*Id.* at 8-9). BLM offered 204 lease parcels in Montana totaling 98,889 acres at the December 2017 oil and gas lease sale. Nearly 90 percent—180 out of 204 parcels—were within General Habitat for sage-grouse. BLM-MT-MC-002243; BLM-MT-MC_002250-51.

### *2018 Montana Sale*

On December 14, 2017, BLM posted a "Lease Sale Notice" for a sale to occur on March 13, 2018, for lands in Montana. (March 2018 Protest Dismissal, Doc. 75-5 at 1.) Montana Wildlife submitted a protest to this notice, arguing that 109 parcels identified in the notice should not be offered for sale. (*Id.* at 2.) This protest included, among other issues, the argument that BLM had failed to prioritize leasing outside of sage-grouse habitats. (*Id.* at 8-12).

11

BLM stated in response that it "followed the prioritization guidance described in IM 2016-143." (*Id.* at 13.) BLM went on to explain, however, that for this lease sale, "there was no need to apply the prioritization sequence criteria because [the field offices'] staff were able to conduct the necessary analyses of all parcels." (*Id.* at 14.) BLM ultimately dismissed all of the protests. At a March 2018 sale, BLM offered 83 parcels in Montana, of which 70 percent were within Priority or General Habitat. BLM-MT-BI-004707 (83 parcels offered totaling over 46,000 acres, none deferred based on sage-grouse habitat); BLM-MT-BI-005751 (58 of the parcels have PHMA or GHMA).

Part of this lease sale happened in area covered by the Butte Field Office. No sage-grouse habitat remains present in this area, and Plaintiffs do not object to leaving the lease sale in place for this portion of the sale. *See* (Doc. 145 at 21: 11-16.) The Court will leave the lease sales intact for those parcels of land covered by the Butte Field Offices.

*2018 Wyoming Sale*

The Wyoming State Office responded to a number of protests to the Wyoming 2018 Sale. One protest stated that "BLM is subject to clear direction . . . that its greater sage-grouse . . . conservation strategy rely not only on stipulations within designated habitats . . . but also on a larger strategy of prioritizing development outside of all sage-grouse habitats." WY013219. In response, BLM

quoted the 2018 IM: "where BLM has a backlog of EOIs, the BLM will prioritize its work first in non-habitat management areas, followed by lower priority habitat management areas, and then higher [PHMAs]." WY013221. The Wyoming State Office then dismissed the protest based, in part, on the 2018 IM. *Id.* At a June 2018 lease sale, BLM offered 159 leases in Wyoming totaling nearly 194,000 acres. All 159 of the leases were within Priority or General Habitat. WY009241; WY013211.

*Summary Judgment*

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

**ANALYSIS**

## I.   Plaintiffs may challenge the 2018 IM as a final agency action, but not the Zinke Memorandum.

The APA authorizes suit by a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "Agency action" refers to "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). A party generally may only

13

challenge a "*final* agency action" under the APA. 5 U.S.C. § 704 (emphasis added).

The Supreme Court has outlined a two-part test to define "final agency actions." First, the action must "mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Second, the action must be "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178. Further, action does not constitute final agency action unless it "'has the status of law or comparable legal force' or if 'immediate compliance with its terms is expected.'" *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1095 (9th Cir. 2014) (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006)). The court must "focus on both the 'practical and legal effects of the agency action,' and define the finality requirement 'in a pragmatic and flexible manner.'" *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1163 (9th Cir. 2017) (quoting *Or. Nat. Desert Ass'n*, 465 F.3d at 982).

The 2018 IM satisfies both prongs of the *Bennett* test. The 2018 IM constitutes the consummation of BLM's decision on how to apply the prioritization requirement. The 2015 Plans represent the beginning of the agency's decision-making process. These plans stated that "[a]dditional instruction and management direction will be necessary to implement certain land allocation decisions and

14

management direction." BLM-MT-BI-000452. This additional instruction and

direction included "additional guidance . . . to clarify how the BLM will implement

the objective of prioritizing future oil and gas leasing and development outside of

[sage-grouse] habitat." *Id.*

The 2018 IM represents the consummation of that decision-making process

because it directs how BLM will implement the prioritization requirement. BLM

made the 2018 IM "effective immediately." BLM-IM026-001072. BLM field

offices then began implementing the 2018 IM. *See, e.g.*, WY013221. As the Ninth

Circuit recently noted, "an agency engaging in 'merely tentative or interlocutory'

thinking does not state a definitive position . . . , confirm that position . . . , and

then" implement it on the ground. *S.F. Herring Ass'n v. Dep't of the Interior*, 946

F.3d 564, 579 (9th Cir. 2019) (citation omitted) (quoting *Bennett*, 520 U.S. at 178).

