Timothy J. Preso, MT Bar No. 5255
Earthjustice
313 East Main Street
Bozeman, MT  59715
Phone: (406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

Michael S. Freeman
(*admitted pro hac vice*)
Rumela Roy
(*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO  80202
Phone: (303) 623-9466
Fax: (303) 623-8083
mfreeman@earthjustice.org
rroy@earthjustice.org

*Counsel for Plaintiffs Montana Wildlife Federation, The Wilderness Society,
National Audubon Society, National Wildlife Federation, and Montana Audubon*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| MONTANA WILDLIFE FEDERATION, et al., | Case No. 4:18-cv-00069-BMM |
| Plaintiffs, | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (PHASE TWO)** |
| v. | |
| DAVID BERNHARDT, in his official capacity as Secretary of the Interior, et al., | |
| Defendants, | |
| WESTERN ENERGY ALLIANCE, et al., | |
| Defendant-Intervenors. | |

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................2

I.    BLM's 2015 SAGE-GROUSE CONSERVATION PLANS ........................2

II.   BLM VIOLATES THE 2015 PLANS ...........................................6

III.  PROCEDURAL HISTORY ..........................................................8

STANDARD OF REVIEW .................................................................11

ARGUMENT .....................................................................................12

I.  THE PHASE TWO LEASE SALES VIOLATED FLPMA (CLAIM 2)...........12

      A.    December 2017 Wyoming Sale........................................13

      B.    March 2018 Wyoming Sale..............................................16

      C.    Nevada Lease Sales .........................................................18

II.   BLM VIOLATED NEPA BY FAILING TO CONSIDER A RANGE
      OF REASONABLE ALTERNATIVES FOR THE PHASE TWO
      LEASE SALES.  (CLAIM 3).........................................................21

III.  BLM VIOLATED NEPA BY FAILING TO DISCLOSE THE
      REASONABLY FORESEEABLE IMPACTS OF THE LEASE SALES.
      (CLAIM 4).................................................................................28

IV.   BLM VIOLATED NEPA BY FAILING TO ANALYZE THE
      CUMULATIVE IMPACTS OF ITS LEASE SALES.  (CLAIM 5)............33

V.    BLM VIOLATED NEPA BY FAILING TO PREPARE AN EIS FOR
      THE LEASE SALES.  (CLAIM 6) ...............................................38

i

VI.  THE COURT SHOULD SET ASIDE BLM'S APPROVAL OF THE
      PHASE TWO LEASE SALES AND ALL LEASES ISSUED FROM
      THOSE SALES ........................................................................................42

CONCLUSION ......................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Anderson v. Evans,
   371 F.3d 475 (9th Cir. 2004) .................................................................39

Blue Mountains Biodiversity Project v. Blackwood,
   161 F.3d 1208 (9th Cir. 1998) ........................................30, 35, 36, 40

Bob Marshall All. v. Hodel,
   852 F.2d 1223 (9th Cir. 1988) ......................................................29, 39

Bob Marshall All. v. Lujan,
   804 F. Supp. 1292 (D. Mont. 1992)..................................................42

Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy
   Comm'n,
   449 F.2d 1109 (D.C. Cir. 1971).............................................21, 22, 27

City and Cty. of San Francisco v. United States,
   130 F.3d 873 (9th Cir. 1997) ..............................................................11

Conner v. Burford,
   848 F.2d 1441 (9th Cir. 1988) ..............................................25, 29, 31

Conservation Cong. v. Finely,
   774 F.3d 611 (9th Cir. 2014) ..............................................................28

Ctr. for Biological Diversity v. BLM,
   937 F. Supp. 2d 1140 (N.D. Cal. 2013).......................................28, 39

Ctr. for Biological Diversity v. NHTSA,
   538 F.3d 1172 (9th Cir. 2008) ............................................................30

Diné CARE v. Klein,
   747 F. Supp. 2d 1234 (D. Colo. 2010).................................................27

Grand Canyon Trust v. Fed. Aviation Admin.,
   290 F.3d 339 (D.C. Cir. 2002)............................................................34

Great Basin Mine Watch v. Hankins,
   456 F.3d 955 (9th Cir. 2006) ..........................................................................34, 37

Greenwood v. CompuCredit Corp.,
   615 F.3d 1204 (9th Cir. 2010) .......................................................................14, 15

High Country Conservation Advocates v. U.S. Forest Serv.,
   67 F. Supp. 3d 1262 (D. Colo. 2014)...................................................................42

Humane Soc'y v. Dep't of Commerce,
   432 F. Supp. 2d 4 (D.D.C. 2006)..........................................................................27

Idaho Conservation League v. Guzman,
   766 F. Supp. 2d 1056 (D. Idaho 2011) .................................................................16

Idaho Sporting Cong., Inc. v. Rittenhouse,
   305 F.3d 957 (9th Cir. 2002) ................................................................................28

Kern v. BLM,
   284 F.3d 1062 (9th Cir. 2002) .........................................................................35, 38

Klamath-Siskiyou Wildlands Ctr. v. BLM,
   387 F.3d 989 (9th Cir. 2004) .................................................................36, 37, 38

Klamath Sikiyou Wildlands Ctr. v. Boody,
   468 F.3d 549 (9th Cir. 2006) ................................................................................12

League of Wilderness Defs.-Blue Mountains Biodiversity Project v.
   U.S. Forest Serv.,
   689 F.3d 1060 (9th Cir. 2012) .............................................................................28

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,
   463 U.S. 29 (1983)................................................................................................11

Muckleshoot Indian Tribe v. U.S. Forest Serv.,
   177 F.3d 800 (9th Cir. 1999) .........................................................................25, 27

N. Plains Res. Council, Inc. v. Surface Transp. Bd.,
   668 F.3d 1067 (9th Cir. 2011) .......................................................................31, 32

Nat'l Parks & Conservation Ass'n v. Babbitt,
   241 F.3d 722 (9th Cir. 2001) ................................................................................39

Neighbors of Cuddy Mountain v. U.S. Forest Serv.,
   137 F.3d 1372 (9th Cir. 1998) ...............................................................40

New Mexico ex rel. Richardson v. BLM,
   565 F.3d 683 (10th Cir. 2009) ...............................................22, 27, 32

Ocean Advocates v. U.S. Army Corps of Eng'rs,
   402 F.3d 846 (9th Cir. 2005) ................................................................40

Or. Nat. Desert Ass'n v. Rose,
   921 F.3d 1185 (9th Cir. 2019) ..............................................................30

Or. Nat. Res. Council Fund v. Brong,
   492 F.3d 1120 (9th Cir. 2007) ..............................................................30

Pit River Tribe v. U.S. Forest Serv.,
   469 F.3d 768 (9th Cir. 2006) ................................................................39

Roy G. Barton,
   188 IBLA 331 (2016) ............................................................................24

S. Utah Wilderness All. v. Burke,
   981 F. Supp. 2d 1099 (D. Utah 2013).....................................................16

W. Energy All. v. Salazar,
   709 F.3d 1040 (10th Cir. 2013) .............................................................24

W. Watersheds Project v. Abbey,
   719 F.3d 1035 (9th Cir. 2013) .......................................................22, 26

WildEarth Guardians v. BLM,
   __, F. Supp. 3d __, 2020 WL 2104760 (D. Mont. May 1, 2020).  ............*passim*

WildEarth Guardians v. Mont. Snowmobile Ass'n,
   790 F.3d 920 (9th Cir. 2015) ................................................................16

Wilderness Society v. Wisely,
   524 F. Supp. 2d 1285 (D. Colo. 2007).....................................................27

## Statutes

5 U.S.C. § 706.........................................................................................42

5 U.S.C. § 706(2)(A)................................................................................11

42 U.S.C. § 4332(2)(C) ....................................................................38

42 U.S.C. § 4332(2)(E) ....................................................................21

43 U.S.C. § 1732(a) ........................................................................12

## Other Authorities

40 C.F.R. § 1502.14 (2019) ............................................................21

40 C.F.R. § 1502.14(a) (2019) .......................................................21

40 C.F.R. § 1508.7 (2019) .......................................................33, 35

40 C.F.R. § 1508.27 (2019) ............................................................39

40 C.F.R. § 1508.27(a) (2019) .......................................................39

40 C.F.R. § 1508.27(b) (2019) .......................................................40

40 C.F.R. § 1508.27(b)(3) (2019) ..................................................41

40 C.F.R. § 1508.27(b)(7) (2019) ..................................................40

40 C.F.R. § 1508.27(b)(9) (2019) ..................................................41

40 C.F.R. § 1508.27(b)(10) (2019) ................................................40

43 C.F.R. § 1610.5-3(a) ..................................................................12

80 Fed. Reg. 59,858 (Oct. 2, 2015) ..........................................*passim*

82 Fed. Reg. 16,093 (Mar. 28, 2017) ..............................................6

82 Fed. Reg. 47,248 (Oct. 11, 2017) ..............................................36

BLM Planning Handbook H-1601-1, available at:
      https://www.ntc.blm.gov/krc/uploads/360/4_BLM%20Planning%2
      0Handbook%20H-1601-1.pdf ...................................................14

## INTRODUCTION

The five oil and gas lease sales at issue in the second phase of this lawsuit violate the Federal Land Policy and Management Act (FLPMA) for the same reason the lease sales did in the first phase of the case: they disregarded the prioritization requirement in the 2015 sage-grouse resource management plan amendments (the 2015 plans).  In Instruction Memorandum 2018-026 (the 2018 IM), and the August 4, 2017 memorandum from Interior Secretary Ryan Zinke (collectively, the National Directives), the Federal Defendants (BLM) unlawfully "reinterpreted" the prioritization requirement to render it effectively a dead letter.

