IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

|  |  |
|---|---|
| **MONTANA WILDLIFE FEDERATION**, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>**DOUG BURGUM**, in his official capacity as Secretary of the Interior, *et al.*,<br><br>Defendants,<br><br>**WESTERN ENERGY ALLIANCE**, *et al.*,<br><br>Defendant-Intervenors. | **CV-18-69-GF-BMM**<br><br>**ORDER ON PHASE THREE SUMMARY JUDGMENT** |

## BACKGROUND

The Bureau of Land Management ("BLM") issued several resource management plans as part of an effort to save the sage-grouse from endangered species designation. These plans adopted measures to save the sage-grouse. One measure provides that "[p]riority will be given to leasing and development of fluid minerals outside of [sage-grouse habitat]." WY066649 (Wyoming RMPA); BLM-MT-March2019-001700 (Billings RMPA). Montana Wildlife Federation, Wilderness Society, National Audubon Society, National Wildlife Federation, and

1

Montana Audubon (collectively, "Plaintiffs") sued then-Secretary of the Interior Ryan Zinke, Montana Bureau of Land Management Deputy State Director Donato Judice, BLM, and the U.S. Department of the Interior (collectively, "Federal Defendants") challenging the BLM's issuance of the 2018 Instruction Memorandum on Greater Sage-Grouse Conservation ("2018 IM") and subsequent oil and gas leasing decisions. The State of Wyoming, Western Energy Alliance ("WEA"), Anschutz Exploration Corporation ("AEC"), Peak Powder River Acquisitions, LLC ("PPRA"), R&R Royalty, Ltd. ("R&R"), Chesapeake Exploration, LLC, and Continental Resources, Inc. (collectively "Continental"), Jonah Energy LLC ("Jonah Energy"), and Rockies Resources Holdings LLC ("Rockies Resources") have intervened.

Pending before the Court are the parties' cross motions for summary judgment. (Docs. 468, 512, 518, 522, & 524.) Rockies Resources also moves for the Court to rescind its 31 leases and require a refund. (Doc. 518.) Intervenors Continental, Jonah Energy, and AEC present alternate arguments against the Court's jurisdiction in this matter. (Doc. 525 at 14, 35, and 54.) The Court heard oral argument on these motions on May 20, 2026. (Doc. 566.)

## BACKGROUND

Plaintiffs challenge BLM's issuance of the 2018 IM and subsequent oil and gas leasing decisions. The Court explained the background of this case in depth in

the Phase One and Phase Two summary judgment orders. (Docs. 147 at 1–13; 335 at 1–3.) The Court assumes familiarity with the prior decisions and summarizes only the outcome of those decisions here.

The Court vacated the 2018 IM and three lease sales in Montana and Wyoming for having violated the Federal Land and Policy Management Act ("FLPMA") in the Phase One order. (Doc. 147 at 32.) The 2018 IM directed BLM staff to disregard BLM's 2015 Resource Management Plans' ("2015 Plans") prioritization requirements for fluid mineral leasing in sage-grouse habitat. BLM-IM026-001071 (Instruction Memorandum 2018-026 (Dec. 27, 2017)). The 2018 IM stated that prioritization would apply only where a "backlog" of leasing requests exists. *Id*. The Court determined that the direction to apply leasing prioritization only where a backlog of leasing proposals exists violated FLPMA because "[t]he 2015 Plans do not say that BLM will prioritize non-sage-grouse habitat in *some* of its decisions. The backlog limitation provides for precisely that result." (Doc. 147 at 21 (emphasis added) (cleaned up).)

The Court further determined that the 2018 IM unreasonably misconstrued the purpose of the 2015 Plans' prioritization requirements and rendered "the prioritization requirement into a mere procedural hurdle." (Doc. 147 at 23–24.) Such an interpretation conflicts with the U.S. Fish and Wildlife Service's ("FWS") understanding of the requirement when it declined to list the sage-grouse under the

Endangered Species Act ("ESA"). (*Id*.) The 2018 IM asserted that "BLM does not need to lease and develop outside of [sage-grouse] habitat management areas before considering any leasing and development within [sage-grouse] habitat." BLM-IM026-001071 (Instruction Memorandum 2018-026 (Dec. 27, 2017)). The 2018 IM thus ignored the goals of the prioritization—to refrain from listing the greater sage-grouse under the ESA—by failing to "further limit future surface disturbance and encourage new development in areas that would not conflict with" sage-grouse habitat. WY072017.

The Court concluded that the three lease sales at issue in Phase One further violated FLPMA for failing to implement properly the 2015 Plans' priority requirement. (Doc. 147 at 30–31.) The Court pointed to the Wyoming lease sales' direct reliance on the 2018 IM, and the BLM's statements in the Montana lease sales indicating that it did not apply the prioritization criteria. (*Id*. at 26–27.) The Court also determined that the BLM's failure to apply the prioritization requirement violated FLPMA regardless of whether the agency purported to follow the 2016 IM or the 2018 IM. (*Id*. at 27.)

Phase Two consisted of the five remaining lease sales listed in Plaintiffs' First Amended Complaint: December 2017, March 2018, and June 2018 Nevada lease sales, and December 2017 and March 2018 Wyoming lease sales. (Doc. 19 at

4

¶¶ 68–82.) The Court determined that those lease sales also violated FLPMA for failing to implement properly the 2015 Plans' priority requirement. (Doc. 335.)

Phase Three consists of six Montana/Dakota and Wyoming lease sales that were added in Plaintiffs' Second Amended and Supplemental Complaint: the lease sales at issue are (1) March and December 2019 Montana/Dakota lease sales; (2) February, September, and December 2019 Wyoming lease sales; and (3) December 2020 Wyoming lease sale. (Doc. 263.)

## LEGAL STANDARDS

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

### *APA*

Courts review compliance challenges for the National Environmental Policy Act ("NEPA") and the FLPMA under the Administrative Procedure Act ("APA"). Under the APA, courts "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action proves arbitrary and capricious "if the

agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court exercises "highly deferential" review and presumes agency action to be valid. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012) (quoting *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). The APA standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle*, 463 U.S. at 43.

### *FLPMA*

FLPMA dictates the framework under which BLM manages public lands. FLPMA requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA further states that the policy of the United States requires that the "United States receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(8).

BLM accomplishes this directive by developing, maintaining, and revising Resource Management Plans ("RMPs"). 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions." 43 C.F.R. § 1601.0–2. RMPs establish "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. § 1601.0-5(n)(1)–(2).