The 2018 IM definitively settles the question of how BLM will implement the

prioritization requirement and represents a "final agency action." *See W.*

*Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1226-27 (D. Idaho 2018)

(noting that instruction memorandum may qualify as the consummation of the

agency's decision-making process); *Chiang v. Kempthorne*, 503 F. Supp. 2d 343,

350 (D.D.C. 2007) (noting that agency decision made "effective immediately"

satisfies the consummation prong of *Bennett*).

Further, the 2018 IM represents a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (quotation marks omitted) (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The 2018 IM in essence rescinds a number of mandates in the 2016 IM "expressly chang[ing] how BLM conducts its oil and gas leasing." *W. Watersheds Project*, 336 F. Supp. 3d at 1227. For example, the 2016 IM states that BLM leases sold, but not issued, may only be issued if "consistent with the sequential prioritization approach." BLM-IM026-000754. The 2018 IM stands silent on this issue. The 2016 IM also sets up a process for those who own, but have not been issued, a lease to receive a refund of the "bonus bid, the first year's rental payment, and the administrative fees" if that owner does not consent to lease stipulations that conform to the 2015 Plans. *Id.* The 2018 IM has no similar process. The 2016 IM also authorizes BLM to suspend "all operations and production . . . where it is determined to be in the interest of the conservation of [sage-grouse] populations and habitats." BLM-IM026-000755. The 2016 IM also outlines a number of "parcel specific factors" that BLM may consider "as appropriate" when "determin[ing] work Plans for the oil and gas leasing program." BLM-IM026-000753. The 2018 IM has no such factors or the power to suspend leases.

16

BLM's argument that the 2018 IM does not constitute a final agency action because it "merely sets forth procedural guidelines, within the bounds of applicable regulations" proves unavailing. (Doc. 109 at 23.) This argument ignores the pragmatic nature of the final agency inquiry. *See Havasupai Tribe*, 906 F.3d at 1163. The final agency action determination requires this Court to consider "the practical effects of an agency's decision." *Columbia Riverkeeper*, 761 F.3d at 1094-95. The differences between the 2016 IM and the 2018 IM prove significant as described above. The 2018 IM takes 9.5 pages from the 2016 IM and replaces it with 5 paragraphs. The "Prioritization Sequence," which previously applied to "any given lease sale," BLM-IM026-000752, now applies only "[w]here the BLM has a backlog of Expressions of Interest," BLM-IM026-01071. BLM's power to suspend leases "in the interest of the conservation of [sage-grouse] populations and habitats" was eliminated. BLM-IM026-000755.

At minimum, the removal of the 2016 IM factors that designated parcels of land as "more appropriate" for inclusion in future lease sales satisfies the second *Bennett* prong. BLM-IM026-000752. This omission means that parcels of land once considered more appropriate for inclusion in future lease sales now stand on the same footing as parcels of land formerly shielded from inclusion potentially. This change in status represents a decision "by which rights or obligations have

been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178.

The recent decision of the district court in *Western Watersheds Project v. Zinke*, ___ F. Supp. 3d ___, 2020 WL 959242 (D. Idaho Feb. 27, 2020), also proves instructive. BLM issued a new IM like the ones at issue here. Federal defendants argued that the new IM represented only a "general statement of policy" that did not determine rights or obligations and did not have legal consequences. *Id.* at *9. The district court analyzed the differences between the new IM and its predecessor, including a new six-month BLM review period for nominated parcels, putting the issue of public participation under the NEPA review process in the discretion of BLM, eliminating a 30-day public review period, and the shortening of the 30-day protest period to a new 10-day deadline. *Id.* at *11. The district court acknowledged that "some strands of discretion" could be involved in the layers of these provisions. *Id.* at *12. The district court concluded, however, that these new provisions "collectively prescribe and require an unmistakably different regulatory framework for BLM's administration of oil and gas lease parcel reviews and leasing decisions." *Id.* These modifications affected the substantive and procedural rights and abilities of the public to participate in the process or challenge such practices in satisfaction of the final agency action test of *Bennett*. *Id.*