As this Court recognized in its May 22, 2020 Phase One summary judgment order, the 2018 IM and three Phase One lease sales violated FLPMA because they "conflict[ed] with the 2015 Plans' plain language," and "ignore[d] the goals of prioritization."  ECF No. 147 at 24, 29 (the Phase One Order).  The same is true of the five Phase Two lease sales at issue in this motion: in implementing the National Directives, BLM disregarded the plain language and purpose of the prioritization requirement.  The Phase Two lease sales should therefore be set aside under FLPMA as inconsistent with the 2015 plans.

While not addressed in the Court's Phase One Order, the National Environmental Policy Act (NEPA) claims asserted by Plaintiffs Montana Wildlife Federation, et al. (collectively, the Federation) provide additional grounds for

1

invalidating the challenged lease sales.  The Phase Two lease sales violate NEPA because BLM refused to consider reasonable alternatives that would have withheld sage-grouse habitat from leasing.  The agency also did not analyze the reasonably foreseeable impacts of developing those leases.  And despite offering more than one million acres (1,562 square miles) for oil and gas development, BLM failed to consider the cumulative impacts of that leasing and did not prepare an environmental impact statement addressing the significant impacts to sage-grouse that may result.

The five Phase Two lease sales thus should be set aside as violating FLPMA and NEPA.

## BACKGROUND

## I.   BLM's 2015 SAGE-GROUSE CONSERVATION PLANS

From 2011 to 2015, BLM undertook a massive planning effort to protect greater sage-grouse habitat on public lands, and thus make it unnecessary to list the species under the Endangered Species Act (ESA).  80 Fed. Reg. 59,858, 59,874 (Oct. 2, 2015) (summarizing planning effort as "unprecedented in scope and scale").  In 2015, BLM and the U.S. Forest Service revised or amended 98 land management plans to adopt sage-grouse protections across the bird's range in ten Western states.  Id.  Federal land management is critical to conservation of the greater sage-grouse because public lands make up more than 50 percent of the

bird's currently occupied habitat.  Fully 45 percent of the grouse's habitat lies on land managed by BLM.  Id. at 59,866 (Rangewide Totals in Table 2).

The 2015 plans assign areas of sage-grouse habitat for varying levels of protection.  The plans designate priority habitat management areas (PHMA or Priority Habitat), which are public lands with "the highest value to maintaining sustainable [sage-grouse] populations."  See, e.g., WY066635 (Wyoming plan at 10);[1] Nevada plan at 1-4.[2]  The plans also designate general habitat management areas (GHMA or General Habitat), which are "lands where some special management will apply to sustain [sage-grouse] populations."  WY066635 (Wyoming plan at 10).  General Habitat includes, for example, "occupied seasonal or year-round habitat outside of PHMAs."  Id.

The 2015 plans require:

> Priority will be given to leasing and development of fluid mineral resources … outside of PHMAs and GHMAs.  When analyzing

---

[1] Citations to the administrative record generally follow the formatting used by BLM.  Documents with the prefix WY- reference the records for the Wyoming lease sales filed with this Court on September 13, 2019 and September 15, 2020.  ECF Nos. 99, 193.  Documents with the prefix BLM-IM026- reference the records for the National Directives.  ECF No. 99.  However, BLM's administrative records for the three Nevada lease sales (ECF No. 194) do not include prefixes distinguishing the different sales.  To avoid confusion, the Federation has added citation prefixes that reference the specific Nevada sale: NV-DEC-XXXX (December 2017 sale), NV-MAR-XXXX (March 2018 sale), and NV-JUN-XXXX (June 2018 sale).

[2] Available at:
https://eplanning.blm.gov/public_projects/lup/103343/143707/176908/NVCA_Approved_RMP_Amendment.pdf.

leasing and authorizing development of fluid mineral resources … in PHMAs and GHMAs, and subject to applicable stipulations for the conservation of [sage-grouse], priority will be given to development in non-habitat areas first and then in the least suitable habitat for [sage-grouse].

WY066649 (Wyoming plan at 24) (emphasis added); Nevada plan at 2-28 (emphasis added).

The purpose of the prioritization requirement "is to further limit future surface disturbance and encourage new development in areas that would not conflict with" greater sage-grouse.  WY072017 (Rocky Mountain Record of Decision (ROD) at 1-25).  BLM explained that it intended prioritization to "guide development to lower conflict areas and as such protect important habitat and reduce the time and cost associated with oil and gas leasing and development by avoiding sensitive areas, reducing the complexity of environmental review and analysis of potential impacts on sensitive species, and decreasing the need for compensatory mitigation."  Id.  BLM staff described prioritization as a "smart from the start" approach because it avoided leasing in areas that could later result in oil and gas development that would harm the sage-grouse.  See ECF No. 101 (Phase One MSJ) at 8, 19; ECF 101-2 at 66-67.

To guide implementation of the plans, BLM issued Instruction Memorandum 2016-143 (the 2016 IM).  The 2016 IM established a detailed "sequential prioritization" process, which called for first focusing oil and gas

leasing outside of Priority and General Habitat "in order to minimize further fragmentation and impacts to [sage-grouse] habitat or populations," and then to consider leasing General Habitat before considering Priority Habitat lands.  BLM-IM026-000751-752.   The 2016 IM also identified a list of site-specific factors to consider within each category of habitat.  For example, it instructed BLM to prioritize leasing parcels "immediately adjacent or proximate to existing oil and gas leases and development," and in areas of lower-value sage-grouse habitat.  <u>Id.</u> In contrast, the 2016 IM assigned lower priority for leasing lands far from existing oil and gas development, and for critical sage-grouse habitat such as leks (i.e., breeding areas), nesting areas, and winter range areas.  <u>Id.</u>

Following adoption of the plans, BLM implemented the prioritization requirement and 2016 IM by "deferring" (i.e., withholding) numerous areas of sage-grouse habitat from oil and gas lease sales.  <u>See</u> Phase One MSJ at 24-25. Some states described new leasing in Priority Habitat as "severely restrictive if not all together [sic] nonexistent."  BLM-IM026-000839.

The 2015 plans succeeded in avoiding an ESA listing of the sage-grouse.  In October 2015, the U.S. Fish & Wildlife Service (FWS) determined that listing the sage-grouse as threatened or endangered was not warranted under the ESA.  80 Fed. Reg. at 59,860.  That determination "expressly relied on the prioritization requirement and other protections in BLM's 2015 Plans."  Phase One Order at 22.

As FWS observed, the 2015 plans require BLM to "follow an avoidance, minimization, and mitigation approach."  80 Fed. Reg. at 59,874-875, 59,891.