### *NEPA*

NEPA represents the country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA generally requires that federal agencies consider the environmental consequences of their actions. *See* 40 C.F.R. § 1501.1. NEPA requires agency decisionmakers to identify and understand the environmental effects of proposed actions and to inform the public of those effects so that it may "play a role in both the decision making process and the implementation of [the agency's] decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also* 42 U.S.C. § 4321; 40 C.F.R. § 1501.1. In other words, NEPA "insure[s] a fully informed and well-considered decision." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

## DISCUSSION

### I. Whether the Phase Three Lease Sales Violated FLPMA.

Plaintiffs argue that the Phase Three lease sales violate FLPMA for the same reasons as the Phase One and Phase Two lease sales based on BLM's inconsistent reliance on the 2018 IM or failure to implement properly the 2015 Plans' priority requirements established to conserve sage-grouse habitat. (Doc. 469 at 21; Doc. 538 at 14 (citing *Montana Wildlife Federation v. Haaland*, 127 F.4th 1, 42–46 (9th Cir. 2025).)  Plaintiffs cite the Ninth Circuit's affirmation of the Court's Phase One decision as dispositive of the merits in Phase Three. (*Id.*) Defendants argue that BLM's decisions comply with the FLPMA because the One Big Beautiful Bill Act's ("OBBBA") prioritization objective overrides the 2015 Plans' priority requirements. (Doc. 514 at 20.) Defendants next contend that the Court should dismiss Plaintiffs' claims challenging the Wyoming sales for improper venue, lack of standing, and lack of final agency action. (Doc. 514 at 17–20.)

### A. Whether Plaintiffs' Wyoming Claims Should Be Dismissed for Improper Venue, Lack of Standing, and Lack of Final Agency Action.

The Court begins by addressing the threshold question of whether the Court remains a proper venue to address the claims. (Doc. 513 at 17.) A plaintiff bears the burden of demonstrating that venue is proper. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). A plaintiff must establish proper venue as to each claim where multiple claims are presented. *W. Org. of Res.*

*Councils v. BLM*, No. CV 16-21-GF-BMM, 2021 WL 718857, at *11 (D. Mont. Jan. 24, 2017). Where venue is improper, a district court has the discretion to dismiss the case under Rule 12(b)(3) or transfer the case in the interests of justice to an appropriate jurisdiction under 28 U.S.C. § 1406(a). *See King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992); *Pac. Coast Dist., M.E.B.A. v. Alaska*, 682 F.2d 797, 799 (9th Cir. 1982). A court draws all reasonable inferences in favor of the non-moving party if the claims present genuine contested facts. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138–40 (9th Cir. 2004).

In civil actions against an agency or officer of the United States, venue is proper "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). The Court exercised its jurisdictional authority to rule on BLM's issuance of leases in Wyoming in the Phase One and Phase Two orders. (*See* Docs. 147 & 335.) The Ninth Circuit affirmed the Court's Phase One order on January 17, 2025. *Montana Wildlife Fed'n*, 127 F.4th at 42–46. The Court previously rejected Defendants' argument that the District of Montana represents an improper venue to hear Plaintiffs' claims in July 2022. (Doc. 365.) The Court determined

that venue proved proper in Montana under all three bases for venue under 28 U.S.C. § 1391(e)(1). (*Id*.) Venue remains proper.

Defendants point to a recent decision that the District of Idaho represented an improper venue to hear claims involving leases from Montana, Utah, and Wyoming, as persuasive authority that the Court lacks jurisdiction to hear Plaintiffs' claims here. *See W. Watersheds Project v. Burgum*, No. 1:18-cv-187, 2025 WL 3853055 (D. Idaho Dec. 29, 2025). *Western Watersheds* differs from the case at hand. Unlike the plaintiffs in *Western Watersheds* who solely relied on the fact that plaintiffs resided in Idaho to establish venue, *see id*. at *16, Plaintiffs here establish venue under all three bases of Section 1391(e)(1). The Court needs only one basis to exercise jurisdictional authority over the leases. 28 U.S.C. § 1391(e)(1).

Defendants urge the Court to reconsider its venue decision based on the legislative history analysis of the venue statute applied in *Western Watersheds*. (Doc. 514 at 17–18.) The Court recognizes that *Western Watersheds* applied a new standard for the third prong of the venue statute in determining if a dispute involves "real property." 2025 WL 3853055 at *16. The Court declines to apply this new standard at this time as the Idaho decision remains persuasive authority until the Ninth Circuit answers the question left open from the Idaho decision.

10

Nonetheless, the Court retains jurisdiction over the leases in this case as venue remains proper under the two other prongs of Section 1391(e)(1).

Defendants further challenge Plaintiffs' standing to bring their claims. (Doc. 513 at 18–19.) This argument also lacks merit. Plaintiffs possess Article III standing to bring their claims against BLM's decision on the 2020 Wyoming lease sale. Plaintiffs satisfy the requirement of imminent future injury because "there is a substantial risk that [Plaintiffs' alleged] harm will occur" upon BLM completing its environmental assessment. *Am. Encore v. Fontes*, 152 F.4th 1097, 1111 (9th Cir. 2025) (citation and quotation marks omitted).

The Court next turns to Defendants' contention that Plaintiffs present no final agency action on the 2020 Wyoming lease sales. (Doc. 513 at 18.) To be considered final, an agency action must "mark the 'consummation' of the agency's decision making process" and be "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1163 (9th Cir. 2018). Courts treat "the act of issuing an 'active,' non-suspended lease to be final agency action ripe for judicial review . . . " *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 783 F. Supp. 3d 1354, 1365 (D. Utah 2025); *see also S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1159 (10th Cir. 2013) ("Federal

courts have repeatedly considered the act of issuing a lease to be final agency action which may be challenged in court.").

The Court will not reach the merits of Plaintiffs' claims challenging the 2020 Wyoming lease sales as BLM has yet to issue the lease sales. BLM's December 2020 Wyoming lease sale offered 261 parcels. WY345814. The December 2020 Wyoming lease sale occurred after the Court's Phase One decision. WY345463. BLM later notified lessees that BLM would not issue the leases until it had completed further NEPA analysis and resolved any concerns related to the process. WY351506. BLM further provided lessees the opportunity to request a refund or wait until completion of the environmental assessments. WY351507. BLM has yet to complete the environmental assessment or issue the leases sold at the sale. (*See* Doc. 514-1, ¶ 7.)

The Court notes that the 2015 prioritization requirements would govern any environmental assessment completed by BLM for the 2020 Wyoming lease sales. BLM's initial decisions to hold the sale in 2020 relied on the 2015 prioritization requirements. No new law would have retroactive effect on the 2020 Wyoming lease sales. BLM should consider the Court's prior rulings in this matter in conducting the environmental assessment to ensure that BLM satisfies the 2015 prioritization requirement.

## B.  Whether OBBBA Applies to Plaintiffs' Claims.

The Court next addresses Defendants' argument that OBBBA's 2025 amendments to the Mineral Leasing Act ("MLA") echoed a preexisting understanding by Congress that the MLA always required leasing under certain circumstances. (Doc. 514 at 21–22.) Defendants cite *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025), and *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), to support their claim that the Court must consider subsequent legislative developments when interpreting a statute as evidence that Congress always understood the MLA to require leasing. (Doc. 513 at 21; Doc. 514 at 21.) The Court finds that these authorities do not control the outcome of this case.