18

The district court further determined that "legal consequences necessarily flow from the changes" contained in the new IM. *Id.* at *13. The legal consequences include the transition from mandatory public participation in parcel reviews under the former IM to more discretionary participation under the new IM. *Id.* The elimination of some comment periods and the shortening of protest periods had "an immediate and practical impact" on the public and interested parties. *Id.* These legal consequences led the district court to conclude that BLM's adoption of the new IM also satisfied the second prong of *Bennett*'s final agency action test. *Id.*; *see also Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (noting that certain factors provide an indicia of finality, including whether the proposal represents a definitive statement of the agency's position and whether the agency expects immediate compliance with the terms). The 2018 IM qualifies as final agency action under this analysis and application of *Bennett* as it represents BLM's position and reflects BLM's expectation of immediate compliance with its terms. *See W. Watersheds Project*, 2020 WL 959242, at *13; *Chiang*, 503 F. Supp. 2d at 350.

The Zinke Memorandum does not constitute the "consummation" of the agency's decisionmaking process, however, because the 2018 IM represents the consummation of that process. The Zinke Memorandum simply directed BLM to "modify or issue new policy" on the "prioritization policy." BLM-IM026-000900.

19

The Zinke Memorandum does not mention the word backlog and does not require BLM to implement the prioritization requirement only during times of backlog. It offers, little, if any direction to BLM on how to modify the prioritization requirement. The underlying report that formed the basis for the Zinke Memorandum's recommendations leaves significant discretion to BLM on how to modify the 2016 IM. Thus, the Zinke Memorandum does not represent the consummation of the agency's decisionmaking process. *Bennett*, 520 U.S. at 177-78.

## II. The 2018 IM and the lease sales violates the FLPMA.

The FLPMA and its implementing regulations require that BLM manage public lands in accordance with land use plans, and that subsequent authorizations and actions conform to those plans. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004). BLM, thus, is prohibited from taking an actions "inconsistent with the provisions of a land use plan." *Id.* FLPMA requires instead that an agency go through a formal amendment process if it seeks to change a resource management plan. *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 556 (9th Cir. 2006) ("[u]nder FLPMA, if BLM wishes to change a resource management plan, it can only do so by formally amending the plan" under certain regulations).

### a.  The 2018 IM violates the FLPMA.

The 2018 IM violates the FLPMA by contradicting the 2015 Plans in two ways. First, by limiting the prioritization requirement only to situations when BLM faces a backlog of EOIs, the 2018 IM permits BLM to make decisions that would contradict the 2015 Plans. Second, the 2018 IM renders the prioritization requirement a mere procedural requirement, even though the 2015 Plans require the prioritization requirement also to have some sort of substantive thrust.

As to the first point, the 2018 IM's faults start with its limitation that the prioritization requirement applies only when a BLM field office faces a backlog. The 2015 Plans do not say that BLM will prioritize non-sage-grouse habitat in *some* of its decisions. The backlog limitation provides for precisely that result. Take the example of a BLM field office that has four EOIs for four different parcels of land, all of which prove identical in every way except that one of the parcels covers sage-grouse habitat. The BLM field office has no backlog under this circumstance. The field office has determined for various reasons that granting all four EOIs would result in too many greenhouse gas emissions, but granting any three of the EOIs would be fine on the greenhouse gas emission front. Under the 2018 IM, nothing would stop BLM from granting the EOI covering sage-grouse habitat. This outcome would conflict with the 2015 Plans' direction to "prioritize

oil and gas leasing and development outside of [sage-grouse habitat]." BLM-MT-BI-000437.

The Court must keep in mind that BLM's original application of the 2015 Plans's prioritization requirement regularly used lease deferrals to guide new leasing outside of sage-grouse habitat. FWS relied on this understanding of the 2015 Plans when it declined to list the sage-grouse as an endangered species. The ESA recognizes that "the inadequacy of existing regulatory mechanisms" to protect a species represents an important factor to consider in deciding whether a species must be listed. 16 U.S.C. § 1533(a)(1)(D). FWS expressly relied on the prioritization requirement and other protections in BLM's 2015 Plans in deciding in 2015 not list to sage-grouse as endangered. FWS instead noted that the important "regulatory mechanisms" contained in the 2015 Plans adequately would protect the sage-grouse. 80 Fed. Reg. 59,874-875, 59,891. FWS viewed the prioritization requirements as establishing "mandatory" protections. *Id.* at 59,875. FWS specifically noted that the 2015 Plans "prioritize the future leasing and development of nonrenewable-energy resources outside of sage-grouse habitats." *Id.* at 59891. The 2015 Plans instead require BLM to "follow an avoidance, minimization, and mitigation approach." *Id.*