## II.    BLM VIOLATES THE 2015 PLANS.

Following the January 2017 change in presidential administration, BLM sought to abandon the commitments it had made to conserve the sage-grouse—and which had helped avoid listing it under the ESA.  After President Trump issued an executive order to remove "regulatory burdens that unnecessarily encumber energy production," 82 Fed. Reg. 16,093 (Mar. 28, 2017), Secretary Zinke directed BLM staff on August 4, 2017 that oil and gas leasing "is not restricted in [sage-grouse] habitat," and that leasing is allowed "in all Greater Sage-Grouse habitat categories," including those (like PHMA) most critical to the bird's survival.[3]  The Zinke Memorandum also directed BLM to rescind the 2016 IM.[4]

On December 27, 2017, BLM revoked the 2016 IM and replaced it with IM 2018-026.  The 2018 IM "replaced the 9.5-pages of the 2016 IM with five paragraphs."  Phase One Order at 10.  The 2018 IM directs BLM staff to disregard the plain language and purpose of the 2015 plans' prioritization requirement, stating that prioritization will apply only where there is a "backlog" of leasing

---

[3] BLM-IM026-000900, 907, 917 (BLM Report in Response to Secretarial Order 3353 at 5, and Appx. A at 2, and cover memorandum from Secretary Zinke directing implementation of report).
[4] Id.

requests.[5]  In addition, the 2018 IM asserted that "BLM does not need to lease and develop outside of [sage-grouse] habitat management areas before considering any leasing and development within [sage-grouse] habitat."[6]  BLM reasoned that prioritization does not limit leasing because:  (a) the 2015 plans designate sage-grouse habitat as "open" for leasing, and (b) BLM sells leases with stipulations required under the plans.  Id.  Unlike the 2016 IM, the 2018 guidance did not contain site-specific prioritization factors, such as instructions to prioritize leasing away from high-value sage-grouse habitat, and to focus leasing in areas adjacent to existing oil and gas development.

   As this Court recognized, the 2018 IM "conflict[ed] with both BLM's own application of the prioritization requirement before issuance of the National Directives and FWS's understanding of the requirement" in declining "to list the sage-grouse under the ESA."  Phase One Order at 23.  BLM implemented the National Directives by offering hundreds of thousands of acres of oil and gas leases for sale in Priority and General Habitat between December 2017 and June 2018.  In addition, from June through December 2018, more than 76% of the

---

[5] BLM-IM026-001071 (Instruction Memorandum 2018-026 (Dec. 27, 2017)).
[6] Id.

acreage offered or proposed by BLM for leasing in several states was in habitat

protected under the 2015 plans.[7]

## III.   PROCEDURAL HISTORY

The Federation filed this lawsuit in April 2018 to challenge the National

Directives and eight oil and gas lease sales implementing the directives.  ECF Nos.

1, 19 (Compl. and 1st Am. Compl.).

By agreement of the parties, the Court bifurcated the case into two phases.

The first phase addressed the Federation's challenge to the National Directives and

three of the lease sales (a June 2018 Wyoming sale and Montana sales held in

December 2017 and March 2018).  ECF No. 97 (Case Management Order).  The

second phase covers the remaining five sales.  ECF No. 163 (Case Management

Order).

On May 22, 2020, this Court entered summary judgment in Phase One,

ruling that the 2018 IM violated FLPMA because it conflicted with the

prioritization requirement of the 2015 plans in two respects.  Phase One Order at

20-26.  First, the direction to apply leasing prioritization only where a backlog of

leasing proposals exists violated FLPMA because: "[t]he 2015 Plans do not say

_____

[7] See Alex Thompson, The Wilderness Society, <u>New maps show Interior
Department Overtaking sage-grouse habitat with oil and gas leasing sales</u> (June 20,
2018), available at: <u>https://www.wilderness.org/articles/press-release/new-maps-
show-interior-department-overtaking-sage-grouse-habitat-oil-and-gas-leasing-
sales</u>; <u>see also</u> ECF No. 101-1 at 62 (Holloran Decl. ¶ 24).

that BLM will prioritize non-sage-grouse habitat in some of its decisions. The

backlog limitation provides for precisely that result." Id. at 21.  Second, the Court

held that the 2018 IM "misconstrues the 2015 Plans and renders the prioritization

requirement into a mere procedural hurdle." Id. at 24.  As the Court explained, the

2018 IM "ignores the goals of prioritization" to "further limit future surface

disturbance and encourage new development in areas that would not conflict with"

sage-grouse habitat.  Id.

The Court also held that three Phase One lease sales violated the 2015 plans

for the same reason as the 2018 IM.  Id. at 26-28.  The Phase One Order set aside

the 2018 IM and leases sold through the three sales.  Id. at 29-31.[8]

This Phase Two summary judgment motion addresses the remaining five

BLM lease sales at issue in this case:

- A December 2017 lease sale in Wyoming offering 45 parcels totaling 72,884 acres.  Fully 42 of the 45 leases covered PHMA or GHMA.  P. 13, infra.

- A March 2018 Wyoming lease sale offering 170 parcels totaling more than 170,500 acres, at least 116 of which were in PHMA or GHMA.  See p. 16, infra.

---

[8] On August 25, 2020, the Court entered an order staying its vacatur of the June 2018 Wyoming leases pending appeals taken by BLM and Defendant-Intervenors from the Phase One Order.  ECF No. 189.  The Federation has moved to dismiss those appeals.  That motion is fully briefed and awaiting a decision by the Ninth Circuit.

- A December 2017 BLM lease sale offering 208 Nevada lease parcels totaling 388,697 acres, 95 percent of which (197 of the 208 parcels) covered PHMA or GHMA.  1st Am. Compl. ¶ 68; NV-DEC-007273.

- A March 2018 BLM sale in Nevada offering 39 leases totaling 67,791 acres. Roughly 67 percent of that acreage covered PHMA or GHMA. NV-MAR-000820; NV-MAR-000817.

- A June 2018 Nevada lease sale, offering 166 leases totaling 311,725 acres in Nevada, half of which (82 parcels) covered Priority or General Habitat.  NV-JUN-001834; NV-JUN-003178.  BLM offered those leases despite concerns registered by the Nevada Division of Wildlife that the "viability of [a particularly valuable] lek complex and [sage-grouse] subpopulation would be likely compromised" if those leases were developed.  NV-JUN-008998-999 (June 2018 Nevada Environmental Assessment (EA) at 29-30); see NV-JUN-009122 (map).

As with the lease sales previously deemed unlawful by this Court, BLM in each of these five sales followed the interpretation from the National Directives and declined to withhold any parcels from leasing under the prioritization mandate. See pp. 13-18, infra.

For each sale, BLM also prepared an environmental assessment (EA) that addressed only two alternatives regarding sage-grouse habitat: leasing all the parcels being considered, and the no-action alternative (offering zero leases). BLM did not consider a middle-ground alternative that would avoid important habitat while offering leases in other areas.  The EAs also did not analyze what the impacts of oil and gas development on the leases would be on sage-grouse.

Instead, BLM deferred its analysis of those impacts until a later date when lessees submit applications for permits to drill on the leases.

As demonstrated below, the five Phase Two lease sales suffer from the same legal flaws as the leases addressed by the Court in Phase One.  They should be held unlawful and set aside for the same reasons.

## STANDARD OF REVIEW

The Federation brings its claims under the Administrative Procedure Act (APA).  In APA cases, summary judgment is typically appropriate because the court's role is to review the evidence in the administrative record, rather than resolving fact issues.  See City and Cty. of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997).

Under the APA, courts shall hold unlawful and set aside agency action "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

## ARGUMENT

## I.   THE PHASE TWO LEASE SALES VIOLATED FLPMA (CLAIM 2).

The Phase Two lease sales are inconsistent with the 2015 plans for the same reasons as the Phase One sales: BLM expressly relied on the unlawful 2018 IM and treated prioritization as no more than a procedural hurdle rather than a meaningful requirement to conserve sage-grouse habitat.  In all five lease sales, BLM declined to defer <u>any</u> leases under the prioritization requirement and disregarded that requirement's purpose of encouraging development outside of sage-grouse habitat.

This agency conduct violated FLPMA.  FLPMA requires that BLM develop resource management plans (RMPs) for public lands, and conduct all subsequent management activities "in accordance with" those RMPs.  43 U.S.C. § 1732(a); <u>see also</u> 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions … shall conform to the approved plan."); <u>Klamath Sikiyou Wildlands Ctr. v. Boody</u>, 468 F.3d 549, 557 (9th Cir. 2006) (FLPMA "require[s] BLM to manage public lands in accordance with resource management plans once they have been established").

The Phase Two lease sales violated these requirements.

### A.     December 2017 Wyoming Sale

BLM's December 2017 lease sale offered 45 parcels totaling 72,884 acres in Wyoming.  Of the 45 parcels, 42 overlapped with either Priority or General Habitat.  WY120986 (EA at 7).  BLM, however, did not defer any leases under the prioritization requirement.  WY120980-981 (id. at 1-2).  In its EA, BLM acknowledged the prioritization requirement of the 2015 plans, and the 2016 IM, but did not apply it.  WY121031-032 (id. at 52-53).  For example, BLM noted that some parcels contained "active [sage-grouse] leks within their boundaries," some parcels in PHMA were distant from existing oil and gas production, and some were on lands with low potential for oil and gas development.  Id.; see also WY118239. All these factors pointed to deferring leases under the 2016 IM.  Pp. 4-5, supra. BLM, however, offered every lease in Priority and General Habitat without explaining how that decision could follow the 2016 IM.