The U.S. Supreme Court noted in *FDA v. Brown & Williamson* that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." 529 U.S. at 133. The U.S. Supreme Court later used the subsequent legislative developments analysis to interpret NEPA in *Seven County*. Unlike the subsequent legislative developments in *Seven County*, the new changes made to the MLA here substantially alter longstanding precedent regarding the interpretation of the MLA. The Court cannot reconcile the longstanding caselaw interpreting the MLA to afford BLM broad discretion to offer lands for lease with Congress's latest update

13

in OBBBA requiring BLM to lease lands as evidence that Congress always required BLM to lease lands. *See, e.g., Udall v. Tallman*, 380 U.S. 1, 4 (1965) (recognizing that the MLA provides BLM "discretion to refuse to issue any lease at all on a given tract"); *see also W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013) (acknowledging that the Secretary of the Interior maintains "considerable" discretion in leasing decisions).

Defendants further argue that the standards outlined in OBBBA lessen the severity of any FLPMA violations or errors as to prioritization. (Doc. 513 at 46.) The Court disagrees. FLPMA's requirements to maintain sustainable wildlife populations and avoid unnecessary or undue degradation of public lands, including sage-grouse habitat, remain in force under OBBBA. 43 U.S.C. § 1732(a); 43 U.S.C. § 1732(b). OBBBA defines lands "eligible" for leasing to mean "all lands" "subject to leasing" unless "excluded from leasing by a statutory prohibition." 30 U.S.C. § 226(b)(1)(A) (2026). This definition would restrict BLM from selling and issuing leases that violate FLPMA's mandates for the protection of public lands and resources. *See Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 42 (D.D.C. 2003) ("FLPMA, by its plain terms, vests the Secretary of the Interior with the authority —and indeed the obligation—to disapprove of an otherwise permissible . . . operation because the operation, though necessary . . . would unduly harm or degrade the public land.").

Defendants lastly argue that the language, "ma[k]e available," in OBBBA effectively mandates BLM to offer nominated parcels for lease if the parcels are open to leasing and known or believed to contain oil and gas deposits. (Doc. 513 at 22–23.) The statutory text of OBBBA does not effectively eliminate BLM's discretion so broadly as to mandate the sale and issuance of leases without oversight. OBBBA's legislative history shows that Congress contemplated, and ultimately rejected, such an interpretation as the version of the bill introduced on May 20, 2025, mandated that BLM "shall . . . offer" lands within 18 months. *See* H.R. 1, 119th Cong. § 80101(a)(1) (May 20, 2025). Congress later amended the bill to require only that the lands "shall be made available for leasing" within 18 months. *See* 30 U.S.C. § 226(a)(1), as amended by Pub. L. No. 119-21, § 50101(b)(1), 139 Stat. 72. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987). As a result, the Court interprets the "made available" language in OBBBA to provide BLM some discretion to limit leasing of sage-grouse habitat that fails to fit within FLPMA's requirements. *Cf.* (Docs. 567, 568, and 569, regarding parties' conflicting interpretations of OBBBA language.)

OBBBA fails to justify a different ruling on the merits in Phase Three. As previously noted in the Court's Order on Remand, the text of OBBBA expressly requires BLM to apply OBBBA's provisions prospectively. (Doc. 504 at 8, citing Pub. L. No. 119-21, § 50101(b)(1) (2025)). The Court shall assess the 2019 Wyoming lease sales and the Montana/Dakota lease sales under the 2015 Plans' prioritization requirements and the Ninth Circuit's analysis in *Montana Wildlife Federation*.

### C. The Phase Three Lease Sales Failed to Incorporate the 2015 Plans' Prioritization Requirement.

FLPMA and its implementing regulations require that BLM manage public lands in accordance with land use plans, and that subsequent authorizations and actions conform to those plans. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004). FLPMA, thus, prohibits BLM from taking actions "inconsistent with the provisions of a land use plan." *Id.* FLPMA requires instead that an agency complete a formal amendment process if it seeks to change a resource management plan. *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 556 (9th Cir. 2006) ("[u]nder FLPMA, if BLM wishes to change a resource management plan, it can only do so by formally amending the plan" under certain regulations).

The Ninth Circuit affirmed the Court's Phase One decision on the merits. *See Montana Wildlife Fed'n*, 127 F.4th at 42–46. The Ninth Circuit held that the

2018 IM is "plainly inconsistent with the 2015 plan" as the 2018 IM "prioritizes administrative efficiency over the 2015 Plan's stated purpose of protecting sage-grouse habitat." *Id*. at 45 (internal quotation omitted). Lease sales issued under the 2018 IM violate FLPMA for failing to implement the prioritization requirement. *Id*. at 46. The Ninth Circuit further concluded that the prioritization requirement "imposes an affirmative requirement on [BLM] to 'guide' and 'encourage' development away from sage-grouse habitat." *Id*. at 43–44. Lastly, the Ninth Circuit affirmed the Court's determination that lease stipulations are "distinct from prioritization" because they "cannot be said to 'encourage' or 'guide' development outside sage-grouse territory" as mandated by the prioritization requirement. *Id*. at 44. Following the Ninth Circuit's holding, the Phase Three lease sales suffer from similar infirmities as the Phase One and Phase Two lease sales as explained below.

Defendants again present arguments already dismissed by the Court and the Ninth Circuit. Defendants first argue that prioritization "only seeks to channel [BLM's] discretion into a certain procedural sequence that may minimize the impact on sage-grouse populations." (Doc. 513 at 15–16 (quoting *Montana Wildlife Fed'n*, 127 F.4th at 56 (Boggs, J., dissenting in part); *see also* Doc. 520 at 20; Doc. 523 at 26.) The Ninth Circuit rejected this argument. *Montana Wildlife Fed'n*, 127 F4th at 43. The Ninth Circuit determined that the prioritization

17

requirement represents a "substantive" mandate that directs BLM to enact more than a mere "method of sequencing the review of" leasing requests. *Id*. at 43–44.

Defendants' argument that the Ninth Circuit's interpretation that "prioritize" means "a mandate to take affirmative steps to lease non-habitat [areas]" violates the presumption that terms used in several places of a statute would "bear[] a consistent meaning throughout." (Doc. 514 at 24, citing *Azar v. Allina Health Servs.*, 587 U.S. 566, 575–76 (2019).) Aside from the Ninth Circuit's explicit rejection of this argument, Defendants' argument fails to reconcile conflicts between the directive on grazing permits and leases with the directive on oil and gas permits and leases. The grazing directive requires BLM to "[p]rioritize the review and processing of grazing permits/leases in [sagebrush focal areas] followed by [priority habitat management areas ("PHMA")]." WY066644. Whereas the oil and gas directive lacks the same procedural "review and processing" language. *Id*. The oil and gas directive instead requires BLM to "[p]rioritize the leasing and development of fluid mineral resources outside of [sage-grouse] habitat." *Id*.