The administrative record reveals significant support for reliance by FWS upon BLM's interpretation of the prioritization requirement. For example, agency

22

staff in Montana stated in 2017 that they had "prioritized leasing outside habitat since the 2015 [Plans] by deferring [sage-grouse habitat] parcels while other areas in the . . . planning area were leased." (Doc. 77-1 at 11.) BLM explained regarding one Montana lease sale that it "applied a prioritization sequence for the nominated parcels." (Doc. 92-3) (preliminary parcel worksheet for May 2017 sale).) In fact "[s]ome parcels were not included in this lease sale as a result of the application of the habitat prioritization sequence" and other factors. *Id.* BLM similarly admitted that "BLM-WY has been deferring certain parcels for 'prioritization' under [the 2016 IM]." BLM-MT-BI-014697; BLMIM026-000790 (46 parcels deferred from June 2017 Wyoming sale). BLM adopted the National Directives in response to complaints from some state governments that BLM "Field Offices have been hesitant to [] conduct new lease sales in PHMA," and "[n]ew oil and gas leases . . . in PHMA [are] severely restrictive if not all together [sic] nonexistent." BLM-IM026-000839.

BLM's reinterpretation of the prioritization requirement in the 2018 IM conflicts with both its own application of the prioritization requirement before issuance of the National Directives and FWS's understanding of the requirement in rejecting the request to list the sage-grouse under the ESA. By contrast, the record reveals little contemporaneous analysis by BLM that would explain or justify its determination that the prioritization requirement would apply only in the event of a

backlog. This failure violates the fundamental requirement that an agency must articulate a satisfactory explanation for its action. *W. Watersheds Project*, 2020 WL 959242, *19. "Faster and easier lease sales," at the expense of potentially imperiling the habitat of a species on the brink of listing under the ESA, falls short. *Id.* at *20.

The 2018 IM also violates the FLPMA because it misconstrues the 2015 Plans and renders the prioritization requirement into a mere procedural hurdle. The 2018 IM states that the 2015 Plans "established an objective to prioritize oil and gas leasing and development outside of [sage-grouse] habitat management areas." BLM-IM026-001071. This statement stands as a partial truth that ignores the goals of prioritization.

The 2015 Plans refer to the prioritization requirement as the "Prioritization Objective." BLM-MT-BI-000437. But the 2015 Plans do not require prioritization for the sake of prioritization. BLM must prioritize non-sage-grouse habitat to accomplish two purposes: "to further limit future surface disturbance and encourage new development in areas that would not conflict with" sage-grouse habitat. BLM-MT-BI-000437. The prioritization requirement stands as the means to achieve these two additional ends. The 2018 IM makes no mention of these additional purposes. The 2018 IM instead views the prioritization as the sole end that BLM must achieve. This flaw proves fatal to the 2018 IM as explained below.

24

The 2018 IM violates the FLPMA because it crafted a prioritization requirement that fails to "encourage new development" in non-sage-grouse habitat. The 2015 Plans explicitly direct BLM to craft a prioritization requirement that satisfies two related goals. Those goals may, but do not inherently, overlap. *See* Chart 1. The 2018 IM accomplishes prioritization, and even then only in the presence of a backlog, without accomplishing the goals of prioritization.



**CHART 1**

The 2018 IM may *result* in new oil and gas development on non-sage-grouse habitat, but it fails to *encourage* that development, as the 2015 Plans requires. Nothing in the 2018 IM prohibits BLM from leasing parcels of non-sage-grouse habitat if someone files an EOI for that type of land. In that scenario, however, BLM stands as a passive participant in new oil and gas development because it has done nothing to encourage a party to file an EOI for that land. As a passive participant, BLM has failed to "encourage new development" in non-sage-grouse habitat lands even though it has prioritized by those lands by processing EOIs for non-sage-grouse habitat lands before EOIs for GHMA and PHMA (of course, as

described above, BLM has not even satisfied the prioritization objective when BLM has no backlog).