In denying the Federation's protest, BLM relied on the same rationale adopted in the National Directives, focusing on the 2015 plans' designation of PHMA and GHMA as "open" for leasing and asserting that stipulations were attached to the leases as provided under the 2015 plans.  WY121527, 535 (Protest Dismissal at 8, 16) (describing prioritization as not an "allocation" under the 2015

plans, and stating that stipulations would be applied);[9] see also WY120986 (EA at 7) (declining to consider deferring leases in sage-grouse habitat because stipulations "provide for appropriate levels of Greater Sage-grouse protection").

Like the National Directives, this approach ignored that prioritization was included in the 2015 plans as a requirement distinct from other plan requirements such as lease stipulations and land classifications for leasing.  Phase One MSJ at 18-19.  The plans identify prioritization as a "key component" of their conservation strategy, and specify that it applies in addition to designations of lands as open or closed to leasing, and separate from required lease stipulations.  WY066644 (Wyoming plan at 19) (table of plans' "key components" states PHMA and GHMA are "[o]pen to fluid mineral leasing subject to" certain lease stipulations, but also listing separate component directing BLM to "prioritize" leasing outside sage-grouse habitat); WY072017 (Rocky Mountain ROD at 1-25) (prioritization requirement applies "[i]n addition to allocations that limit disturbance" in sage-grouse habitat).  The prioritization requirement, in fact, would be meaningless if it applied only to lands already closed to all leasing.  See Greenwood v.

---

[9] "Allocations" refer to RMP provisions designating certain lands as open or closed to leasing.  See BLM Planning Handbook H-1601-1 at 13 (defining allocations as provisions that "identify uses … that are allowable, restricted, or prohibited on the public lands and mineral estate"), available at: https://www.ntc.blm.gov/krc/uploads/360/4_BLM%20Planning%20Handbook%20H-1601-1.pdf.

CompuCredit Corp., 615 F.3d 1204, 1209 (9th Cir. 2010) (statute must be interpreted "such that all its language is given effect, and none of it is rendered superfluous").

BLM also erred in relying on lease stipulations.  The 2015 plans require application of both stipulations and prioritization—not stipulations instead of prioritization.  See Phase One MSJ at 19-20; WY066644 (Wyoming plan at 19).  The prioritization requirement serves a different purpose from lease stipulations.  Prioritization addresses whether BLM will offer leases in sage-grouse habitat, in order to "guide development to lower conflict areas and as such protect important habitat."  WY072017 (Rocky Mountain ROD at 1-25).  Lease stipulations, by contrast, apply only after BLM has issued the lease, and aim to mitigate the harm from developing sage-grouse habitat.  By relying only on stipulations, BLM skipped over the threshold step of considering whether to protect certain areas by not leasing them at all.

BLM also asserted that prioritization required only considering the factors from the 2016 IM, not actually applying them to guide leasing away from sage grouse habitat.  See WY121535 (Protest Dismissal at 16) ("the policy mandate is to consider, not shall").  This theory is inconsistent with the 2015 plans, which as this Court held do not make prioritization merely a "procedural hurdle."  Phase

One Order at 24.  Rather, the point of prioritization is to guide leasing and development away from sage-grouse habitat.  Id. at 22.

As courts have held with similar requirements, "[a]cknowledging … standards is not the same as applying them."  S. Utah Wilderness All. v. Burke, 981 F. Supp. 2d 1099, 1104 (D. Utah 2013) (enforcing requirement that BLM designate travel routes to "minimize" impacts).  "Simply listing the [minimization] criteria and noting that they were considered is not sufficient to meet this standard."  Idaho Conservation League v. Guzman, 766 F. Supp. 2d 1056, 1074 (D. Idaho 2011); see also WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920, 931 (9th Cir. 2015) (same).

The December 2017 Wyoming sale violated the 2015 plans.

**B.  March 2018 Wyoming Sale**

BLM's March 2018 auction offered 170 leases totaling more than 170,500 acres in Wyoming.  The sale included 89 parcels in BLM's Wind River/Bighorn Basin District (WRBB) (Wind River leases), of which 79 were within Priority or General Habitat.  WY130986 (WRBB EA at 3-39).  An additional 81 parcels were in the agency's High Plains District (HPD) (High Plains leases), of which 14 were within Priority Habitat and 23 were within General Habitat.  WY130898-899 (HPD EA at 48-49).  BLM did not defer a single parcel under the prioritization requirement.  WY131590.

16

BLM prepared separate EAs for the Wind River and High Plains leases.  The

Wind River EA mentions the prioritization requirement, but does not discuss it,

other than to state that appropriate lease stipulations are applied to leases in sage-

grouse habitat.   WY130987 (WRBB EA at 3-40) ("The [plans] in BLM Wyoming

direct the priority for leasing of fluid mineral resources to be outside of sage-

grouse habitat areas.  If leasing occurs in sage-grouse habitat areas, all leasing is

consistent with stipulations developed during land use planning …").  The High

Plains EA did not discuss the prioritization requirement.  WY130891, 898-899,

911-912 (HPD EA at 41, 48-49, 61-62).[10]

When the Federation objected to BLM's failure to follow the prioritization

requirement, the agency expressly relied on the unlawful 2018 IM.  In denying the

Federation's administrative appeal, BLM quoted the 2018 IM's direction that the

agency "does not need to lease and develop outside of [sage-grouse] habitat

management areas before considering any leasing and development within [sage-

grouse] habitat."   WY131018-019, 025 (Protest Dismissal at 11-12, 18).  BLM

also followed the interpretation from the 2018 IM, noting that lease stipulations

would apply and stating that prioritization "is not an allocation decision" (i.e., not

---

[10] The High Plains EA did note that BLM staff had recommended deferring one
lease parcel pursuant to the 2016 IM but were overridden on the theory that lease
stipulations "would be sufficient to conserve sage-grouse and their habitats."
WY130854, 861-862 (HPD EA at 4, 11-12).

closed to leasing) under the 2015 plans.  WY131019; see also WY129702-703

(HPD EA Attachment F at 7-8); WY129874 (WRBB EA Attachment 2 at 4) (same

in response to comments).

As discussed above, these rationales violate the 2015 plans, just as the 2018

IM does.  See pp. 13-16, supra; see also Phase One Order at 26-27 (lease sale

violated FLPMA when BLM "explicitly … followed the 2018 IM").

### C.    Nevada Lease Sales

In the December 2017 Nevada lease sale, and the March and June 2018

Nevada sales, BLM offered more than 750,000 acres of oil and gas leases without

withholding a single parcel under the prioritization requirement.  NV-DEC-010610

(December 2017 sale); NV-MAR-000820 (March 2018 sale); NV-JUN-004109

(June 2018 sale).  In fact, BLM stated at the outset of its planning process for the

June 2018 sale—in November 2017, months before any public comment was

received—that "there's to be no deferral of parcels" in the sale.  NV-JUN-001770.

Consistent with the agency's predetermined approach, the NEPA analyses

for the three sales do not even mention prioritization.[11]  When the Federation

objected to this omission, BLM pointed to the unlawful 2018 IM or offered

---

[11] See NV-MAR-000492, 576-577 (March 2018 EA at 4 (discussion of compliance
with 2015 plans does not mention prioritization), 88-89 (discussion of sage-
grouse)); NV-DEC-011354-357, 379-80 (December 2017 EA at 46-49, 71-72);
NV-JUN-008974, 8998-999, 9018 (June 2018 EA at 5, 29-30, 49).

excuses echoing that IM.  In its dismissal of the Federation's June 2018 sale

protest, BLM expressly cited the 2018 IM and treated prioritization as just a

workflow management provision.  NV-JUN-002849 (Protest Dismissal at 6)

(asserting that BLM complied with prioritization requirement because it

"follow[ed] a specifically outlined guidance on prioritization implementation listed

in the WO IM 2018-026, and [processed] nominations outside of sage grouse

habitat first before considering leasing within habitat"); see also NV-JUN-009136

(June 2018 EA at 167) (response to comments on EA cites 2018 IM with no

additional explanation).  The agency offered the same rationale in the December

2017 and March 2018 sales, without expressly citing the 2018 IM.  See NV-DEC-

010888 (same language in December 2017 Protest Dismissal at 9); NV-MAR-

000818-819 (March 2018 sale).[12]  This rationale violates the 2015 plans for the

same reason at the 2018 IM.  See Phase One Order at 21, 24-26.