Defendants again argue that placing stipulations on leases may fulfill the prioritization requirement of the 2015 Plans. (Doc. 514 at 25.) The Ninth Circuit rejected this argument. The Ninth Circuit instead concluded that lease stipulations cannot satisfy the prioritization requirement because they remain "distinct from

prioritization." *Montana Wildlife Fed'n*, 127 F.4th at 44. The Phase Three lease sales failed to incorporate the 2015 Plans' prioritization requirement. As a result, the 2019 Wyoming Lease Sales and the Montana Dakota Lease Sales violated FLPMA as discussed below.

*2019 Wyoming Lease Sales*

BLM offered more than 1,250,000 acres in total of oil and gas leases in the 2019 Wyoming lease sales. WY147839 (Feb. 2019); WY170726 (Sept. 2019); WY180857 (Dec. 2019). BLM's February 2019 lease sale offered 565 parcels or more than 758,198 acres in Wyoming. WY170726. BLM's September and December 2019 lease sales offered more than 493,000 acres of oil and gas leases. WY170726; WY180857. BLM failed to consider the 2015 Plans' prioritization requirements in the environmental assessments for these lease sales.

Nothing in the administrative record for the 2019 Wyoming lease sales suggests that BLM considered prioritization's purpose of guiding development away from sage-grouse habitat. BLM failed to defer the parcels from these sales based on the prioritization requirement. *See* WY147839 (Feb. 2019); WY170857 (Sept. 2019 at 47); WY180085 (Dec. 2019 at 4–22.) Most of the parcels offered by BLM included lands in PHMA and general habitat management areas ("GHMA").

*See* WY147496; WY147471; WY170857; WY 180085. BLM failed to consider deferral of leases located in PHMA and GHMA. *Id*.

BLM acknowledged the prioritization requirement of the 2015 Plans in its environmental assessment and in the 2016 IM, but BLM failed to apply it. WY147470-71. The 2016 IM advised that BLM should defer parcels near an occupied lek due to the threat of fragmentation and other impacts to greater sage-grouse. WY147471. BLM ignored this prioritization factor and offered parcels fitting that criteria in PHMA and GHMA for sale.

BLM relied on the same rationale adopted in the 2018 IM when responding to protests to the 2019 Wyoming lease sales. BLM focused on the 2015 Plans' designation of PHMA and GHMA as "open" for leasing and asserting that stipulations provided the necessary protections under the 2015 Plans. *See* WY145744; WY147470–71; WY147888; WY170575; WY180889; WY180900; WY171061. BLM's designation of lands as open to leasing does not override the prioritization requirement. And, as the Court and the Ninth Circuit have concluded, stipulations cannot substitute for prioritization. The 2019 Wyoming Lease sales violated FLPMA by failing to adequately implement the 2015 Plans' prioritization requirement.

*Montana and Dakotas Lease Sales*

20

BLM offered over 185,000 acres for sale in the Montana and Dakotas lease sales. *See* BLM-MT-March2019-000085; BLM-MT-March2019-00001; MTDK-2019-12-000277; MTDK-2019-12-000347. Most of the lease sales included parcels located in PHMA or GHMA. *See* BLM-MT-March2019-000093; MTDK-2019-12-000314. Similar to the 2019 Wyoming lease sales, BLM failed to implement the prioritization requirement in offering the Montana and Dakota lease sales. BLM again failed to defer the March and December 2019 Montana and Dakota lease sales based on the prioritization requirement. *See* BLM-MT-March2019-000025; MTDK-2019-12-000285. BLM violated the directives of the 2015 Plans by failing to "actively encourage development outside of or seek to minimize impacts on sage-grouse habitat." *Montana Wildlife Fed'n*, 127 F.4th at 43.

BLM did defer 17 parcels in the March 2019 lease sales but for reasons other than prioritization. *See* BLM MT-March2019-000025, 36 (twelve parcels deferred in Beaverhead and Madison counties because "public submitted extensive comments raising concerns about potential effects to numerous resources"); *id*. (five parcels deferred in Valley County "to protect a migratory corridor designated by the State of Montana as a Connectivity Area"). As the Ninth Circuit recognized, to defer parcels for alternative reasons "does not demonstrate compliance" with the prioritization requirement. *Montana Wildlife Fed'n*, 127 F.4th at 46. The Court

21

must conclude that the Phase Three Montana and Dakota lease sales also violated the FLPMA by failing to meet the 2015 Plans' prioritization requirement. The Court will not address Plaintiffs' arguments on NEPA as the FLPMA violations suffice to consider the issue of vacatur.

## II.    Whether Vacatur of Phase Three Lease Sales Proves Appropriate

The Court must address the proper remedy after having determined that the Phase Three lease sales violated FLPMA. The Court reviews the Phase Three lease sales under the APA. The APA permits the Court to "set aside" final agency actions deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 702(2)(A); *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008).

The Ninth Circuit remands agency actions without vacating that action only in "limited circumstances." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)). The decision to remand with or without vacatur is "controlled by the principles of equity." *Alliance for Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105, 1121 (9th Cir. 2018). *See also Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (determining that remand without vacatur proves appropriate "when equity demands"). A court must "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may

itself be changed'" when determining whether to leave an agency action in place on remand. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

A court may consider factors such as the economic impact of vacatur, the disruption vacatur would have on local communities, and other practical concerns that harm the public interest when deciding whether vacatur of an agency action proves proper. *Ctr. for Biological Diversity*, 141 F.4th at 1015; *Backcountry Horsemen of Missoula v. Marten*, CV-24-37-M-KLD, 2025 WL 2402006, at *5 (D. Mont. Aug. 19, 2025). For example, in *California Communities Against Toxics v. EPA*, the Ninth Circuit ordered remand without vacatur of an EPA rule where vacatur would be "economically disastrous" because it would "delay a much-needed power plant," disrupt "a billion-dollar venture employing 350 workers," and probably result in "needless and duplicative legislat[ion]." 668 F.3d at 993-94.

Plaintiffs argue that the Court should remand with vacatur of the Phase Three lease sales for the same reasons as ordered in Phase One and in Phase Two. (Doc. 469 at 45. (citing Doc. 146 at 30 and Doc. 335 at 12).) Plaintiffs claim that the Ninth Circuit previously upheld the Court's vacatur decision in Phase One by determining that "[t]he seriousness of the government's error" of failing to follow the 2015 Plans' prioritization requirement was sufficiently "significant" to warrant vacatur. (Doc. 469 at 45 (quoting *Montana Wildlife Fed'n*, 127 F.4th at 51.)

23

Plaintiffs contend that because the Phase Three lease sales also violate FLPMA, like the Phase One and Phase Two lease sales that the Court also should vacate the Phase Three lease sales and declare the Phase Three leases unlawful. (Doc. 469 at 45.)