BLM's actions under the 2016 IM show how BLM can "encourage new development" on non-sage-grouse habitat lands. BLM appeared to defer lands explicitly because they contained sage-grouse habitat. (Doc. 92-3; Doc. 101 at 24-25 (outlining BLM's reluctance under the 2016 IMs to hold lease sales for PHMA or GHMA)); *see* BLM-IM026-000752-753. By deferring land explicitly because they contained sage-grouse habitat, BLM signaled to interested parties that EOIs for non-sage-grouse habitat had a better chance of approval than EOIs for GHMA or PHMA. This signal sought to encourage new development on non-sage-grouse habitat lands.

### b. The lease sales violate FLPMA for the same reason the 2018 IM violates the FLPMA.

The lease sales either explicitly, or in effect, follow the same rationale as the 2018 IM and thus also violate the FLPMA. For the challenged Wyoming lease sale, the Wyoming Field Office quoted the 2018 IM: "where BLM has a backlog of EOIs, the BLM will prioritize its work first in non-habitat management areas, followed by lower priority habitat management areas, and then higher priority habitat management areas (PHMA)." WY013221. The Wyoming State Office dismissed the protests, in part, because of the 2018 IM. *Id.* For both of the challenged Montana lease sales, BLM stated that it did not apply the prioritization

26

criteria because no backlog of EOI requests existed at that time. (*See* Montana 2018 Lease Sale Protest Dismissal, Doc. 75-5 at 14, Montana 2017 Lease Sale Protest Dismissal, Doc. 77-1 at 10-11.) All of the challenged lease sales either explicitly, or in effect, followed the 2018 IM and thus also have violated the FLPMA.

Federal Defendants and all Defendant-Intervenors claim that the Montana leasing decisions could not have applied the 2018 IM because neither the Zinke Memorandum or the 2018 IM existed at the time that BLM made prioritization decisions for those lease sales. (*See* Doc. 109 at 29; Doc. 113 at 25; Doc. 115 at 20.) Federal Defendants and the Defendant-Intervenors make factually correct, but ultimately irrelevant, points. The Montana leasing decisions explicitly state that they did not apply the prioritization requirement of the 2016 IM because there existed no EOI backlog. (*See* Montana 2018 Lease Sale Protest Dismissal, Doc. 75-5 at 14; Montana 2017 Lease Sale Protest Dismissal, Doc. 77-1 at 10-11.) BLM's failure to apply the prioritization requirement in the absence of a backlog violates the FLPMA regardless of whether the agency purported to follow the 2016 IM or the 2018 IM.

Federal Defendants further claim that "the fact that prioritization would only be necessary if there was a backlog of expressions of interest is implicit in the 2016 IM." (Doc. 126 at 7-8.) This argument simply ignores the multiple times that the

27

2016 IM directs BLM to consider the prioritization requirement in addition to its workload capacity. In the section titled "Configuration of Quarterly Lease Sales from BLM-Identified Lands and EOIs," the 2016 IM states that BLM should "take into account . . . this prioritization sequence policy, other resource values, *and workload capacity* in configuring lease sales." BLM-IM026-000756 (emphasis added). Further, in the section outlining the prioritization sequence, the 2016 IM states that BLM "will use this Prioritization Sequence, these parcel-specific factors, and the BLM's workload capacity and other workload priorities as they determine work Plans for the oil and gas leasing program." BLM-IM026-000753. To the extent backlogs were relevant at all in the 2016 IM, backlogs represented an additional consideration for BLM to use when configuring lease sales, rather than limiting when the prioritization requirement applied.

### c.   **BLM cannot receive deference for its interpretation of the 2015 Plans.**

The National Directives purport to represent interpretations of the 2015 Plans and the prioritization requirement. Agencies typically receive deference to their interpretation of their own land use plans. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). Courts do not defer to agency interpretations of a management plan that prove inconsistent with the plain language of the plan. *Id.*; s*ee also Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1127 (9th Cir. 2007). That said, courts generally should not ask whether the

agency interpretation represents "the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Courts instead must simply determine whether an agency has made a "reasonable" interpretation. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1098 (9th Cir. 2003).