    BLM's responses to the Federation's objections also followed the 2018 IM

by asserting that stipulations attached to the leases served to comply with the

---

[12] BLM's December 2017 Protest Dismissal claimed to apply the 2016 IM.  NV-
DEC-010888.  The administrative record for the December 2017 sale, however,
contains no indication that BLM ever considered or applied the factors required by
the 2016 IM.  Moreover, the Protest Dismissal was not issued until February 2018
(after issuance of the 2018 IM) and it used language identical to BLM's application
of the 2018 IM.  Compare id. with NV-JUN-002849-850 (June 2018 Protest
Dismissal at 6-7).

prioritization requirement.  See NV-DEC-010888-889 (December 2017 Protest

Dismissal at 9-10); NV-MAR-000818-19 (March 2018 sale); NV-JUN-002849-

850 (June 2018 Protest Dismissal at 6-7).  As discussed above, this was improper

because lease stipulations are distinct plan requirements from prioritization.  See p.

15, supra.[13]  BLM's approach was consistent with the illegal 2018 IM, but not the

2015 plans.

Further, nothing in the administrative record suggests that BLM gave any

consideration to prioritization's purpose of guiding development away from sage-

grouse habitat.  The administrative records, for example, do not address the

proximity of leases in Priority or General Habitat to existing oil and gas

development, or whether the value of sage-grouse habitat warranted deferring

some leases that were far removed from existing development.  See pp. 4-5, supra

(discussing prioritization factors from 2016 IM).

In fact, had BLM applied the 2016 IM prioritization factors, it should have

withheld numerous parcels in sage-grouse habitat because there appears to be little

existing development in the vicinity of the Nevada leases.  The March 2018 EA

states that in Nevada, "[b]etween 2005 and 2015, there have been a total of 7 drill

---

[13] In the June 2018 sale, BLM staff expressed concern that stipulations provided
under the 2015 plans would be insufficient to protect sage-grouse in some
locations.  NV-JUN-008544.  Nevertheless, BLM stated that "we're told that [the
2015 plan stipulations] is what we have to use."  Id.

holes on Public lands, with an average of less than one well drilled per year."  NV-
MAR-000630 (March 2018 EA Appx. C at 3).  While the EA projects drilling to
increase in the area, NV-MAR-000634 (id. at 7), nothing in the record shows that
BLM considered whether to defer leasing important sage-grouse habitat under the
prioritization requirement.

BLM's near-total disregard of prioritization in the three Nevada sales did not
comply with the 2015 plans or with FLPMA.

## II.   BLM VIOLATED NEPA BY FAILING TO CONSIDER A RANGE OF REASONABLE ALTERNATIVES FOR THE PHASE TWO LEASE SALES.  (CLAIM 3)

BLM violated NEPA by approving the five Phase Two sales without
analyzing a range of reasonable alternatives.  NEPA requires BLM to evaluate "all
reasonable alternatives" to its proposed actions.  40 C.F.R. § 1502.14(a) (2019);
see 42 U.S.C. § 4332(2)(E) (agencies must study, develop, and describe
appropriate alternatives to recommended courses of action); WildEarth Guardians
v. BLM, __, F. Supp. 3d __, 2020 WL 2104760, **6-7 (D. Mont. May 1, 2020).
This alternatives analysis is "the heart" of the environmental review.  40 C.F.R. §
1502.14 (2019).

Analyzing reasonable alternatives is necessary to ensure BLM considers all
possible approaches to addressing the environmental impacts from a project.
Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n, 449

21

F.2d 1109, 1114 (D.C. Cir. 1971).  NEPA's alternatives requirement aims to ensure that the "most intelligent, optimally beneficial decision will ultimately be made." Id.  "Without substantive, comparative environmental impact information regarding other possible courses of action, the ability of [a NEPA analysis] to inform agency deliberation and facilitate public involvement would be greatly degraded." New Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 708 (10th Cir. 2009).  "The existence of a viable but unexamined alternative renders an EA inadequate." W. Watersheds Project v. Abbey, 719 F.3d 1035, 1050 (9th Cir. 2013) (internal quotation omitted).

In each of the EAs for the five challenged lease sales, BLM took an "all or nothing" approach by analyzing only two options related to sage-grouse habitat: either leasing all of the parcels being considered, or leasing none of them.[14]  BLM failed to consider a reasonable middle-ground alternative that would have offered some leases for sale while deferring parcels in high-quality sage-grouse habitat.

For example, in the December 2017 Nevada sale, the Federation proposed that BLM consider an alternative deferring parcels in Priority Habitat because there

---

[14] WY120985-986 (December 2017 Wyoming EA at 6-7); WY130863-864 (March 2018 Wyoming HPD EA at 13-14); WY130947 (March 2018 Wyoming WRBBD EA at 2-1); NV-DEC-011313, 324  (December 2017 Nevada EA at 5, 16); NV-JUN-008979 (June 2018 Nevada EA at 10); see also NV-MAR-000496, 503 (March 2018 Nevada EA at 8, 15) (considering third alternative unrelated to sage-grouse).

was little existing oil and gas development there and "BLM anticipates very little, if any, development on these parcels." NV-DEC-010969 (December 2017 Protest Ex. 1 at 3); see NV-DEC-011332 (December 2017 Nevada EA at 24). Under the 2016 IM, these parcels should have been prime candidates for deferral because proximity to existing development is the "most important" parcel-specific prioritization factor. BLM-IM026-000752 (2016 IM at 4). The 2016 IM also provided that "[p]arcels in areas with higher potential for development … are more appropriate for consideration than parcels with lower potential for development." Id. BLM's EA, however, did not consider such an alternative.

BLM also failed to consider a middle-ground alternative for the June 2018 Nevada sale, despite offering leases containing or near important leks. NV-JUN-002742 (June 2018 Protest at 7); NV-JUN-008998-999 (June 2018 EA at 29-30); NV-JUN-002846, 848-849 (June 2018 Protest Dismissal at 3, 5-6). The same was true for the December 2017 Wyoming lease sale, where at least eight of the parcels had active leks within their boundaries, WY121031-032 (December 2017 EA at 52-53). The presence of leks is an important factor supporting deferral of leases under the 2016 IM. BLM-IM026-000752 (2016 IM at 4). BLM, however, did not consider such an alternative. WY121539 (December 2017 Wyoming Protest Dismissal at 20).

23

Similarly, BLM refused to consider an alternative deferring parcels with PHMA and GHMA in the March 2018 Wyoming and Nevada sales.  WY127098 (March 2018 Wyoming Comments at 2); WY130735 (March 2018 Wyoming Protest Dismissal at 15); NV-MAR-000496, 503-504 (March 2018 Nevada EA at 8, 15-16).

Rather than considering such an alternative, BLM claimed that deferring leasing in PHMA and GHMA "would not be in conformance with the" 2015 plans. See, e.g., WY120986 (December 2017 Wyoming EA at 7).  This assertion is arbitrary and capricious.  An alternative that avoids leasing PHMA and GHMA is entirely consistent with the 2015 plans' strategy of guiding future development away from that habitat.  Pp. 8-9, supra.  The prioritization requirement, in fact, requires BLM to take such an approach.  Id.

But regardless of the prioritization requirement, BLM should have considered an alternative deferring parcels in sage-grouse habitat.  Even for lands designated as available for leasing, the 2015 plans do not mandate leasing.  RMPs leave BLM with authority to decide which lands (if any) to offer.  See W. Energy All. v. Salazar, 709 F.3d 1040, 1043-44 (10th Cir. 2013) (where lands are open for leasing, BLM retains broad discretion over which lands to offer for leasing); Roy G. Barton, 188 IBLA 331, 337 (2016).  A middle-ground alternative was therefore

"viable," independent of the prioritization requirement.  <u>Muckleshoot Indian Tribe</u> <u>v. U.S. Forest Serv.</u>, 177 F.3d 800, 814 (9th Cir. 1999).

Moreover, BLM claimed for some lease sales that it did not need to analyze an alternative excluding PHMA and/or GHMA because lease stipulations would adequately mitigate impacts to sage-grouse habitat.  <u>See, e.g.</u>, WY120986 (December 2017 Wyoming EA at 7); WY130854 (March 2018 Wyoming HPD EA at 4) (declining to defer a parcel because "[i]t is the position of HPD and the State of Wyoming that the stipulations applied to [the parcel] would be sufficient to conserve sage-grouse and their habitats").  But as discussed, lease stipulations only mitigate drilling impacts once the lease is issued.  P. 15, <u>supra</u>.  Stipulations are no substitute for protecting habitat by not offering the leases at all.  <u>See</u> <u>Conner v.</u> <u>Burford</u>, 848 F.2d 1441, 1450 (9th Cir. 1988) (rejecting argument that lease stipulations eliminated need to prepare NEPA analysis considering option of not issuing leases); <u>see also</u> <u>WildEarth Guardians</u>, 2020 WL 2104760 at *8 (BLM reliance on lease stipulations provided inadequate explanation for failing to consider more protective alternative).