Defendants collectively request that the Court remand the Phase Three leasing decisions to BLM without vacatur. (Doc. 514 at 45-50; Doc. 520 at 35; Doc. 523 at 18-30; Doc. 525 at 31-36; Doc. 525 at 61; Doc. 525 at 64.) Federal Defendants argued at the hearing that differing factors exist from Phase One and Phase Two that warrant remand without vacatur of the lease sales in Phase Three. Federal Defendants argue that those differing factors include the following: (1) the enactment of OBBBA and the evolving legal and regulatory landscape following BLM's entering of Phase Three leases (Doc. 514 at 46); (2) Phase Three includes a higher number of leases and a higher amount paid to acquire the leases (*Id.* at 48); and (3) Plaintiffs delay in challenging the Phase Three lease sales leading to increased development and progress with the Phase Three leases. (*Id.*)

Intervenor Defendants also make similar arguments on why remand without vacatur represents the proper remedy under these circumstances arguing that the *Allied-Signal* prongs weigh against vacatur. (*See* Doc. 523 at 18-30; Doc. 525 at 31-35, 47-51. 60-64, & 68-77.) Intervenor WEA claims that vacatur could have further devastating impacts on the sage-grouse. WEA notes that existing

development already affected by disturbance and/or are necessary for further

development of the non-Phase Three land owned in fee by private parties or state-

owned mineral rights surrounds some of the Phase Three lease parcels does not

support vacatur. (Doc. 523 at 22-25.) WEA and other Intervenors note that

horizontal drilling of an entire drilling and spacing unit alleviates the surface

disturbance on federal lands. (*Id*.) WEA and other Intervenors contend that

vacating some of the Phase III leases surrounded by these private leases and state-

owned leases would prevent horizontal drilling from achieving to its full benefit.

(*Id*. at 24.)  Wyoming also claims the loss of revenue and taxes from the Phase

Three leases would have detrimental impacts on the local communities in

Wyoming who rely on this funding. (Doc. 520 at 35-38.) The Court will address

Defendants' argument below.

### A. OBBBA Enactment

Federal Defendants contend that any FLPMA errors remain non-serious due

to the evolving legal and regulatory landscape since BLM entered into the Phase

Three leases. Federal Defendants specifically point to the enactment of OBBBA.

(Doc. 514 at 46.) Federal Defendants cite the portion of OBBBA that requires

available lease parcels be offered within 18 months after industry interest. (*Id.*

(citing OBBBA § 50101(d)(1)).) Federal Defendants claim that the prioritization

that forms the basis of Plaintiffs' FLPMA claims has been removed, and that the

Phase Three leases conform to the current legislative and regulatory policy. (*Id.* at 47.)

As explained above, the enactment of OBBBA does not apply retroactively to BLM's actions in conducting the challenged Phase Three lease sales. Defendants' arguments that OBBBA alters the seriousness of BLM's FLPMA violations remain unpersuasive to the Court. Congress enacted OBBBA after BLM had sold, and the lessees had acquired, the Phase Three leases. Legislative and regulatory policy constantly may be evolving, especially in regard to oil and gas production. This constant evolution, however, does not cure BLM's failures to follow the 2015 Plans prioritization requirement at the time of the Phase Three sales. The enactment of OBBBA does not diminish the seriousness of BLM's error. The enactment of OBBBA did not alter either *Allied-Signal* factor.

BLM was required to follow the 2015 Plans' prioritization requirements when offering the leases at issue in Phase Three including the February, September, and December 2019 Wyoming lease sales and the March and December 2019 Montana/Dakota lease sales. BLM's failure to follow the 2015 Plans' prioritization requirements occurred before the enactment of OBBBA, rendering its new regulations irrelevant to this matter. The alleged changed circumstance from the Phase One and Phase Two lease sales due to the enactment of OBBBA does not persuade the Court to remand without vacatur.

## B. Magnitude of Economic Disruption of Vacatur

Defendants also collectively argue the significant economic and disruptive impact of vacatur contained in the second *Allied-Signal* prong weighs in favor of the Court ordering remand without vacatur of the Phase Three lease sales. (Doc. 513 at 26; Doc. 523; Doc. 525.) Federal Defendants assert that vacatur of the leases would require a return of $109 million in bonus bids, lease filing fees, and first year rentals. (Doc. 513 at 48.) Federal Defendants and Wyoming contend that half of the funds already have been dispersed to Montana and Wyoming making vacatur even more disruptive. (*Id.*; Doc. 520 at 35.) Defendants argue that the amount and lease revenues at issue in Phase Three greatly exceed the amounts lessees paid during Phase One and Phase Two to warrant remand without vacatur. The Court disagrees.

The Court acknowledges the economic disruption that would occur if the Court orders remand with vacatur as it did in Phase One and Phase Two. (*See* Doc. 147 at 31; Doc. 335.) The Court recognized that vacatur in Phase One would result in economic harm with around $36 million in lease revenues returned to the lessees and $17.6 million Wyoming would need to return. (Doc. 147 at 331; *Mont. Wildlife Fed.*, 127 F.4th at 30.) The Court distinguished this disruption from *Cal. Cmtys. Against Toxics* in which the Ninth Circuit declined to remand with vacatur because

vacatur would result in disruption to a billion-dollar venture employing 350 workers. (*Id*. (citing 688 F.3d at 993-94).)

The Court continues to recognize that economic and disruptive impacts will occur upon vacatur of the Phase Three lease sales including the return of nearly $109 million to lessees, the recoupment of distributed funds from Wyoming and Montana, and disruption of lessees' interest and investment in development of the Phase Three leases. The Court further acknowledges Defendants' concerns over the "checkerboard" nature of the land owned by others not involved in this action and the impact vacatur may have on surrounding property owners and local communities. The Court addresses, however, only the challenged Phase Three lease sales and the apparent and serious errors committed by BLM in conducting those Phase Three lease sales. Remand with vacatur remains the necessary remedy to allow BLM to fix its serious errors that occurred at the beginning of the leasing process. BLM's errors do not pertain to the other neighboring developed lands. The Court determines that BLM's errors in conducting the Phase Three lease sales outweigh the disruptive effects vacatur may have on these surrounding parcels in the future.

Although Phase Three includes higher revenue amounts than the Phase One and Phase Two lease sales, the economic disruptions do not rise to be "significant enough to warrant remand without vacatur." *Mont. Wildlife Fedn*, 127 F.4th at 50.

The economic disruption resulting from vacatur still remains substantially less disruptive than *Cal. Cmtys. Against Toxics* as the Court's remand with vacatur here would not result in chaos to over 350 workers' lives and the disruption of a billion-dollar venture. 688 F.3d at 993-94. Courts have further declined to forego vacatur solely on the basis of economic harms because "the risk of economic harm from procedural delay and industrial inconvenience 'is the nature of doing business, especially in an area fraught with bureaucracy and litigation.'" *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 n.35 (D.D.C. 2019) (quoting *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017)). The Court also notes that Plaintiffs explained at the hearing that Wyoming and Montana would not be required to refund the already distributed funds immediately in a lump sum. Federal Defendants instead will reduce Wyoming's and Montana's annual allocation over time in smaller increments to alleviate the disruptive impacts of vacatur to these states.