As discussed above, the 2018 IM conflicts with the 2015 Plans' plain language. The 2015 Plans expressly state that BLM must implement the "Prioritization Objective" in a way that prioritizes non-sage-grouse habitats over sage-grouse habitats, "encourage[s] new development" on non-sage-grouse habitats, and "further limit[s] future surface disturbance." BLM-MT-BI-000437. The 2018 IM conflicts with the 2015 Plans because it fails to "encourage new development" on non-sage-grouse habitats.

## III.   The 2018 IM and the lease sales are vacated.

The Court reviewed the 2018 IM and lease sales under the APA, which permits the Court to "set aside" final agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 702(2)(A); *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). The Court recognizes that when the agency record is inadequate, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power &*

*Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *accord Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("In rare circumstances, when we deem it advisable that the agency action remain in force until the action can be reconsidered or replaced, we will remand without vacating the agency's action.")

The Ninth Circuit remands agency actions without vacating that action only in "limited circumstances." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)); *see Wood v. Burwell*, 837 F.3d 969, 975-76 (9th Cir. 2016) (recognizing that remand without vacatur is a remedy "used sparingly"). When determining whether to leave an agency action in place on remand, courts "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.Cir.1993)). When agencies likely can come to the same conclusion on remand, the "seriousness of the agency's errors" weighs in favor of remand without vacatur. *See Pollinator*, 806 F.3d at 532.

The Court sees no reason to leave the 2018 IM in place. BLM's errors undercut the very reason that the 2015 Plans created a priority requirement in the first place and prevent BLM from fulfilling that requirement's goals. As for the lease sales, the errors here occurred at the beginning of the oil and gas lease sale

process, infecting everything that followed. The proper implementation of the 2015
Plans' priority requirement means that BLM may not include parcels included in
the lease sales. This change affects everything else that happened in the oil and gas
lease sales, including but not limited to BLM's NEPA analysis of each lease sale,
the protests that BLM received and the responses it provided to those protests, and
potentially the EOIs that interested parties may have submitted in the first place.
The Court recognizes that the Government and states will need to return millions
of dollars to the interested parties who won lease sales, but that economic harm
does not rise to the level of harm that the Ninth Circuit has previously considered
significant enough to warrant remand without vacatur. *See Cal. Cmtys. Against
Toxics*, 688 F.3d at 993-94 (noting that remand with vacatur would disrupt a
"billion-dollar venture").

Given the agency's errors, the Court cannot see "a serious possibility that the
[agency would] be able to substantiate its decision on remand." *Allied-Signal, Inc.*,
988 F.2d at 151. The Court instead will follow the normal procedure in the Ninth
Circuit and vacate the 2018 IM and the lease sales in their entirety except for the
portion of the Butte parcels that did not cover sage-grouse habitat.

## ORDER

Accordingly, **IT IS ORDERED** as follows:

- Plaintiffs' Motion for Summary Judgment (Doc. 100) is **GRANTED, IN PART**. Plaintiffs' claims that the 2018 IM and lease sales violated the FLPMA are granted.

- Plaintiffs' motion (Doc. 100) is also **DENIED, IN PART**. Plaintiffs' claims that the 2018 IM and lease sales violated NEPA are denied as moot. Plaintiffs' claim that the Zinke Memorandum violated NEPA is denied as unreviewable under the APA. Further, Plaintiffs' claims as they relate to the Butte parcels are denied;

- Federal Defendants' Cross Motion for Summary Judgment (Doc. 108) is **DENIED, IN PART**, and **GRANTED, IN PART**. The Court grants summary judgment in favor of Federal Defendants' claim that the Zinke Memorandum is not a final agency action. The remainder of Federal Defendants' claims are denied on the merits or denied as moot;

- Defendant-Intervenors State of Wyoming and State of Montana's Cross Motion for Summary Judgment (Doc. 112) is **DENIED**. The states' claims that the 2018 IM is not reviewable under the APA and that the 2018 IM and lease sales complied with the FLPMA are denied. The claim that BLM complied with NEPA before the Wyoming lease sale is denied as moot;

- Defendant-Intervenors Western Energy Alliance's Cross Motion for Summary Judgment (Doc. 114) is **DENIED, IN PART**, and **GRANTED, IN PART**. The Court grants summary judgment in favor of Defendant-Intervenors' claim that the Zinke Memorandum is not a final agency action. The remainder of Defendant-Intervenors' claims are denied on the merits or denied as moot.

DATED this 22nd day of May, 2020.


Brian Morris, Chief District Judge
United States District Court