In dismissing the December 2017 Wyoming and Nevada protests, BLM also claimed to be following the 2016 IM.  WY121536, 540 (December 2017 Wyoming Protest Dismissal at 17, 21); NV-DEC-010888 (December 2017 Nevada Protest Dismissal at 9).  Even if BLM had followed the 2016 IM and the prioritization

requirement (it did not, <u>see</u> pp. 12-21, <u>supra</u>), that does not excuse the agency from complying with NEPA.  BLM's obligation under NEPA to consider reasonable alternatives is separate from its duty to comply with the 2015 plans.  <u>See Abbey</u>, 719 F.3d at 1051-53 (holding that even though FLPMA did not require BLM to reduce grazing in Missouri Breaks National Monument, agency violated NEPA by failing to consider in detail an alternative reducing grazing).

The two duties are complementary: the 2015 plans' prioritization requirement required BLM to defer at least some parcels as part of guiding leasing and development away from sage-grouse habitat.  Pp. 8-9, <u>supra</u>.  Considering a middle-ground alternative under NEPA would allow BLM to make a better-informed decision about which leases to defer.  For example, an alternative that offered lands with high potential for oil and gas development near existing leases, while deferring PHMA and GHMA far from existing development, could have better protected sage-grouse while also leasing those areas most valuable for energy production.  <u>See Abbey</u>, 719 F.3d at 1053 (reduced grazing alternative should have been considered because it could have allowed continued grazing while better protecting national monument).  Even without the prioritization requirement, considering a middle-ground alternative was certainly a reasonable option that would have helped BLM determine the "optimally beneficial" balance

between energy development and habitat protection.  Calvert Cliffs, 449 F.2d at 1114.

Courts routinely reject agencies' refusal to consider similar reasonable middle-ground alternatives.  For example, in Wilderness Society v. Wisely, 524 F. Supp. 2d 1285, 1312 (D. Colo. 2007), the court rejected an EA for oil and gas leasing that considered only the proposed action and a no-action alternative.  The court held that BLM should have considered a "potentially appealing middle-ground compromise between the absolutism of the outright leasing and no action alternatives," which would have reduced environmental impacts.  Id.  Similarly, in WildEarth Guardians, 2020 WL 2104760 at **3, 6-8, this Court invalidated two-alternative EAs for oil and gas lease sales where BLM failed to provide an adequate explanation for not considering a third alternative that would have better protected groundwater.[15]

---

[15] See also Richardson, 565 F.3d at 711 (failing to analyze alternative closing important wildlife habitat to drilling, while keeping other areas open, violated NEPA); Muckleshoot Indian Tribe, 177 F.3d at 813 (holding that Forest Service failed to consider adequate range of alternatives where "EIS considered only a no action alternative along with two virtually identical alternatives"); Diné CARE v. Klein, 747 F. Supp. 2d 1234, 1241, 1255-56 (D. Colo. 2010) (two-alternative EA for 3,800-acre coal mine inadequate where agency regulations provided for third alternative); Humane Soc'y v. Dep't of Commerce, 432 F. Supp. 2d 4, 23 n.13 (D.D.C. 2006) (two-alternative EA violated NEPA by failing to consider less intrusive options for researching Steller sea lions).

As in those cases, BLM violated NEPA here by failing to consider middle-ground solutions that would have offered some oil and gas leases while still following the prioritization requirement of the 2015 plans.

## III.   BLM VIOLATED NEPA BY FAILING TO ANALYZE THE REASONABLY FORESEEABLE IMPACTS OF THE LEASE SALES. (CLAIM 4)

BLM further violated NEPA, and defied controlling Ninth Circuit precedent, by failing to analyze "all foreseeable direct and indirect impacts" to the environment from an agency's proposed actions.  Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002).  BLM's environmental review should have "involve[d] a discussion of adverse impacts that does not improperly minimize negative side effects."  League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 689 F.3d 1060, 1075 (9th Cir. 2012).  "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  Conservation Cong. v. Finely, 774 F.3d 611, 621 (9th Cir. 2014).  Whether an impact is "reasonably foreseeable" depends on whether there is a "reasonably close causal relationship" between the agency's action and the environmental impact.  Ctr. for Biological Diversity v. BLM, 937 F. Supp. 2d 1140, 1155 (N.D. Cal. 2013).

Oil and gas development represents one of the greatest threats to survival of the sage-grouse, see Phase One MSJ at 4-5, yet BLM failed to address the reasonably foreseeable impacts to sage-grouse from the lease sales.  Instead, BLM contended that issuing leases is "strictly an administrative action," and "[t]here would be no direct impacts from issuing leases because leasing does not directly authorize ground disturbing activities."[16]  This assertion defies controlling precedent.

The Ninth Circuit has long made clear that "the sale of leases cannot be divorced from post-leasing exploration, development, and production."  Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229 (9th Cir. 1988).  BLM's issuance of leases is an irretrievable commitment of resources, and before taking that step the agency must consider the reasonably foreseeable impacts—such as from oil and gas drilling—to other resources.  Making an irreversible commitment of resources, without analyzing effects on sage-grouse, is an "approve now and ask questions later" approach—"precisely the type of environmentally blind decision-making NEPA was designed to avoid."  Conner, 848 F.2d at 1450-51.

---

[16] NV-JUN-008982 (June 2018 Nevada EA at 13); see WY121041-042 (December 2017 Wyoming EA at 62-63); WY130894 (March 2018 Wyoming HPD EA at 44); WY130948, 986 (March 2018 Wyoming WRBBD EA at 3-1, 3-39); NV-DEC-011333 (December 2017 Nevada EA at 25); NV-MAR-000577 (March 2018 Nevada EA at 89).

Where BLM's EAs do mention development of the leases, they offer only vague generic statements about the types of effects on the sage-grouse that may result, without any analysis specific to the particular lands in question.  See, e.g., WY121057 (December 2017 Wyoming EA at 78 ("Direct and or [sic] indirect impacts could result in habitat fragmentation, reduced breeding success and/or nest abandonment as well as cause Greater Sage-grouse to move to less suitable winter habitat.")).  Broad statements like this could be applied to any lease sale anywhere in the sage-grouse's range.  They do not meaningfully inform BLM's decision-making for any particular sale.  Such "general statements about possible effects and some risk do not constitute a hard look absent a justification for why an agency could not supply more definitive information." Or. Nat. Desert Ass'n v. Rose, 921 F.3d 1185, 1191 (9th Cir. 2019) (quotation omitted); accord Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1213 (9th Cir. 1998); Or. Nat. Res. Council Fund v. Brong, 492 F.3d 1120, 1134 (9th Cir. 2007).  NEPA requires agencies to "provid[e] a reasonably thorough discussion of the significant aspects of the probable environmental consequences." Ctr. for Biological Diversity v. NHTSA, 538 F.3d 1172, 1194 (9th Cir. 2008) (quotation omitted).  BLM did not do so here.

In all the EAs for the challenged sales, BLM claimed it could not evaluate impacts of lease development until applications for drilling permits are filed.[17]  To the contrary, the Ninth Circuit has held that "[t]he government's inability to fully ascertain the precise extent of the effects of mineral leasing … is not … a justification for failing to estimate what those effects might be before irrevocably committing to the activity."  Conner, 848 F.2d at 1450; see also N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1079 (9th Cir. 2011) ("NEPA requires that an EIS engage in reasonable forecasting.  Because speculation is … implicit in NEPA, [ ] we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry.") (alterations in original).

The administrative record shows that the impacts of lease development are reasonably foreseeable, and tools are readily available for BLM to forecast those impacts.  For example, the December 2017 Wyoming EA indicated that some proposed parcels were near existing development and in areas with high potential for development.  WY121031-032 (December 2017 EA at 52-53).  In such

---

[17] WY121041-042 (December 2017 Wyoming EA at 62-63); WY130894 (March 2018 Wyoming HPD EA at 44); WY130948 (March 2018 Wyoming WRBBD EA at 3-1); NV-DEC-011333 (December 2017 Nevada EA at 25); NV-MAR-000577 (March 2018 Nevada EA at 89 (deferring review)); NV-JUN-008999 (June 2018 Nevada EA at 30).

situations, BLM can review patterns of existing oil and gas development, and the impacts of that development, to forecast what future drilling will look like on the proposed leases.  In fact, the record for this case contains a petroleum engineer's report describing how this should be done.  WY006072 (report stating "[t]o assess reasonably foreseeable development on the tracts … one can look in detail at the tracts and nearby production"); see also WY131179-184 (similar analysis for March 2018 sale); Richardson, 565 F.3d at 718-19 (failure to discuss impacts from developing oil and gas lease was arbitrary and capricious where "[c]onsiderable exploration has already occurred on parcels adjacent to the" proposed lease).