The Court finds that BLM's errors in conducting the Phase Three lease sales prove serious and occurred at the beginning of the process when BLM needed to implement the 2015 Plans' prioritization requirements in deciding what parcels to offer in the same manner that it did in Phase One and Phase Two. This prioritization error "infect[ed] everything that followed" making it "infeasible for [BLM] to keep the current leases in place on remand." *Mont. Wildlife Fedn.*, 127

F.4th at 51 (citing *Pollinator Stewardship Council*, 806 F.3d at 532). BLM may remedy its errors only by redoing the Phase Three lease sales from the beginning in compliance with its obligations under FLPMA. The economic and other disruptive impacts fail to outweigh the seriousness of BLM's actions. Remand with vacatur remains the proper remedy.

### C. Plaintiffs' delay in challenging the Phase Three lease sales and lease development and production of a number of Phase Three leases

Lastly, Defendants argue that remand without vacatur remains proper due to Plaintiffs' delay in challenging the Phase Three lease sales. (Doc. 513 at 48; Doc. 523 at 22; Doc. 525.) Defendants assert that Plaintiffs' delay in challenging the Phase Three lease sales for years after their offering and acquisition caused a number of Phase Three leases to be developed and placed into production. (Doc. 512 at 38; Doc. 520 at 34, 38; Doc. 523 at 32-33, 48, and 52-53.) Wyoming also cites the presence of producing leases as further evidence to justify remand without vacatur due to the revenue and taxes that Wyoming receives from these producing leases. (Doc. 520 at 34, 38.)

Wyoming, Jonah Energy, and Continental argue that development and surface disturbance already have commenced on these producing leases that cannot be undone or unraveled to restore the status quo like the non-producing leases. (*Id.* at 38-39 (citing *Am. Great Lakes Ports Ass'n v. Shultz*, 962 F.3d 510, 519 (D.C.

30

Cir. 2020); *Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)); Doc. 523 at 32-33, 48, and 52-53).) Defendants contend that there exist a total of nine producing leases challenged in this action where drilling has occurred. (Doc. 538 at 35; Doc. 513-1.) For example, Intervenors Jonah Energy (3) and Continental (1) have a total of four producing leases challenged in Phase Three and the five other producing leases are held by other lessees who have not intervened in this action. (*Id.*) Jonah Energy estimates it has spent over $68 million to develop its producing leases since the Phase Three lease sales. (Doc. 523 at 49.) Continental contends that it has spent over $97.6 million on its nine producing wells located on the challenged Phase Three leases. (*Id.* at 33.) The other five non-party lessees who hold producing leases from a challenged Phase Three lease sale also likely would see significant economic and environmental impacts from vacatur. Plaintiffs agree that the producing leases warrant a tailored remedy due to the significant disruption vacatur would cause. (Doc. 538 at 35-36.)

The considerations of equity require that the Court not vacate the nine already producing leases stemming from the challenged Phase Three lease sales. The Court finds, however, that the minimal number of producing leases in comparison to the thousands of non-producing leases does not weigh in favor of the Court remanding without vacatur all the challenged Phase Three lease sales. The Court instead determines that a tailored remedy of remand without vacatur as

31

to the producing leases appears reasonable. The Court declines to address Jonah

Energy's alternative defenses of laches, waiver, and impermissible collateral attack

related to its producing leases (Doc. 525 at 35-47), as the Court's vacatur order will

exclude Jonah Energy's producing leases.

Vacatur of the producing leases would be particularly disruptive as

development, production, surface disturbance, and drilling have already occurred

that could not easily be undone by conducting renewed lease sales that follow the

Court's directives. "[V]acutur [under the APA] 'does nothing but re-establish the

status quo absent the unlawful agency action.'" *Nat'l TPS All. v. Noem*, 166 F.4th

739, 760 (9th Cir. 2026) (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir.

2022)). Vacatur as to the producing leases could not restore the leases to the pre-

leasing condition without further disruption. In other words, "[t]he egg has been

scrambled and there is no apparent way to restore the status quo ante." *Sugar Cane

Growers Coop. of Fa. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002).

The D.C. Circuit in *Sugar Cane* denied remanding with vacatur because

vacatur at that point could not undo the unlawful agency action as farmers already

had plowed under their crops. 289 F.3d at 97. Similarly, here, some of the

challenged Phase Three lease sales contain leases that are now in production and

where drilling has commenced thereby presenting limited ways to return to the

status quo before the unlawful Phase Three lease sales were held. Remand with

vacatur of the producing leases would be "economically disastrous" as the producing leases already have third-party obligations for natural resource delivery that would be thwarted with cancellation of the producing leases. (Doc. 525 at 50.) The same concerns do not exist for the non-producing leases. Vacatur of the actively producing leases challenged within the Phase Three lease sales would result in significant and burdensome disruption and unworkable alternatives to restore the land from the surface disturbance that already has occurred. Such disruption tips the second *Allied-Signal* prong in favor of denying vacatur as to only the producing leases.

In conclusion, the Court determines that, much like Phase One and Phase Two, the seriousness of BLM's errors in conducting the Phase Three lease sales without proper regard to the 2015 Plans' prioritization requirement outweighs the disruption that vacatur of the Phase Three lease sales will cause. The Court remands with vacatur the challenged Phase Three lease sales, excluding the nine already producing Phase Three leases held by Jonah Energy, Continental, and other non-intervening parties. The Court's vacatur order also excludes the Phase Three 2020 Wyoming lease sales, as no final agency action exists to vacate or remand. Plaintiffs agree that "[b]ecause those leases have never been issued, this Court does not need to decide whether to vacate them." (Doc. 538 at 64.) Federal Defendants will be required to return the bonus bids, lease filing fees, and first year rental

33

amounts to lessees and recoup the distributed funds from Montana and Wyoming

of which relate to the vacated Phase Three lease sales.

### III.    Whether Plaintiffs Possess Standing to Challenge Continental's Leases

Intervenor Defendant Continental argues that Plaintiffs lack Article III

standing to cancel Continental's leases because it must show standing for each

challenged agency action and remedy sought. (Doc. 525 at 16 (citing *Wash. Env't*

*Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).) Continental argues that

Plaintiffs cannot establish injury-in-fact, causation, or redressability "because the

surface of the [Continental's leases] is inaccessible by the public, and a favorable

outcome will not redress [Plaintiffs'] alleged injuries." (Doc. 525 at 16.)

Continental further argues that the Court may set aside only "final agency

actions," that is, BLM's leasing policies, but that the Court lacks authority to

cancel the individual Phase Three leases themselves. (*Id*. at 17.) The Court agrees

that this action revolves around BLM's decisions, not the individual leases. As the

Ninth Circuit stated, "the agency action challenged is the administration of the

lease sales overall, not the approval of the individual leases." *Mont. Wildlife Fed'n*,

127 F.4th at 36.

Plaintiffs do not seek vacatur of the individual leases to necessitate that

Plaintiffs must demonstrate standing for each individual Phase Three lease. (Doc.