Moreover, for the June 2018 Nevada lease sale BLM prepared a "reasonably foreseeable development" (RFD) scenario forecasting the number of wells that may be drilled, and the resulting surface disturbance.  See NV-JUN-008980, 9117 (June 2018 EA at 11, 148).  This RFD estimate further shows that BLM could have made a reasonable prediction of the likely impacts from developing the leases.

BLM never explained why it couldn't look to existing development in Wyoming, or use its RFD forecast in Nevada, to estimate potential impacts to sage-grouse habitat.  Instead, BLM ignored these options.  BLM's failure to use readily-available resources to forecast reasonably foreseeable impacts to sage-grouse was arbitrary and capricious and violated NEPA.  See Richardson, 565 F.3d at 718-19; N. Plains Res. Council, 668 F.3d at 1078-79 (rejecting agency argument that

32

impacts from future coalbed methane development were "too speculative" to evaluate where there was "available data concerning likely future development"); WildEarth Guardians, 2020 WL 2104760, at *6 (finding NEPA violation where "BLM possessed the information necessary to undertake a more specific analysis at the leasing stage than it did").

Evaluating the reasonably foreseeable impacts from drilling on specific lease parcels would have benefitted BLM's decision-making by better informing the agency's compliance with the prioritization requirement.  As with consideration of a middle-ground alternative, assessing the impacts of developing the leases could have shown, for example, which parcels present the greatest threat to sage-grouse, and which parcels could be deferred without materially affecting energy development.  Such an analysis would have allowed BLM to make better decisions on which parcels should be leased or deferred.  BLM's decision to proceed without that information violated NEPA.

## IV.    BLM VIOLATED NEPA BY FAILING TO ANALYZE THE CUMULATIVE IMPACTS OF ITS LEASE SALES.  (CLAIM 5)

BLM also failed to comply with NEPA's requirement to analyze cumulative impacts.  Cumulative impacts are the incremental effect of each action "added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7 (2019).  BLM's cumulative effects analysis "must give a realistic evaluation of the

total impacts and cannot isolate a proposed project, viewing it in a vacuum."
Grand Canyon Trust v. Fed. Aviation Admin., 290 F.3d 339, 342 (D.C. Cir. 2002).

BLM failed to address cumulative impacts for the five Phase Two lease sales. The sage-grouse is a landscape-scale species: it relies on large swaths of connected "sagebrush sea" habitat to survive and reproduce. See NV-JUN-001950 (Holloran Oct. 13, 2017 Comments at 2) ("Sage-grouse are considered a landscape-scale species as populations generally inhabit and rely on large, interconnected expanses of sagebrush."). Accordingly, the impact to sage-grouse of any given lease sale cannot accurately be assessed without considering that sale in the context of other leasing and development occurring in the region. See Great Basin Mine Watch v. Hankins, 456 F.3d 955, 973-74 (9th Cir. 2006) (holding agency's cumulative impacts analysis insufficient based on failure to discuss other mining projects in the region). This is especially true here, given that these five lease sales cover more than a million acres. 1st Am. Compl. ¶¶ 68-80.

BLM disregarded NEPA's requirements by considering each lease sale in isolation. None of the EAs for the five Phase Two lease sales considered the impacts to the sage-grouse from other large sales that BLM was planning to hold, or had already held, in the region during 2017 and 2018. The December 2017 and March 2018 Wyoming EAs do not discuss the other sales being held in Wyoming

34

and adjacent states like Montana.[18]  The Nevada EAs similarly did not address

other lease sales occurring in that state and adjacent states like Utah.[19]

This siloed approach violated NEPA because BLM did not evaluate "the

incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions."  40 C.F.R. § 1508.7 (2019); Blackwood, 161 F.3d at

1214-16 (overturning Forest Service EA that analyzed impacts of only one of five

concurrent logging projects in the same region); see also Kern v. BLM, 284 F.3d

1062, 1078 (9th Cir. 2002) (holding BLM arbitrarily failed to address cumulative

impacts from reasonably foreseeable future timber sales in the same district as the

proposed sale).

Moreover, in the March 2018 Wyoming sale, the EA for BLM's High Plains

District did not even mention the leases being offered in the agency's Wind

River/Bighorn Basin District, or vice versa, even though both EAs concerned the

same lease sale.  See WY130913-915 (HPD EA at 63-65); WY130986 (WRBBD

---

[18] WY121075-076 (December 2017 Wyoming EA at 96-97); WY130913-915
(March 2018 Wyoming HPD EA at 63-65); WY130986 (March 2018 Wyoming
WRBBD EA at 3-39).
[19] NV-DEC-011378-380 (December 2017 Nevada EA at 70-72); NV-MAR-
000577 (March 2018 Nevada EA at 89); NV-JUN-009017-021 (June 2018 Nevada
EA at 47-52); see also WY006044 (noting Utah sale).

EA at 3-39).[20]  This made it impossible even to assess the full impacts of the

March 2018 Wyoming lease sale, much less the cumulative impacts of that sale in

combination with other lease sales.   See Klamath-Siskiyou Wildlands Ctr. v.

BLM, 387 F.3d 989, 992, 997 (9th Cir. 2004) (agency violated NEPA where

multiple EAs prepared for timber sales in same area that were "originally

conceived as a single project," but EAs did not analyze how their "impacts might

combine or synergistically interact with each other"); Blackwood, 161 F.3d at

1214–16.

In addition, BLM ignored a very significant reasonably foreseeable action:

the agency's plan to amend the 2015 plans and remove many protections for sage-

grouse.  BLM had proposed those changes at the time it held the Phase Two sales.

See 82 Fed. Reg. 47,248 (Oct. 11, 2017) (notice of intent to amend 2015 plans).

The lease sale EAs violated NEPA by failing to discuss how those sales would

combine with BLM's broader efforts to reduce protections for the sage-grouse.

BLM attempted to sidestep these deficiencies by claiming the EAs tiered to

the NEPA analyses that had been prepared for the 2015 plans.  See NV-JUN-

002849 (June 2018 Nevada Protest Dismissal at 6); WY130736 (March 2018

---

[20] The High Plains and Wind River/Bighorn Basin Districts are adjacent to each
other and together cover about half the State of Wyoming, including BLM's
Buffalo, Casper, Newcastle, Cody, Lander and Worland field offices.  See
https://www.blm.gov/office/wyoming-state-office (map).

Wyoming Protest Dismissal at 16). To rely on an earlier EIS for a cumulative impact assessment, however, BLM must show that the earlier EIS provides information about the "incremental impact that can be expected" from the specific projects being proposed. Klamath-Siskiyou, 387 F.3d at 997-98.

The EISs for the 2015 plans do not provide this required analysis. At the site-specific level, "proper consideration of the cumulative impacts of a project requires some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." Great Basin Mine Watch, 456 F.3d at 971 (quoting Klamath-Siskiyou, 387 F.3d at 993). "The analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." Id.

The EISs for the 2015 plans did not purport to provide this required analysis. See WY061668 (Wyoming EIS at 4-464) (describing analysis in the 2015 plan as "broad and general in nature"); Nevada EIS at 5-159 (similar).[21] Rather, BLM stated that "cumulative impacts will then be considered in subsequent NEPA documents that analyze specific projects or programs." WY061668 (Wyoming

---

[21] Available at:
https://eplanning.blm.gov/public_projects/lup/21152/58711/63774/10_Volume_3_Chapter_5_NVCA_GRSG.pdf.

EIS at 4-464).  Having deferred a detailed cumulative impacts analysis when preparing EISs for the 2015 plans, BLM cannot now rely on those same EISs to provide the necessary analysis at the leasing stage.  See Klamath-Siskiyou, 387 F.3d at 997-98 (EA could not rely on RMP EIS that only "contain[ed] general statements about the cumulative effects of logging across the" planning area); Kern, 284 F.3d at 1078 (rejecting attempt in EA to tier to EIS that lacked detailed cumulative impacts analysis).

By considering each lease sale in isolation, and ignoring its planned amendments to the 2015 plans, BLM violated NEPA by failing to address cumulative effects.