525 at 18.) Plaintiffs instead claim that BLM's actions in conducting the Phase

34

Three lease sales, not the individual leases themselves, violated FLPMA and NEPA. (*Id.*) The Court recognizes, as did the Ninth Circuit, that the practical effect of the vacatur of the Phase Three lease sales requires BLM to cancel those individual leases that fall within the erroneous lease sales. (Doc. 538 at 68-69.); s*ee also Mont. Wildlife Fed'n*, 127 F.4th at 30. Plaintiffs argue that they are challenging the Phase Three lease sales as the final agency action. Plaintiffs argue, as a result, that the Ninth Circuit only requires that Plaintiffs "demonstrate that cancellation of any particular leases will remedy the harm" but need not show "harm tied to each parcel on which a lease was granted" to establish standing. (Doc. 538 at 71 (quoting *Mont. Wildlife Fed'n*, 127 F.4th at 35–36).) The Court agrees. Plaintiffs have demonstrated standing for its claims and each "distinct agency action" they challenge. *Ctr for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 309–10 (D.C. Cir. 2025) (requiring plaintiffs to establish standing for each individual application for permit to drill ("APD") they challenged as final agency actions). Plaintiffs collectively have challenged six specific Phase Three lease sales as final agency actions, but Plaintiffs have not challenged the issuance of the thousands of individual leases granted in Phase Three as a final agency actions.

Plaintiffs sufficiently have satisfied Article III standing as evidenced in the declarations submitted by Plaintiffs. (*See* Docs. 468-1 and 476-1.) Member

Plaintiffs attested that they have used and enjoyed the sage-grouse habitat that the challenged Phase Three lease sales would impact. (*Id*.) Plaintiffs have shown they have used each affected area at issue in the six "distinct agency action[s]." *Ctr for Biological Diversity*, 144 F.4th at 309–10. Member Plaintiffs further attested that the oil and gas drilling on those impacted habitats would cause harm that the Court could redress through vacatur by preserving the sage-grouse habitat. (*Id*.) Member Plaintiffs additionally have asserted an interest in the conservation of the habitat at issue in the Phase Three lease sales for observation and enjoyment of the sage-grouse. (Doc. 538 at 75. (citing *Lujan*, 594 U.S. at 566).) The cumulative effects of the flawed issuance of the Phase Three lease sales may harm sage-grouse and Plaintiffs as a result. The Court may address these injuries by vacatur of the Phase Three lease sales as it has done in Phase One and Phase Two. The declarations submitted by Plaintiffs establish Article III standing to challenge the Phase Three lease sales, and, in turn, the individual leases at issue here.

IV.   **Whether the Court Possesses the Authority to Cancel AEC's Leases**

AEC argues that the Court lacks authority to cancel its leases under Rule 19 because the Court lacks personal jurisdiction over AEC in Montana. (Doc. 525 at 54-55.) AEC argues that it cannot be joined to this action as venue remains improper and personal jurisdiction does not exist. (Doc. 525 at 57-58.) AEC argues that its challenged leases lie in Wyoming, and it has undertaken no actions or has

no contacts arising in Montana. (*Id.* at 58-59.) AEC contends that because AEC cannot be joined under Rule 19, that the Court cannot vacate its leases. (*Id.* at 59.) Plaintiffs respond that AEC has waived its defense to lack of personal jurisdiction. (Doc. 538 at 82-83.)

A short procedural review proves appropriate. AEC voluntarily sought intervention in this action and in Phase Three. (Docs. 154 and 281.) A Ninth Circuit panel previously found that AEC timely had moved for intervention, had a substantial interest in the outcome of the litigation, and that the Court had erred in denying AEC's motion to intervene under Rule 24(a). *See Mont. Wildlife Fed'n v. Haaland*, No. 20-35793, 2022 U.S. App. LEXIS 239, at \*4–5 (9th Cir. Jan. 5, 2022). The Ninth Circuit subsequently found that AEC had a legally protected interest at stake, but that AEC and WEA shared the same objectives in this litigation and that WEA adequately could represent AEC's interest in the litigation in the previous phases. *Mont. Wildlife Fed'n*, 127 F.4th at 48–50. The Ninth Circuit affirmatively rejected AEC's argument that it stood as "an indispensable party" under Rule 19 and that the Court had not erred in vacating the Phase One leases without AEC's intervention. (*Id.*)

The Court permissively allowed AEC to intervene under Rule 24(b) for Phase Three. (Doc. 305.) The Court determined that permissive intervention under Rule 24(b) proved appropriate. The Court also determined, however, that AEC did

37

not qualify as a required party under Fed. R. Civ. P. 19(a). (*Id*.) The Court, similar to the Ninth Circuit, reasoned that WEA adequately could represent AEC's interests in this litigation. (*Id*.)

AEC asserts that the Rule 19 inquiry requires the Court to address (1) whether AEC is a necessary party; (2) if so, whether AEC can properly be joined; and (3) if not, what remedies the court order can provide. (Doc. 525 at 56 (citing *EEOC v. Peabody W. Coal Co*., 400 F.3d 774, 779 (9th Cir. 2005).) As a threshold matter before the Court must decide any personal jurisdiction question, the Court already has determined that AEC does not constitute a necessary party under Rule 19. (Doc. 305 at 6.) The Court determined that WEA properly could represent AEC's interest as "a trade association representing the interests of its member companies on federal public lands." (*Id*.) AEC's renewed arguments as to Rule 19 do not persuade the Court. AEC failed to dispute that WEA adequately could represent its interest in this litigation and for maintaining the federal gas and oil leases at issue in Phase Three. AEC and WEA continue to share the same objectives in this lawsuit. (Doc. 305 at 7.) AEC's Rule 19 and personal jurisdiction argument fails there.

The Court also finds that AEC's actions in this litigation appear contrary to a party asserting that the Court lacks personal jurisdiction. The Court acknowledges that the Ninth Circuit in *SEC v. Ross* left open the door for a non-party intervenor

38

under Rule 24(a)(2) to raise objections to personal jurisdiction. 504 F.3d 1130, 1148–1151 (9th Cir. 2007). The Ninth Circuit determined that "[t]he intervenor has consented to something, but it is not personal jurisdiction." *Id.* at 1150. The Ninth Circuit's approach to the question of intervention and consent to personal jurisdiction remains in the minority of other circuits, district courts, and guidance from Wright and Miller. *See Cnty. Sec. Agency v. Ohio DOC*, 296 F.3d 477, 483 (6th Cir. 2002) (determining that "a motion to intervene is fundamentally incompatible with an objection to personal jurisdiction"); *City of Santa Clara v. Klepp*, 428 F.Supp.315, 317 (N.D. Cal. 1976) (holding that "by voluntarily intervening in this action under [Fed. R. Civ. P. 24] [the defendant] has submitted to the jurisdiction of this court"); Wright, Miller, & Kane, Federal Practice and Procedure, Civil 3D § 1920, at 612 (3d ed. 2001) (stating that "the intervenor submits himself to the personal jurisdiction of the court by seeking to intervene in the action and cannot move to dismiss on that ground").