## V.     BLM VIOLATED NEPA BY FAILING TO PREPARE AN EIS FOR THE LEASE SALES.  (CLAIM 6)

Finally, BLM violated NEPA by failing to examine the impacts of the challenged lease sales in an environmental impact statement (EIS).  NEPA requires an agency to prepare an EIS for any major federal action that may significantly affect the quality of the human environment.  42 U.S.C. § 4332(2)(C).  An agency can rely on an EA only if it makes an affirmative finding that environmental impacts will not be significant (a FONSI).  The five Phase Two sales offered more than one million acres of leases.  1st Am. Compl. ¶¶ 68-80.  BLM analyzed those five sales in six different EAs and issued a FONSI for each of them.  BLM's

conclusion that no significant impacts will result from this extensive oil and gas leasing was arbitrary and capricious.

To prevail on this claim, the Federation does not need to show that significant effects to the sage-grouse will in fact occur.  Instead, the Federation only need to raise "substantial questions" regarding whether leasing may have a significant effect on the environment.  Anderson v. Evans, 371 F.3d 475, 488 (9th Cir. 2004); Ctr. for Biological Diversity, 937 F. Supp. 2d at 1154.

In assessing the significance of a proposed action, BLM was required to consider "both context and intensity."  40 C.F.R. § 1508.27 (2019).  Context "delimits the scope of the agency's action," Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001), and contextual "[s]ignificance varies with the setting of the proposed action," 40 C.F.R. § 1508.27(a) (2019).   The context of the decisions challenged in this case—offering more than a million acres of sage-grouse habitat for leasing across multiple states—points strongly toward significant impacts on sage-grouse.  See Pit River Tribe v. U.S. Forest Serv., 469 F.3d 768, 775, 783-84 (9th Cir. 2006) (issuing 41,500 acres of geothermal leases could have significant impact and required EIS); Bob Marshall All., 852 F.2d at 1226-27 (EIS required for issuance of nineteen oil and gas leases in roadless area of national forest in Montana).

"Intensity" assesses the "severity of impact," and considers several factors. 40 C.F.R. § 1508.27(b) (2019).  The presence of any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances."  Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 865 (9th Cir. 2005). Here, several factors point toward the need for an EIS.

 One factor asks whether "the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7) (2019).  This factor weighs strongly in favor of an EIS because BLM's surge of leasing in multiple states has a far greater impact on the sage-grouse's survival than any one lease sale considered in isolation.  Pp. 34-36, supra. "If several actions have a cumulative environmental effect, 'this consequence must be considered in an EIS.'"  Blackwood, 161 F.3d at 1214 (quoting Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1378 (9th Cir. 1998)).  Here, each EA fails to address, or even mention, other sales, and the two March 2018 Wyoming EAs fail to reference each other.  Pp. 34-36, supra.

Another factor necessitating an EIS is that the lease sales "threaten[ ] a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(10) (2019).  The Phase Two sales violate FLPMA because they conflict with the 2015 plans.  Pp. 12-21, supra.

Similarly, by leasing large areas of PHMA, the lease sales affect "ecologically critical areas" for the sage-grouse.  40 C.F.R. § 1508.27(b)(3) (2019).

Moreover, the 2015 plans were the foundation of FWS's decision not to list the sage-grouse under the ESA.  Phase One Order at 22; see 80 Fed. Reg. at 59,874.  BLM never analyzed whether the surge in oil and gas leasing arising from the National Directives would drive the sage-grouse toward listing under the ESA—precisely the type of question that an EIS could answer.  See 40 C.F.R. § 1508.27(b)(9) (2019) (adverse impacts to ESA-listed species considered in evaluating significance).

BLM's FONSIs do not address these impacts.  Rather, they only offer conclusory statements asserting that the significance factors are not met.[22]  This fails to demonstrate that an EIS was not required.

In sum, the impacts of BLM's wave of oil and gas leasing in sage-grouse habitat since 2017 may be significant and thus require an EIS.  BLM's FONSIs for the lease sales were arbitrary and capricious and violated NEPA.

---

[22] See, e.g., NV-JUN-000163 (June 2018 Nevada FONSI); NV-DEC-000421 (December 2017 Nevada FONSI); WY121084 (December 2017 Wyoming FONSI).  Indeed, some of the FONSIs do not even mention sage-grouse.  See NV-MAR-003885 (March 2018 Nevada FONSI); WY130919 (March 2018 Wyoming HPD FONSI); WY131003 (March 2018 Wyoming WRBBD FONSI).

## VI.   THE COURT SHOULD SET ASIDE BLM'S APPROVAL OF THE PHASE TWO LEASE SALES AND ALL LEASES ISSUED FROM THOSE SALES.

To remedy BLM's statutory violations, the Court should declare invalid and set aside the agency's decisions authorizing the Phase Two lease sales, and all leases issued in connection with those sales.  The APA expressly provides for this result.  See 5 U.S.C. § 706 (providing that courts "shall … set aside agency action" found to be unlawful or arbitrary and capricious).

This relief is warranted for the same reasons as in Phase One.  As the Court noted, BLM's FLPMA violations "undercut the very reason that the 2015 Plans created a priority requirement in the first place and prevent BLM from fulfilling that requirement's goals."  Phase One Order at 30.

Setting aside the leases also is necessary to provide an effective remedy for BLM's violations of the law.  See, e.g., WildEarth Guardians, 2020 WL 2107460, at *13 (vacating oil and gas leases for NEPA violations); Bob Marshall All. v. Lujan, 804 F. Supp. 1292, 1297 (D. Mont. 1992) (cancellation of leases was "the only remedy which will effectively foster NEPA's mandate requiring informed and meaningful consideration of alternatives"); High Country Conservation Advocates v. U.S. Forest Serv., 67 F. Supp. 3d 1262, 1265 (D. Colo. 2014) (vacating coal leases approved in violation of NEPA so that agency can reconsider its decision

"with a clean slate"); see also ECF No. 174 at 12-13 (describing evidence that BLM almost never chooses to cancel leases on remand).

## CONCLUSION

Because they violated FLPMA and NEPA and were arbitrary and capricious, the Court should declare invalid and set aside: (a) the decisions authorizing the December 2017 Nevada lease sale, the March 2018 Nevada sale, the June 2018 Nevada sale, the December 2017 Wyoming lease sale, and the March 2018 Wyoming sale; (b) the EAs and FONSIs for those sales; and (c) all leases issued in connection with those sales.

Respectfully submitted this 2nd day of October, 2020,

/s/ Michael S. Freeman
Michael S. Freeman
Rumela Roy
Earthjustice
633 17th Street
Suite 1600
Denver, CO 80202
Phone: (303) 623-9466
Fax: (303) 623-8083
mfreeman@earthjustice.org
rroy@earthjustice.org

/s/ Timothy J. Preso
Timothy J. Preso
Earthjustice
313 East Main Street

43

Bozeman, MT  59715
Phone: (406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org

*Counsel for Plaintiffs Montana Wildlife Federation, The Wilderness Society, National Audubon Society, National Wildlife Federation, and Montana Audubon*

## CERTIFICATE OF COMPLIANCE

I certify with respect to the foregoing that:

(1) This document complies with the type-volume limitation of Local Rule 7.2(d)(2), as modified by court order, ECF No. 163, because:

   [X] this document contains 9487 words.


   */s/ Michael S. Freeman*
   Michael S. Freeman

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October, 2020, I electronically transmitted the attached **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (PHASE TWO)** to the Clerk's Office using the CM/ECF System for filing, thereby generating service upon the following parties of record:

| | |
|---|---|
| LUKE HAJEK<br>luke.hajek@usdoj.gov<br>*Attorney for Federal Defendants* | ERIK E. PETERSEN<br>ADRIAN ANN MILLER<br>MICHELLE M. SULLIVAN<br>erik.petersen@wyo.gov<br>adrian.miller@sullivanmiller.com<br>michelle.sullivan@sullivanmiller.com<br>*Attorneys for Defendant-Intervenor*<br>*State of Wyoming* |
| BRET A. SUMNER<br>MALINDA MORAIN<br>bsumner@bwenergylaw.com<br>mmorain@bwenergylaw.com<br>*Attorneys for Defendant-Intervenor*<br>*Western Energy Alliance* | ROB CAMERON<br>TIMOTHY C. FOX<br>MELISSA SCHLICHTING<br>rob.cameron@mt.gov<br>edoj@mt.gov<br>mschlichting@mt.gov<br>*Attorneys for Defendant-Intervenor*<br>*State of Montana* |

*/s/ Michael S. Freeman*
Michael S. Freeman