*Ross* held that a party intervening as a matter of right under Rule 24(a) did not automatically consent to personal jurisdiction and foreclose the opportunity to raise objections to personal jurisdiction. *Ross*, 504 F.3d at 1149. *Ross* based its reasoning on the fact that the intervenor had "'objected to in personam jurisdiction as effectively as [he] could have' at every turn," *id.* (quoting *Teyseer Cement Co.* v.

Halla Maritime Corp., 749 F.2d 472, 478 (9th Cir. 1986)), and did so "promptly and unambiguously when he filed his answer." *Ross*, 504 F.3d at 1149.

The facts here differ significantly. *Ross's* holding appears to be limited to those intervenors who intervene as of right under Rule 24(a). Intervenors as of right have a particular interest in the action where disposition may impact the intervenors' interests. Fed. R. Civ. P. 24(a). Whereas Fed. R. Civ. P. 24(b) allows permissive intervention by a court if a common question or fact exists. The circumstances of Fed. R. Civ. P 24(b) do not involve Plaintiffs merely failing to name AEC as a defendant. The Court instead allowed AEC to join due to the common defenses it shared with other Intervenor Defendants in this action.

AEC took further affirmative action to consent to the Court's jurisdiction. AEC failed to include a personal jurisdiction defense in its answer. (Doc. 281-2 at 33-35.) AEC failed to object to personal jurisdiction at every turn in this litigation. *Ross*, 504 F.3d at 1149. AEC instead sought intervention in 2020, appealed the Court's denial to intervene to the Ninth Circuit, and actively participated in this litigation once the Court allowed intervention. (*See* Doc. 305.) The Court's Phase One and Phase Two decision impacted AEC's leasehold interests. At no time did AEC assert or raise its objection to personal jurisdiction until Phase Three briefing, nearly six years after seeking to intervene in the action. (Doc. 525 at 55.) The Court declines to remove AEC's specific leases from vacatur as requested.

40

### V.        Rockies Resource's Motion to Rescind Leases and Require Refund

Intervenor Defendant Rockies Resources requests that the Court (1) rescind 31 leases it purchased during the Phase Three lease sales (February and September 2019), and (2) require BLM to grant a full refund of bonus bids, administrative fees, rentals, and permitting fees that Rockies Resources paid to acquire the 31 leases. (Doc. 518 at 2.) In the alternative, Rockies Resources would seek vacatur as a remedy (including refunds) if the Court rules in Plaintiffs favor that the Phase Three leases were unlawful. (*Id.*)

Rockies Resources purchased leases at BLM's February (29) and September (2) 2019 lease sales. (Doc. 518 at 2; Doc. 518 -1 at 4.) Rockies Resources contends that it has invested over $7 million in the 31 leases but has been deprived of the benefits of the leases due to the ongoing litigation. (Doc. 518-1 at 4.) Rockies Resources previously requested that BLM return the challenged leases for a full refund. (Doc. 518-1 at 7.) BLM declined to provide Rockies Resources with a refund. (*Id.*) Rockies Resources asserts that the uncertainty of the leases will remain until resolution of this case, which may take years and appellate procedure. (*Id.* at 10.) Rockies Resources seeks a recission to get its full refund and invest its money elsewhere, rather than remain stalled for years in litigation. (*Id.* at 11-12.) Rockies Resources cites to 5 U.S.C. § 705 to support its position: "to the extent necessary to prevent irreparable injury" a court may "issue all necessary and

appropriate process . . . to preserve status or rights pending conclusions of the review proceedings."

Federal Defendants argue that Rockies Resources requested relief of recission proves inappropriate because Rockies Resources has provided no legal basis for the relief under the Mineral Leasing Act and has not brought a claim against Federal Defendants to warrant any relief. (Doc. 535 at 2.) Intervenor Defendants similarly oppose Rockies Resources's motion to rescind their leases and order a refund. (Doc. 532 at 2; Doc. 534; Doc. 533 at 3, 4.) The Court agrees that recission would be improper. The Mineral Leasing Act and related regulations allow federal oil and gas leases to terminate in the following three ways: (a) voluntary relinquishment (30 U.S.C. § 187b; 43 C.F.R. § 3108.10); (b) automatic termination (43 C.F.R. § 3108.21), and (c) cancellation (43 C.F.R. § 3108.30). A court's only mechanism to "set aside" an agency action remains to hold that action as "unlawful." 5 U.S.C. § 706.

Section 705 of the APA allows the Court to grant only temporary relief pending a final decision, but the APA does not allow for the permanent remedy of recission that Rockies Resources requests. The Court cannot treat Rockies Resources's Phase Three leases differently from the others. Other Intervenor Defendants similarly poured in millions of dollars investing in these Phase Three leases and have suffered harm. Rockies Resources also certainly had some

knowledge of the uncertainty and delays that may be associated with its acquisition of the challenged Phase Three leases. Rockies Resources chose to enter the binding lease contract and accept those risks and delays. The Court declines to rescind Rockies Resources's leases and order a full refund from BLM. The Court notes that its decision to remand with vacatur the Phase Three leases that are non-producing will have the practical effect of recission and refund for Rockies Resources after having properly analyzed the merits of BLM's actions in conducting the Phase Three lease sales.

## ORDER

Accordingly, **IT IS ORDERED** as follows:

- Plaintiffs' Motion for Summary Judgment (Doc. 468) is **GRANTED**, in part, and **DENIED**, in part.
    - o The Court grants Plaintiffs' claims that the 2018 IM and 2019 Wyoming and Montana/Dakota lease sales violated FLPMA.
    - o The Court remands with vacatur the Phase Three lease sales that violate FLPMA, excluding the nine producing leases and the 2020 Wyoming lease sales.
    - o The Court denies without prejudice as moot Plaintiffs' claims that the 2018 IM and lease sales violated NEPA.

- Vacatur of the Phase Three lease sales, excluding the nine producing leases and the 2020 Wyoming lease sales, will be stayed and operations related to those leases will be suspended pending any appeals arising from this order.

- Federal Defendants' Motion for Summary Judgment (Doc. 512) is **GRANTED**, in part, and **DENIED**, in part.
    - o The Court dismisses Plaintiffs' claims on the 2020 Wyoming lease sales for lack of final agency action.

43

- o The Court denies Defendants claims that the Court represents the improper venue for Plaintiffs' claims and that Plaintiffs' lack standing to bring their claims against the 2020 Wyoming lease sales.

- Defendant- Intervenor Rockies Resources Holdings LLC's Motion for Order Rescinding 31 Leases and Requiring Refund (Doc. 518) is **DENIED**.

- Defendant-Intervenor Western Energy Alliance's Cross Motion for Summary Judgment (Doc. 522) is **DENIED**.

- Defendant-Intervenor Continental's, AEC's, Jonah Energy's, and PPRA and R&R Royalty's Cross-Motions for Summary Judgment (Doc. 524) are **DENIED** and/or **DENIED** as moot.

DATED this 12th day of June, 2026.


_____
Brian Morris, Chief District Judge
United States District Court